ORIGINAL 530 PJH

FILED

1 | __PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY__

2 | Name  SIERRA        ALIPIO        NMI

JUL 2 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

    (Last)        (First)        (Initial)

3 | Prisoner Number  H-32811

4 |

5 | Institutional Address  CTF II(C), C-230L, P.O. BOX 689, SOLEDAD, CA
             93960-0689.

6 |

7 | ### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

(PR)

8 | ALIPIO SIERRA
(Enter the full name of plaintiff in this action.)

CV 08 3564 PJH

9 |

10 |         vs.        )     Case No. _____
                  )    (To be provided by the clerk of court)

11 | B. CURRY, WARDEN, B.P.H. COMMISSIONERS,   )   **PETITION FOR A WRIT**

ET AL.               )   **OF HABEAS CORPUS**

12 |

13 |

14 | (Enter the full name of respondent(s) or jailor in this action)

15 |

16 | ### Read Comments Carefully Before Filling In

17 | __When and Where to File__

18 |      You should file in the Northern District if you were convicted and sentenced in one of these

19 | counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 | San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 | this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 | good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23 |      If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 | one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 | District Court for the district in which the state court that convicted and sentenced you is located. If

26 | you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 | your petition will likely be transferred to the district court for the district that includes the institution

28 | where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS     - 1 -

1  <u>Who to Name as Respondent</u>

2       You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6       If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11      1.  What sentence are you challenging in this petition?

12  The refusal of the Board of Parole Hearings To Find For
   Parole.   (a)  Name and location of court that imposed sentence (for example; Alameda

13         County Superior Court, Oakland):

14         SUPERIOR COURT OF CALIFORNIA, LOS ANGELES COUNTY.

15         Court                         Location

16      (b)   Case number, if known  PA-006487.

17      (c)   Date and terms of sentence 4/20/1992, 15 YEARS TO LIFE +
   1 YEAR  FOR  KNIFE USE ALLEGATION.

18      (d)   Are you now in custody serving this term?  (Custody means being in jail, on

19         parole or probation, etc.)       Yes _x___   No _____

20         Where? CORRECTIONAL TRAINING FACILITY CTF II(C),
              P.O. BOX 689, SOLEDAD, CA 93960-0689.

21         Name of Institution: CTFII(C).

22         Address: P.O. BOX 689, SOLEDAD, CA 93960-0689.

23      2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Second Degree Murder; w/ knife Use Allegation.

27  Cal. P.C. §§ 187; 12022(b).

28

PET. FOR WRIT OF HAB. CORPUS      - 2 -

3. Did you have any of the following?

    Arraignment:               Yes __x__    No _____

    Preliminary Hearing:      Yes __X__    No _____

    Motion to Suppress:      Yes __?__    No _____

4. How did you plead?

    Guilty _____    Not Guilty __x__    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury __X__    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?    Yes _____    No _____

7. Did you have an attorney at the following proceedings:

    (a)  Arraignment        Yes __X__    No _____

    (b)  Preliminary hearing    Yes __X__    No _____

    (c)  Time of plea        Yes __x__    No _____

    (d)  Trial            Yes __X__    No _____

    (e)  Sentencing        Yes __x__    No _____

    (f)  Appeal          Yes __x__    No _____

    (g)  Other post-conviction proceeding  Yes _____    No __x__

8. Did you appeal your conviction?    Yes __?__    No _____

    (a)  If you did, to what court(s) did you appeal?

    Court of Appeal       Yes __?__    No _____

    Year: _____    Result:_____

    Supreme Court of California    Yes _____    No _____

    Year: _____    Result:_____

    Any other court        Yes _____    No _____

    Year: _____    Result:_____

    (b)  If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS    - 3 -

1            petition?                   Yes _____     No__x__

2       (c)     Was there an opinion?           Yes __?__    No_____

3       (d)     Did you seek permission to file a late appeal under Rule 31(a)?

4                                         Yes __?__    No_____

5            If you did, give the name of the court and the result:

6            _____

7            _____

8   9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?        Yes __x__    No_____

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16       (a)     If you sought relief in any proceeding other than an appeal, answer the following

17             questions for each proceeding. Attach extra paper if you need more space.

18          I.      Name of Court: ~~Petitioner has sought relief on habeas~~
     corpus against the Board of Parole Hearings in all the courts of

19     California.     Type of Proceeding: ~~Habeas Corpus petitions.~~

20            Grounds raised (Be brief but specific):

21                  a. ~~Identical to the Grounds presented in this~~

22                  ~~Petition.~~
                 b._____

23                  c._____

24                  d._____

25            Result: _____ Date of Result See Add. I

26          II.     Name of Court: _____

27            Type of Proceeding: _____

28            Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS       - 4 -

1            a._____ _____

2            b._____ _____

3            c._____ _____

4            d._____ _____

5            Result: _____Date of Result:_____

6      III.    Name of Court: _____ _____

7            Type of Proceeding: _____

8            Grounds raised (Be brief but specific):

9            a._____ _____

10          b._____ _____

11          c._____ _____

12          d._____ _____

13          Result: _____Date of Result:_____

14     IV.    Name of Court: _____

15          Type of Proceeding: _____

16          Grounds raised (Be brief but specific):

17          a._____ _____

18          b._____ _____

19          c._____ _____

20          d._____ _____

21          Result: _____Date of Result:_____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                          Yes _____     No_x___

24        Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26       State briefly every reason that you believe you are being confined unlawfully.  Give facts to

27  support each claim.  For example, what legal right or privilege were you denied?  What happened?

28  Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS     - 5 -

1  need more space. Answer the same questions for each claim.

2  [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One: USE OF THE "SOME EVIDENCE" TEST PRINCIPLE BY THE

6  B.P.H. AT HEARINGS, AND COURTS ON DE NOVO REVIEW IS A VIOLATION

7  OF CLEARLY ESTABLISHES U.S. SUPREME COURT CASE LAW & STATS.
   Supporting Facts:
   THE CALIFORNIA BOARD OF PAROLE HEARINGS USES THE "SOME EVIDENCE"

8  TEST PRINCIPLE TO DECIDE PAROLE SUITABILITY AND COURTS USE IT

9  ON DE NOVO REVIEW ILLEGALLY BECAUSE THE CONSTITUTIONALLY MANDA-

10 TED STANDARD OF PROOF WHEN THERE IS CREATED A PROTECTED LIBERTY

11 INTEREST AT BOARD AND COURTS IS "PREPONDERANCE OF EVIDENCE".
   (PLEASE, ADDENDUM I, @ P. 6(a) FOR ALL CLAIMS.)

12 Claim Two: EVEN THE COURTS HAVE REVEALED THEY HOLD THE B.P.H. EITHER
   TOTALLY INCOMPETENT AND INEPT, OR CRIMINALLY CORRUPT.

13 Supporting Facts: (PLEASE SEE THE ORDER OF SANTA CLARA COUNTY SUPERIOR CT.

14 JUDGE, HON. LINDA CONDRON, IN CLAIM TWO, ON P. 6(c), of ADDENDUM I.)

15 

16 

17 Claim Three: REGARDLESS OF THE STANDARD OF PROOF, PETITION IS ELIGIBLE

18 FOR RELEASE ON PAROLE; BUT THE B.P.H. REFUSES TO FIND HIM EVEN
   SUITABLE FOR PAROLE.(PLEASE SEE GROUND 'CLAIM' THREE ON P.6(a.)

19 Supporting Facts: THE BOARD OF PAROLE HEARINGS IS IN A CONSPIRACY

20 WITH THE GOVERNORS AND THE EXECUTIVE BRANCH NOT TO PAROLE AS

21 MANY LIFE-TOP PRISONERS IN C.D.C.R. AS POSSIBLE, EXCEPT FOR

22 THE "FIG-LEAF" FEW REQUIRED TO AVOID CORRUPTION CHARGES. 99.5% OF
   LIFE-TOP TERM ARE CONVERTED TO LIFE WITHOUT PAROLE POSSIBILITY.

23 If any of these grounds was not previously presented to any other court, state briefly which

24 grounds were not presented and why:

25 

26 

27 

28 

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    Trantino v. New Jersey State Parole Board, 764 A.2d, 943, 976

5    (2001); on "Substantial Evidence". Davis v. Board of Parole &

6    Post-Prison Supervision, 200 Or. App. 366, 371-373, 114 P.3d
     1138 (2005); on Clear and Convincing Evidence for liberty.

7    Do you have an attorney for this petition?          Yes____   No_x_

8    If you do, give the name and address of your attorney:

9    Petitioner is helped by, Joseph P. Gutierrez, Layman Assistant,
     Pro Bono, D-02765, z-1381, CTF II (C), P.O. Box 689, Soledad,

10   WHEREFORE, petitioner prays that the Court grant petitioner relief to which she may be entitled in
    CA. 93960-0689.

11   this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on ~~May~~ *June 16* , 2008

14              Date                         Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

   PET. FOR WRIT OF HAB. CORPUS       - 7 -

ADDENDUM   I

ADDENDUM   I

ADDENDUM   I

Supporting Facts (Cont.):

A.      The California Board of Parole Hearings uses the "Some

Evidence" Test Principle, (a modicum of proof: <u>any</u> evidence) in

its parole suitability hearings in the California  Depsrtment of

of Corrections and Rehabilitation, for DSL (Determinate Sentence

Law) life top candidates, . "Some Evidence" is described in case

law as a modicum of proof, but then the Superior Court[s] often

opine that "with the great deference due the B.P.H. in parole mat-

ters... the Court will deny the Petition because it finds there is

'some evidence' in the record to deny parole...". By so doing,

Petitioner asserts the courts who do this are surrendering their

constitutional power on <u>de novo</u> review to the B.P.H.; and are

thereby misinterpreting and violating clearly established United

States Supreme Court precedent setting case law and statutes. The

reviewing courts in this case, and thousands of others in Califor-

nia, have abandoned the Preponderance of Evidence series of proof

standards historically, and constitutionally mandated  series of

proof levels equivalent to preponderance of evidence, such as the

Independent Judgment, and Substantial Evidence standards, in decid-

ing habeas corpus petitions against the Commissioners of the B.P.H.

B.      In fact, the <u>constitutionally mandated</u> standard of proof

has <u>ALWAYS</u> been Preponderance of Evidence on habeas corpus <u>de novo</u>

review in all the states of the Union and in the Federal Courts,

except where the issues presented are dealing with matters of more

importence^than "merely money"; <u>Santovsky v. Kramer</u>, (1982) 955 U.S.

745, 767-769, 102 S.Ct. 1388; <u>Addington v. Texas</u>, 441 U.S. @ 424,

99 S.Ct. @ 1868; <u>Goldberg v. Kelly</u>, 317 U.S. 259, 262-263, 90 S.Ct.

1011, 1017-1018, 25  L.Ed.2d 287 (1970); <u>Joint Anti-Fascist Refugee</u>

6(a)

1  Committee v. McGrath, 341 U.S. 125, 168, 71 S. Ct. 626, 646 L.Ed.

2  817 (1951); [Frankfurter Concurring]; Davis v. Board of Parole

3  and Post-Prison Supervision, 200 Or.App. 366, 371-373, 114 P.3d.

4  1138 (2005); [On Clear and Convincing Evidence for Parole consi-

5  deration].; Trantino v. New Jersey State Parole Board, 764 A.2d.

6  943, 976 (2001); "Substantial Evidence mandated for parole consi-

7  deration..." ; and Hamdi v. Rumsfeld, 124 U.S. 2633, 2650-2551

8  (2004); [Some Evidence on Habeas Corpus review is "Inadequate"];

9  (Assoc. Justice Hon. Sandra Day O'Connor, writing the Majority

10  Opinion); and Rule 5 of Rules Governing Habeas Corpus Petitions

11  pursuant to 28 U.S.C. §§ 2254-55."For matters dealing with such

12  critical issues as liberty and freedom, the standard of evidence

13  must be "clear and convincing". In all the laws and statutes Pe-

14  titioner's Layman Assistant has read over 27 years of Writ writ-

15  ing in cases dealing with state & federal Board of Parole Hearings

16  except for the State of California's B.P.H., since 1988; (see,

17  In re Powell, (1988) 45 Cal.3d.394,, 248 Cal.Rptr. 431 (Cal.Sup-

18  reme Court); "....because prisoners have no vested liberty inter-

19  est..." "some evidence is appropriate..."; the standard of proof

20  has always been "Preponderance of Evidence" or BETTER, on habeas

21  corpus or Civil Rights Complaints Lawsuits pursuant to State TORT

22  Law and Section 1983 Suits in Federal Courts.  Only now, in this

23  aberration of the habeas corpus rules, has this "Some Evidence"

24  test principle, first mentioned by the Cal. Supreme Court in Pow-

25  ell, supra, come into use.(See, Superintendant v. Hill, 472 U.S.

26  455 (1985)); where Some Evidence was used for a disciplinary hear-

27  ing because Massachusetts had no standards for prisoners!  Cali-

28  fornia DID/DOES! But due to the Executive and Legislative

6(b)

Branches' reactions to Public Outcry when the former Death Row
inmate was given a parole suitability grant by the then, B.P.T.
Shortly thereafter, the film entitled, 'The Onion Field' aired,
generating the aforementioned public outcry. Predictably, the
Respondents used this ruling against a truly heinous murderer
and applied it willy-nilly against all present and future Lifers,
no matter what the factors of their own specific crimes are.

1. Contemporaneously, however, the continued use of the "some
evidence" test principle is untenable. When Powell, @ 436-437,
was ruled and decided upon by the California Supreme Court, it
cited, Hill , Supra, 472 US 455 (1985); stating, "Some Evidence"
trumps "independent judgment standard" in "administrative" ins-
titutional hearings because, "That standard applies only when an admin-
istrative decision affects a vested right."( See, eg.; Bixby v. Pierno,
(1971) 4 Cal. 3d. 130, 144-. 46, 93 Cal. Rptr. 234, 481 P.2d. 242)
A prison inmate has no vested right in his prospective liberty on a parole
release date. (Fain I., Supra, 65 Cal. App. 3d. at p. 390. 135 Cal.
Rptr. 543: See, in re McClain, Supra, 55 Cal. 2d. 78, 87, 9 Cal.
Rptr. 824, 357 P.2d. 1080)." But those statements are untrue now,
in lieu of the Courts' findings in the cases of In re Dannenberg,
(2005) 29 Cal. 4th. 616 and 621; In re Ramirez , 94 Cal. App. 4th.
549 @ p. 564 fn. 5; In re Ernest Smith, at p. 683; Biggs v. Terhune
334 F.3d. 910 (9th. Cir. 2006); Sass v. California Board of Parole Terms. 461
F.3d. 1123 (9th. Cir. 2006) Trantino v. New Jersey  State Parole Board
764 A.2d. 940 (2001); and Hamdi v. Rumsfeld , 124 US 2633 and 2650-
2651; plus, McQuillon v. Duncan, 306 F.3d. @ 902.) inter alia.

2. As a matter of fact, the Board of Parole Hearings was it-
self very happy to adopt this Holding by the Supreme Court for its

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 1 (Cont.):

1   parole suitability hearings, even though its own self-promulga-
2   ted Rules and Guidelines instruct it otherwise; (See, Title 15,
3   Division Two § 2000 (b)(50)); "Good Cause decisions by the Board
4   are to be decided by the "preponderance of the Evidence"(51%). No-
5   where in Title 15, or the laws and statutes of the State of Cal-
6   ifornia is the "Some Evidence" test principle [1%], acknowledged
7   or ordered to be the standard of denial or the grant of parole;
8   except in case law SINCE the Powell, supra, holding. Therefore,
9   it is obvious the parties are simply obeying the 'interpretation'
10  by the High Court in Superintendant v. Hill, supra, in Hearings
11  and on de novo review.
12      3.   As has so often happened in the past, the courts have
13  taken a Supreme Court Ruling on some truly heinous or egrigious
14  or multi-victim cases such as Powell, supra, and made it the law for
15  all other vaguely similar examples which come before them. This
16  particular infirmity has made it all but impossible for any Life
17  -Top inmate seeking parole eligibility in California to be found
18  suitable; except for the fig-leaf few who 'win' the B.P.H.
19  lottery. . But we do now have, and have always had, a Protected
20  liberty interest on parole! (See, citations on p. 6(c), inter
21  alia. The issue is, of course, as it should be, whether ten or
22  twenty thousand sentences of 'simple' life, 7, 15, 25-to-life,
23  "determinate" terms prescribed by the Legislature (Penal Code §
24  1168,) and accordingly imposed by the State's courts, can be con-
25  verted to Life without possibility of parole by B.P.H. Panels
26  and the Governors' staffs who appoint them-using "Some Evidence"?
27      4.  The paramount question before this Court then is, why did
28  the High Court adopt the "some evidence" Test. and later passed

6(d)

1  the Holding down to all other lifers no matter the facts of their

2  specific case[s]? Often, the target case, in this case <u>Powell,</u>

3  <u>Supra</u>, is so truly heinous and egrigious, that no one cared that

4  a contract was being violated through the use of manipulative

5  legal language and case law. Predictably, the neglect to insist

6  on strict adherence to the constitution and laws already on the

7  books have come  rumbling downhill  in an out of control ava-

8  lanche of confusing  convoluted 'new' rules and laws. in viola-

9  tion of <u>Stare Decisis</u>, i.e.; Once a law has been created it be-

10  comes a law Americans can count on...." Not the case here...!

11      Petitioner knows of no other state whose parole statutes

12  provide a protected liberty interest in parole, or any defined

13  liberty interest extinguishable by the mere presence of any evid-

14  ence whatsoever. In fact, the opposite is true. Why, even in the

15  case of an alleged Enemy Combatant, the U.S. Supreme Court, Just-

16  ice, Hon. Sandra Day O'Connor, wrote in the case of <u>Hamdi v. Rums-</u>

17  <u>feld</u>, <u>supra</u>, on page 2351, that; ¶"Because we conclude that due

18  process demands some system for a citizen detainee to refute his

19  classification, the proposed "some evidence" standard is inade-

20  quate. Any process in which the Executive's factual assertions

21  go wholly unchallenged or are simply presumed correct without

22  any opportunity for the alleged combatant to demonstrate other-

23  wise falls constitutionally short. As the Government itself has

24  recognized, we have utilized the "some evidence" standard in the

25  past as a standard of review, not as a standard of proof..."

26  <u>See</u>, <u>e.g., St. Cyr</u>, 533 U.S. at 301, S.Ct. 2271. ("At its historical

27  core, the writ of habeas corpus has served as a means of reviewing the legali-

28  ty of Executive detention, and its in that context that its protections have

6(e)

1  "been the greatest..."); quoted in Hamdi, supra, on p. 2650.

2  Petitioner hereby petitions the Court for a Petition of Habeas

3  Corpus to revisit the Holding in the case of In re Powell, to

4  remedy his unlawful and unconstitutional confinement resulting

5  from the refusal of the Board of Parole Hearings to make a find-

6  ing of parole suitability and afford Petitioner a parole release

7  date. The instrument of its no-parole-policy being the aforemen-

8  tioned, "some evidence" test principle which effectively torpe-

9  does all but less than 1% of all eligible life top prisoners "from

10  ever seeing the light of day on parole..." (quote made by Mr.

11  James Tilton, Ex-director of California Department of Correc-

12  tions & Rehabilitation to the victims rights group members gath-

13  ered at Correctional Training Facility (CTF II) on September 25,

14  2007, during the protest against granting of a Parole Release

15  Date to Inmate Kerry Conley, at this location.) Mr. Tilton, ad-

16  dressed the crowd and this speech was aired on KION TV, Channel

17  46. In that speech, the Director of the C.D.C.R. told the vic-

18  tims rights representatives that prisoners only have a due pro-

19  cess right to have a hearing; not parole [i.e. no Protected Lib-

20  erty Interest], and that "Of the 4000... hearings we'll hold

21  this year less than 1% of these men will ever see the light of

22  of day..." This is a Governor Wilson, Gov. Davis-like declara-

23  tion that all lifer hearings are pro forma and sub rosa, Tilton

24  reaffirmed the truth we all recognize as overt Executive Branch

25  policy. The goal is the same; NO Paroles; the tool is the "some

26  evidence" test principle declared law in Powell. But the real

27  travesty is that the State's Courts have allowed these political

28  machinations to contaminate the Constitutions and laws....

6.(6)

C.    "A State Court determination is 'contrary to' clearly
established Supreme Court precedent, if the state court 'applies
a rule that contradicts the governing law set forth in [Supreme
Court] cases' or if the state court confronts a set of facts
that are materially indistinguishable from a decision of the
[Supreme Court] and nevertheless arrives at a result different
from [Supreme Court] precedent.'" Tracey v. Palmeteer; (quoting
Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146
L. Ed.2d 389 (2000)), See Tracey v. Palmeteer, supra, at 341
F.3d. 1037, 1042 (9th. Cir. 2003); [2, 3]; "A state court decision
is an unreasonable application of Supreme Court precedent if
the State court correctly identifies the governing legal prin-
ciple but applies it unreasonably to the facts of the case."
Id. at 407-08, 120 S. Ct. 1495.

(1).    That is exactly what has taken place in California, because
the Board of Parole Hearings considers itself a quasi-legislative
Body that can write its own pseudo-law, ignoring the legal
mandate, ante; and it also considers itself a quasi-judicial
Body; and claims for itself almost absolute immunity from
prosecution. Of course, this state of affairs should not be
surprising to anyone. History has clearly demonstrated again
and again, and AGAIN, that police agencies must be watched vigi-
lantly and judiciously, or they will always go over the top
in the conduct of their duties as they see it. The Court knows
Petitioner speaks the truth. If necessary, example after example
can be presented to the Court and will be if required. Suffice
it to say, that the Cabal of Commissioners are such a group,
and that their acts and omissions are typical of police agencies;

6 (g)

1  who have been allowed to grow and operate independent of strict,
2  on-going supervision by the Legislature, the Courts, and the
3  Governors. The Courts of the State have been particularly contri-
4  butory to this sad state of affairs, because they grant the
5  B.P.H. Commissio-ners high status such as "great deference"
6  in their sanctioning of the BOARD. The Boards then do assume
7  they have 'special powers', 'outside' the normal perview of
8  the laws. In fact, in a very recent case which appli-es to the
9  B.P.H., specifically, the United States Court of Appeals for
10 the Ninth Circuit in the case of Irons v. Warden, CSP Solano,
11 et al., 358 f. Supp. 2d. 936(E.D. Cal. 2005);had to reexamine
12 a situation, where the U.S. District Court gave too much leeway
13 to the decisions of the BOARD, no matter how illogical and nonsen-
14 sical: "(1) H.C. Key 452: ¶ California Supreme Court's silent
15 denial of claim of State prisoner, that there was not sufficient
16 evidence to find him unsuitable for parole, was an unreasonable
17 application of clearly established Supreme Court due process
18 authority;"
19 (2) 'Subsequent parole suitability hearings did not render moot
20 state prisoners's federal habeas corpus petition."[The Superior
21 Court tried to kill the Petition, on this Ground, rather than
22 find remotely in the Petitioner's favor] "(3)  Due Process did
23 not require the Board of Prison Terms to state parole release
24 date where some evidence existed to demonstrate that prisoners
25 should not be paroled; (4)  B.P.T. did not violate prisoner's
26 Equal Protection rights. Petition Granted in Part."
27      The arguments in this particular case went on for about
28 three (3) years before Irons was finally allowed to go home!

-6(h)

1  But go home he did! So did Rosenkrantz; which the Superior Court

2  uses in its Orders to Deny Petitioners. Also, in the case of

3  Sass v. California Board of Prison Terms; et al; The Court of

4  Appeals For the United States Ninth Circuit; stated unequivocally

5  that Sass; (and all indeterminately sentenced prisoners in

6  California; and in fact, in all the States under the perview

7  of the Ninth Circuit U.S. Court of Appeals); "The California Court

8  did not hold that section 3041(b) does not use mandatory language. Dannenberg

9  argued that 'he was denied federal due process rights arising from his protect-

10 ed interest, and expectation, in a 'uniform' parole release date.' Id. at 1098

11 n. 18. The Court explained that 'he has such a liberty interest and expectation

12 only  to the extent that state law provides it,' but did not hold that state

13 law does not provide such a liberty interest. Id. instead, the Court proceeded

14 to the second step of the due process analysis whether the procedures attend-

15 ant upon a deprivation were constitutionally sufficient."Id. (Emph. Added.)

16 ..."The Court would not reach this step if it had held that there was no liberty interest."

17 See, Ky. Dept. of Corr., 490- U.S. at 460. Dannenberg does not explicitly or

18 implicitly hold that there is no constitutionally protected liberty interest."

19 Sass, supra, 2006 DJDAR 11931. In case after case, the State and Federal

20 courts are holding that indeterminate law sentenced prisoners do

21 have a protected liberty interest in parole. In case after case,

22 Respondents are scolded and schooled, and ordered to comply

23 with the laws of State and Nation: But the Cabal of Commissioners

24 have established this little mini-government inside the Executive

25 Branch in California. There, because they have the respect and

26 deference due public servants of long standing; and because

27 heretofore, no one was championing prisoners' causes in this State

28 and throughout the Nation; it was a simple matter 'to set up'

6(i)

1  this hidden, secretive, state inside the State Government; com-
2  plete with legislative power to promulgate its own law, notwith-
3  standing the supposed supervision by the Office of Administrative
4  Law (OAL); which more often than not, in past years, was not
5  even consulted before new Title 15 Division Two Rules were con-
6  jured by the lawyers at B.P.H. (See, Exh. B., Transcripts of
7  the B.P.H. passing a measure whereby they would stipulate amongst
8  themselves that no life term prisoner would ever be transferred
9  to his home country until he was first found suitable for parole).
10  The Chairman stated this pseudo law would not mention that little
11  fact in the new rule/law, because the BOARD is not authorized
12  to take such an action. This Rule/law was certainly put into
13  effect, legal or not; without the knowledge of the Legislature
14  or interpretation by any Judicial Body in this State. The OAL
15  has proved itself part and parcel to the illegalities perpetrated
16  by the B.P.H., because even in the rules they have reviewed, the
17  improprieties and unconstitutional rules are still there! Put into
18  print anyway; condemning thousands of Indeterminate sentenced
19  prisoners to languish ten, fifteen or twenty more years in prison
20  after they honorably served their legal imposed sentence  by
21  a Judicial Court of this Sovereign  State. The activities of
22  these Commissioner/Cops are akin to the heinous actions of such
23  infamous pseudo 'police' groups such as the GESTAPO. During the
24  1930s in Hitler's Germany, the NAZIs (Nationalsozialistischen
25  Partei), decided the Weimar Courts were way too democratic and
26  liberal. Therefore, all courts in the Weimar Republic were out-
27  lawed. 'New' courts were created and named, "Volksgerichtshof",
28  and "Reichsgerichthofs"; etc. Then, all Weimar Judges, prosecutors

6(j)

1  'soft' lawyers, were sent off on a one way trip to the Koncentra-

2  tions Lagers, and 'new' Judges, Prosecutors, and 'proper' Coun-

3  selors were emplaced, insuring 100% conviction rates during

4  the rest of the existence of the Dritte Reich. If by chance

5  a lucky defendant was acquitted, found not guilty, or somehow,

6  walked out of one of these courts a free man; he was promptly

7  met by GESTAPO officers,loaded into one of their Mercedes

8  sedans, and was whisked away to a Vernichttungslager, (Death

9  Camp), anyway. All these 'officials' were SS (Schutz Staffel &
   NAZI Party members.) ('Rise and Fall Of The Third Reich'; W.Shirer.)

10      No. Things have not reached that level of murderous, vin-

11  dictive persecution in America, so far; unless one counts the

12  Due Processless Denizens of the Concentration Camp at Guantanamo

13  Bay, Cuba. But here we have a group of mostly law enforcement

14  career officers taking the law into their own hands. People

15  are dying in California's prisons from old age, and geriactric

16  diseases, who have long been 'rehabilitated', and more import-

17  tantly, have served much more than the time a truly legal

18  Superior Court Judge sentenced them to after a trial by jury,

19  judge, or Plea Agreement: A bona fide Judicial Court of the

20  State of California, who shouldn't take kindly to having

21  their well thought out sentences and interpretations of the

22  laws thrown out of the window with the Laws, Statutes, Penal

23  Codes, Government Codes, and Constitutions, flying out a close

24  second along with the Rules of Court of the State of California.

25  Well, that is exactly what has come to pass in this State.

26  What good is it to talk about suitability, parole plans, self-

27  help programs, age of the prisoner, etc; when we've got a Cabal

28  of Commissioners insuring they get 100% 'reconviction' rates?

6.(k)

1  Of course, like in those NAZI courts of 70 years ago, every

2  once in a while: about 1% of the time, one slips out. A prisoner

3  nicknamed 'Cadillac Bob', out of this institution, was one

4  such lucky soul. Of course, 'Cadillac Bob' suffered from gout,

5  rheumatoid arthritis, sugar diabetes, heart disease, and going

6  blind: had been 'down' since the 80s. Once the Courts all but

7  dragged him out of this place, 'Cadillac Bob', had to immediately

8  check himself into San Bernadino Hospital for treatment of his

9  fatal illnesses. When, former Chairperson of the Board of Parole

10  Hearings, Ms. Susan Fisher, found out he had been rescued, she

11  immediately convened an emergency session of the B.P.H. En

12  Banc, in Sacramento, and ordered him 'picked up' and brought

13  back into custody. ' Cadillac Bob', disappeared from the San

14  Bernadino Hospital without a trace, and has not been heard

15  of since. His real name is Harold Jones, and he has disappeared.

16  The California Newsletter, headed his article "Does Anyone Know

17  The Whereabouts of 'Cadillac Bob'"?

18      This writer served 15 years active duty as a Paratroop

19  Unit Commander, in three combat zones, including two tours

20  in Vietnam with the 101st Abn. Div. (Air Mobile) [67-69]; and was

21  honored to do so. After his experiences in the CDCR the past 23

22  years; and told to expect much more time at his last BOARD; he

23  wonders, if he would have volunteered for such duty as a commis-

24  sioned officer, knowing what he knows about this country now?

25  This writer is convicted for 211/209(b), where no victim was

26  physically harmed.

27      That is what the Petitioner in this habeas corpus action

28  is fighting: the make-up, and yes, the existence of this Rogue

6(1)

1  gang of former law enforcement personnel, who have been given a
2  green light to flout the rightful laws of State and Nation and
3  have made a mockery of the California and United States Consti-
4  tutions by their illegal, unethical, arrogant and even felonious
5  actions as Commissioners for the B.P.H., acting under color of
6  State Law, each and every one of them, in their Official Capacity
7  as members of the Executive Branch of Government. They cannot
8  cry out in self defense, that they were "just obeying orders",
9  as those NAZIs did 60 years ago at Nuremberg, Germany, ("Befehl
10 sind Befehl!" "Orders are Orders!"), because in this country, uni-
11 formed and plainclothes members of the armed forces and police
12 forces, and officials of the CDCR; as these Commissioners are;
13 are forbidden from carrying out unlawful commands or orders, on
14 pain of imprisonment, or even death in times of War. All members
15 and former members of law enforcement agencies and or military
16 organizations (as many of these Commissioners also were;) know,
17 beyond any reasonable doubt, that this is true. Yet, the B.P.H.
18 Commissioners conciously smash the Bill of Rights, The Constitu-
19 tions and protections the Amendments have built; in order to
20 complete their mission of realizing as close to a "no parole-
21 policy for Indeterminate Term Prisoners as they can." They
22 have established a mini-police State Government where they can
23 do as they please; sort of like the Commanding General of the
24 'Kingdom of Jones' during the American Civil War, in Alabama.
25 The 'law' started and ended at Gen. Jones's behest until Federal
26 troops arrived there in 1865. Jones, Taxed, punished, executed,
27 rewarded or murdered whom he chose. He did this in obscurity,
                                    authority,
28 ignoring all Confederate or Union. ^He was a law unto himself.

6(m)

1. General Jones got away with this tyrannical behavior during the
2. War Between the States, because no one was looking.(Ken Burns, 'The Civil War'.)
3.    The B.P. H. is not isolated away deep in the middle of war-
4. time Alabama, but it is 'isolated' deep in the 'Belly of the Beast',
5. protected and coddled by the Governors and CDCR; tolerated & funded
6. by the Legislature; until now, because now all the dirty laun-
7. dry is being put out for public viewing: After all, they were
8. performing a desired mission: convicts went/go into the prison
9. system; and if with an Indeterminate Term, "they checked in but
10. they don't check out... the Roach Motel". Except that now the
11. prisons are bursting at the seams; the Federal Government is on
12. the verge of taking over the running of the prison system; and
13. heads <u>will roll</u>. Forget Democracy, get Justice! Justice is our
14. President's code word for vengeance. But you can't have it both
15. ways. That road leads to madness.
16.   Specifically, the BOARDS' and Governors' refusals "normally to
17. grant parole..." [California Penal Code § 3041 (a);] as mandated
18. by the statutes     and regulations; to those lifers who served
19. exemplary time in excess of their minimum terms, many of whom
20. [including this Petitioner]; have been imprisoned approaching a ½
21. century, exceeding even the maximum terms prescribed by genuine
22. law, based on the particular facts of their case[s], issues that
23. were professionally, legally, and <u>finally</u>, Petitioner thought; set-
24. tled by a qualified Judge, who, by the way, showed Petitioner no
25. pity or mercy. Little did Petitioner know that he would be 'really
26. sentenced' a score of years down the road by the GESTAPO (sorry,
27. Petitioner means the BPH.) Instead, the Governors and their hand-
28. picked BPH, insure that less than 1% of such individuals, who

1   are suitable for parole are finally released on parole. That

2   number approached 4% last year, due to the blessed intervention

3   of the State and Federal Courts. This is no conclusionary

4   statement: each of the prisoners who claim suitability have

5   been forensically evaluated to pose no undue risk of danger

6   to public safety if released on parole. These psychological

7   evaluations  are habitually denegrated, disagreed with and

8   universally ignored by the Panels that roam the State visiting

9   the prisons constantly. In fact, there was an effort by the

10  Administrative Head of the Board of Parole Hearings to official-

11  ly do away with these professional reports. However, the in-

12  house memo found its way out of B.P.H. Headquarters in Sacramento

13  and appeared on every State Prison bulletin board in the State.

14  Thankfully, this unwanted exposure caused that bad idea to

15  disappear. But the attitude; the desire to do these things

16  is strong; an unchangeable biased     partiality against all

17  "Lifers", as the CDCR & B.P.H. officials like to call us.

18  Meanwhile, the taxpayer is stuck with a bill of about a half

19  billion dollars   annually to keep those prisoners; Petitioner

20  included, who no longer pose   a public safety concern, impris-

21  oned until they die, for purely political reasons.(See, Exh. C.)

22  **II.**     TO THE HONORABLE PRESIDING JUDGE OR MAGISTRATE

23                    UNITED STATES DISTRICT COURT

24                   NORTHERN DISTRICT OF CALIFORNIA

25       PETITIONER ALIPIO SIERRA,  HEREBY PETITIONS FOR A WRIT

26  OF HABEAS CORPUS  TO REMEDY HIS UNLAWFUL & UNCONSTITUTIONAL

27  CONFINEMENT RESULTING FROM THE REFUSAL OF THE BOARD OF PAROLE

28  HEARINGS TO MAKE A FINDING OF SUITABILITY AND AFFORD PETITIONER

                              6 (a)

1  A PAROLE RELEASE DATE.

2      1.  Petitioner wasa convicted of one count of Murder in the

3  Second Degree, based on one incident occurring on May 7, 1991,

4  and was sentenced to a term of 16 Years to life: one year  was

5  assessed for the knife use allegation; Cal. P.C. § 12022(b), yiel-

6  ding an M.E.P.D. of January 5th., 2002. During the 'now' 17 years

7  of imprisonment between the  time of his offense and his parole

8  suitability hearingOne (1) Initial and one (1) Subsequent, begin-

9  ning in 1999; Petitioner has been a model inmate, conforming in

10  overwhelming measure to institutional regulations with but two

11  CDCR-115s. CDCR-128 "Bad" Chronos  are considered by the Panels

12  as "disciplinaries": but they are wrong. These are merely counsel-

13  ing slips. At his Initial Hearing and on this Subsequent, he was

14  found not suitable for parole, despite bringing an excellent re-

15  cord to the BOARD; including steady employment over the years,

16  and sustained AA/NA,  and literacy courses over the years. His

17  His Classification Score is as low as it can get, and has not

18  changed since it reached '0', over 8 years ago; (19 points is ar-

19  bitrarily assigned.) Custody Level has remained at Medium 'A'

20  since the last century. No gang affiliation, 20+ Laudatory Chronos.

21  He has tried to learn English but finds it an impossible task for

22  he has no scholastic background and hasn't a clue on how to memo-

23  rise academic material, prepare or follow a course curriculum; or

24  any of the study and goal reaching tools necessary to succeed in

25  school. The BOARD should 'get over it'. He is not a scholar; and

26  never will be. He IS a HARD  WORKER! He is now in his 50s. All he

27  wants or needs is a cook's job, or any manual labor which provides

28  him with a living wage. His crime did not involve unemployment,

29  drugs or money. (See Hrng Trans. attchd. as Exhibit  A.)

1   THE PROOF IS IRREFUTABLE EVEN TO THE COURT, NOW, THAT
2   THE BOARD OF PAROLE HEARINGS IS ENGAGED IN A POLICY OF
3   NO PAROLE, AS MUCH AS POSSIBLE. EITHER THEIR ACTIONS
4   ARE PURPOSEFULLY UNLAWFUL AND MALICIOUS, OR THE BOARD
5   COMMISSIONERS ARE WOEFULLY INEPT IN THEIR KNOWLEDGE OF
6   THE LAW AND DUE PROCESS, AND THEREFORE ARE IN DIRE
7   NEED OF CORRECTIVE SCHOOLING, SUPERVISION AND OVER-
8   SIGHT IN THE PERFORMANCE OF THEIR CRITICALLY IMPORTANT
9   DUTIES AS BOARD COMMISSIONERS, IN ORDER TO STAY WITH-
10  IN THE LAWS OF STATE AND NATION, AND THE PARAMETERS
11  OF THE XIVTH. AMENDMENT TO THE UNITED STATES CONSTITUTION.

13      As will be seen in the following quotations from the cited
14  case, many jurists are now convinced beyond any doubt that something is
15  seriously wrong with the manner in which the B.P.H. conducts its duty
16  to the citizens of the State of California under the auspices of
17  the Governor who selects them for this work, and the Executive Branch
18  of State Government of which they are members.
19      A.   Petitioner is personally of the opinion that the actions
20  of the B.P.H. are far from innocently ignorrant and arbitrary, but
21  rather, that they are planned, purposeful covert actions designed to
22  cripple and subvert the constitutions of State and Nation by insuring
23  life term prisoners in the C.D.C.R. are never paroled. Additionally,
24  many courts are sympathetic with that objective and consciously coop-
25  erate with the Executive Branch to water down the Petition For Writ
26  of Habeas Corpus so that it becomes a useless instrument in these mat-
27  ters. Some Jurists give the B.P.H. the benefit of the doubt, and the
28  following case Holding is a perfect example, to wit:

6(q)

Please see, <u>In re Jamieson</u> Case No: 71194, Superior Court County of Santa Clara (Aug 30, 2007), pp. 26-

## CONCLUSION

"The conclusive nature of the proof in this case, and the suggestion of institutional bias do not pre-clude formulation of an remedy which will guarantee adequate restrictions on, and guidance for, the Board's exercise of discretion in making parole suitability determinations. The Board can be made to lawfully perform its duties if given explicit instructions.

As noted supra, a reason the proof in this case irrefutably establishes constitutional violations is because the Board does not, in actual fact, operating within the limiting construction of the regulations. The Board's expansive interpretation allows it to operate without any true standards. Although numerous rulings of both state and federal courts of appeal have invalidated the Board's application of the §2402(c) criteria to particular facts, the Board does not take guidance from these binding prece-dents and ignores them for all other purposes. In the most recent of these cases, <u>In re Roderick</u>, (2007) ___ Cal. App. 4th ___ (A 113370) the First District held four of five §2402 factors "found" by the Board to be unsupported by any evidence. At footnote 14 the court took the time to criticize the Board for its repeated use of a "stock phrase" "generically across the state." The Court also clarified that "at minimum," the Board is responsible for ar-ticulating the grounds for its findings and for citing to evidence supporting these grounds.

There is nothing in the evidence presented that would allow any conclusion but that, without intervention of the Courts, the Board will ignore the lessons of these rulings in the future and continue to employ its formalaic approach of citing a criteria for §2402(c)(1), repeating the facts of the crime, but never demon-strating a logical connection between the two. This is the core problem with the Board's methodology -- they provide no explanation or rationale for the findings regarding the crime itself. This

6(r)

"practise results in violence to the requirements of due process
and individualized consideration which are paramount to the appro-
priate exercise of its broad discretion.

The only solution is one that compels the Board to identify
the logical connection between the facts upon which it relies and
the specific criteria found to apply in the individual case. For
example, the Board often finds that an inmate's motive is "triv-
ial" without ever suggesting why, on these facts, that motive is
not just as trivial as the motive behind any other murder. What
motive is not trivial? By any definition, "trivial" is a word of
comparison and only has meaning when there can be examples that
are not "trivial."

Similarly, although the Sixth District made it plain four years
ago that "all [ ] murders by definition involve some callousness,"
(In re Smith (2003) 114 Cal.App.4th 343, 345,) the Board has con-
tinued to deny countless paroles labeling the crime "callous" with-
out ever suggesting what crime would not qualify as "callous" and
without consistently explaining why the individual case before it
demonstrates "exceptional" callousness.

Respondent has consistently refused to suggest what possible
instances of murder would not fit the Board's amorphous applica-
tion of the §2402 criteria. Citing Dannenberg, Respondent insists
such comparative analysis is unnecessary. Respondent fundamentally
misunderstands the Dannenberg holding.

The PC § 3041(b) exception to the rule can only be invoked
when the "gravity of the current convicted offense or offenses,
is such that the consideration of the public safety requires a
more lengthy period of incarceration for this individual." The
word "gravity" is a directive for comparison just as "more lengthy"
indicates a deviation from the norm. While Dannenberg held there
does not need to be intra case comparison for the purposes of term
uniformity or proportionality, there necessarily has to be some
sort of comparison for the purposes of adhering to the legislative
mandate that parole is available. This is implicit in §2402 be-
cause the qualifier "especially","especially heinous or atrocious
or cruel," requires that some form of comparison be made. While
the original drafters of § 2402 seemed to have recognized this fact,

6 (s)

"the on-going conduct of the Board has completely ignored it,
and this is the essence of the due process violations Petition-
ers have asserted.

As noted in his dissent in the recent case of In re Roder-
ick, supra, Justice Sepulveda would have deferred to the Board's
'exercise' of discretion because "Board members have both train-
ing and vast experience in this field. They conduct literally
thousands of parole suitability hearings each year. The Board
therefore has the opportunity to evaluate the egregiousness of
the facts of a great number of commitment offenses. ... The
Board's training and experience in evaluating these circumstan-
ces far exceeds that of most, if not all, judges," The evidence
in this case, however, suggests a flaw in granting such defer-
ence. Since the Board continues to place every murder in the
category of offenses "tending to show unsuitability," something
is certainly wrong. Since the Board's vast experience is unde-
niable, the problem must be in the Board's training and under-
standing of the distinguishable features of guidelines and cri-
teria. Although Justice Sepulveda presumes the Board members
receive substantive training, there is no evidence before this
Court to suggest that it does, and substantial circumstantial
evidence  that it does not.

In the vast numbers of Santa Clara County cases reviewed by
this Court, the Board's formulaic decisions regarding the com-
mitment offense do not contain any explanation or thoughtful
reasoning. Instead, the Board's conclusionary invocation of
words from §2402(c) (1) is linked to a repetition of the facts
from the Board report by the stock phrase; "These conclusions
are drawn freom the statement of facts wherein ..." Thereafter
the inmate files a habeas corpus petition and Respondent, after
requesting an extension of time, files a boilerplate reply as-
serting the Board's power is "great" and "almost unlimited" and
and thus any "modicum" of evidence suffices. Respondent does
not cite or distinguish the expanding body of case law that is
often directly on point as to specific findings made. Thereaf-
ter, if the writ is granted, the Board is directed to conduct
a new hearing "in compliance with due process" and that order

6(t)

"is appealed by Respondent. On appeal the order is
usually upheld with modifications and in the end,
after countless hours of attorney and Judicial time,
the Board conducts a new two hour hearing at which their dis-
cretion and violate due process in some different way.

This system is malfunctioning and must be repaired. The
solution must begin with the source of the problem. The Board
must make efforts to comply with due process in the first ins-
tance. The case law published over the last five years provides
ample and sufficient guidelines and must be followed. Although
the Board methods suggest it believes this to be optional, it
is not...."

## REMEDY

"Thus, it is the Order of this Court that the Board develop,
submit for approval, and then institute a training policy for
its members based on the current and expanding body of published
state, and federal case law reviewing parole suitability deci-
sions, and specifically the application of §2402 criteria. In
addition to developing guidelines and further criteria for the
substantive application of §2402 the Board must develop rules,
policies and procedures to ensure that the substantive guide-
lines are followed.

This Court finds its authority to impose this remedy to
flow from the fundamental principles of judicial review an-
nounced over two centuries ago in Madison v. Marbury, (1803)
5 U.S. (1 Cranch) 137. Citing that landmark case, the Califor-
nia Supreme Court has recognized "Under time-honored princi-
ples of the common law, these incidents of the parole applica-
nt's right to 'due consideration' cannot exist in any practi-
cal sence unless there also exists a remedy against abrogation."
(In re Sturm, 11 Cal. 3d 258, 268.)

In Sturm, the Court directed that the Board modify its
rules and procedures so that thereafter "The Authority will
be required [,] commencing with the finality of this Opinion
to support all its denials of parole with a written, definitive
statement of its reasons therefor and to communicate such

6(u)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 2 (Cont.):

1    "statement to the inmate concerned." (Sturm, at 273.)"

2      Similarly, in the case of Minnis, supra, the California

3   Supreme Court held the Board's policy of categorically denying

   parole to drug dealers was illegal. Based on its analysis the

4   Court there was clearly prepared to order that Board to modify

5   its rules and procedures however such was unnecessary because

6   the Board "voluntarily rescinded" the illegal policy. While

   the remedy in this case is of greater scope than that necessary

7   in either Sturm or Minnis, supra, so too has been the showing

8   of a systematic abuse of discretion and distortion of process.

9      The most recent case to address the Court's roles and

10   duties in overseeing the parole suitability process has been

   in In re Rosenkrantz, supra, 29 Cal.4th 616. In that case the

11   court explained that judicial review of a Governor's parole

12   determination comports with, and indeed further, separation of

   Powers principles because the courts are not exercising "com-

13   plete power" over the Executive branch and do not "defeat or

14   materially impair" the appropriate exercise or scope or execu-

15   tive duties. (Rosenkrantz, at p. 662.) Citing Sturm, supra,

   the Court reaffirmed that a life term inmate's "due process

16   rights rights cannot exist in any practical sence without a

17   remedy against its abrogation." (Rosenkrantz, at p. 664.)

18     The Rosenkrantz court also put forth what it believed was

   an extreme example but which, unfortunately, has been shown to

19   exist in this case. The court stated: "In the present context,

20   for example, judicial review could prevent a Governor from

   usurping the legislative power, in the event a Governor failed

21   to observe the constitutionally specified limitations upon pa-

22   role review authority imposed by the voters and the Legislature."

23   This is exactly what the evidence in this case has proven. As

   As noted above the Board has abrogated to itself absolute au-

24   thority, despite legislative limitations and presumptions,

25   through the mechanism of a vague and all inclusive, and thus

26   truly meaningless application of standards, The remedy this

   Court is imposing is narrowly tailored to redress this consti-

27   tutional violation.

28      The consequence of the Board's actions (of giving § 2402(c)

"(1) such a broadly all encompassing and universal application) is that they have unwittingly invalidated the basis of the California Supreme Court's holding in <u>Dannenberg</u>. The reason the four Justice majority in Dannenberg upheld the Board's standard operating procedures in the face of the Court of Appeal and dissent position is because 'the Board must apply detailed standards when evaluating whether an individual inmate is unsuitable for parole on public safety grounds " (<u>Dannenberg</u>, at p. 1096, footnote 16. See also page 1080: "the regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole.") However, Petitioners in these cases have proven that there are no "detailed standards" at all. Instead the Board has systematically reduced the "detailed standards" to empty words. The remedy this Court orders, that there truly be "detailed -standards," requires the promulgation of further rules and procedures to constrain and guide the Board's power's. This remedy differs in specifics, but not in kind, from what courts have previously imposed and have always had the power to impose.

The Board must fashion a training program and further rules, standards and regulations based on the opinions and decisions of the state and federal court cases which provide a limiting construction to the criteria which are applied.[8] The Board must also make provisions for the continuing education of its commissioners as new case law is published and becomes binding authority. This Court will not at this point, outline the requirements and lessons to be taken from the above cases. It is the Board's duty, in the first instance to undertake this task. The training program, and associated rules and regulations,

_____

[8]While the showing and analysis in this case was limited to §2402(c)(1), the conclusions that the evidence compelled, that the Board has been carelessly distorting and misapplying the regulations, is not so limited. Accordingly, the training program that is necessary for the Board can not reasonable be limited to just § 2402(c)(1). Thus, to the extent case law recognizes, clarifies and establishes remedies for other due process violations they must also be incorporated into necessary rules and training the Board is required to abide by.

6 ( v )

"shall be served and submitted to this Court, in writing, with-
in 90 days. Counsel for Petitioners, and any other interested
parties, may submit briefs or comments within 30 days thereaf-
ter. After receipt and review of the materials this Court will
After receipt and review of the materials this Court will fina-
lize the training program, and associated rules, and the Peti-
tioners in these cases shall receive a new hearing before a
Board that does not operate by the evidence here presented."

                              ORDER

        "For the above reasons the habeas corpus petition is granted and
it is hereby ordered that Petitioner be provided a new hearing which shall
comply with due process as outlined above. Respondent shall provide weekly
updates to this Court on the progress of its development of the new rules
and regulations outlined above."

DATED:   30 Aug, 2007        _____
                             LINDA R. CONDRON
                             JUDGE OF THE SUPERIOR COURT

        1.   Petitioner's Layman Assistant, would like to take this opportu-
nity to apologize to this Court, because he wrote three major and rather
lengthy quotes in their entirety, instead of citing the documents and pre-
senting his own analysis. However, in the past, from the B.P.H. Chambers,
to many of the Courts he has litigated in, the words "conclusory", "no evid-
ence in the record", "vague"; et cetera, crop up with regularity, and per-
haps with some correctness, as incarcerated Petitioner [s] are often handi-
capped in the institutions and find it difficult to access WESTLAW, and other
helpful research engines. But these three Jurists quoted herein, have it just
right and mirror Petitioner's sentiments exactly. It is no easy task to fight
the State with all its power and resources such as the Electronic media, etc.

        Just so, included as Exhibit D , there is a Flyer issued by the Sacra-
mento Bee, where Senior Assistant Attorney General Julie Garland, is complain-
ing that judges are violating the Separation of Powers Act, and are over-
ruling the Governor too often, (about 1% of the Lifer population), are actu-
ally getting out! This is an ironic statement, because this Writer, has been

1  sounding the alarm on the Separation of Powers issue for years.It

2  is the Governor and the Executive Branch: (Inclusive, the B.P.H.),

3  that have usurped the power of the Judicial, and Legislative

4  Branches all these years. In fact, there exists a mini-government

5  inside the State Government of the State of California, which

6  has granted itself immunity, and does not hesitate to flount the

7  Rules, Guidelines and Statutes of State and Nation regularly, wi-

8  thout fear of reprisal. This development verges on Fascism and

9  Tyranny. It is an alrming situation that must be stopped.

10      B.    Petitioner's Main Argument; that the Board of Parole

11  Hearings is a corrupt, illegal, "merely ministerial Body" which

12  unlawfully imposes sentences on lawfully convicted and sentenced

13  than the Courts, or Legislature intended, was not _even_ addressed

14  by the State Courts.

15      1.    The Courts concentrated their reviews of Peti-

16  tioner's habeas corpus petition on the "some evidence" test (as

17  described _ante_, herein,) and that the B.P.H. supposedly uses to

18  decide whether a candidate for parole suitability finding

19  "is an unreasonable risk or threat to public safety if released

20  on parole..." These Courts, as they have done numerous times in

21  this writer's experience, have ignored the [hopefully] well-pre-

22  sented and proved beyond a "Preponderance of the Evidence" that

23  the California Board of Parole Hearings, is an improperly appoint-

24  ed Cabal of Commissioners; and that no matter the magnitude or

25  lack of it or heinous levels of culpability; and or the prison-

26  er's comportment or accomplishments in prison, the chances are 1%

27  to 99% against a prisoner ever being found suitable for parole by

28  these 'commissioners'; because they are under orders NOT to.

1   parole 'lifers'. These _pro forma_, _sub rosa_ hearings (even though

2   they seem to cover the factors, do not) Thousands of State pris-

3   oners who have 'incredibly' committed murder, then spent 25 years

4   without one single disciplinary infraction; it is just too good

5   to believe: and the Board[s] don't! That is why they deny on the

6   "Some Evidence" Test Principle only. They do not believe the 'per-

7   fect' record guys. If the prisoner does them a huge _Favor_ and

8   and suffers a couple of CDCR-115 RVRs in twenty years; so much

9   the easier; either way, no suitability finding. However, this

10   prisoner did the Board a huge favor and suffered two 115s; the

11   offenses were for taking food. CDCR 128-Counseling Chronos are

12   not to be used as RVRs; but are. The last 115 was NINE years ago!

13      2.   But "virulently conservative", ex-policemen Boards

14   have always been known to ignore the human rights of prisoners in

15   American prisons for centuries. Dozens of movies and hundreds of

16   books have been made and written on the subject. What is unpardon-

17   able is that the Legislature and some members of the Judiciary

18   are playing along with these "sham and farce", _pro forma_ hearings,

19   and LOOK; SEARCH, for words and laws to even vaguely justify the

20   unjustifiable! That is the end result, as Petitioner proved in

21   his habeas corpus Petition. The other month a famous politician

22   announced: "Stare Decisis", is DEAD in America. That is true!

23   In its Denial Order in the Superior Court, the Court cited _In re_

24   _Powell, supra_ on "some evidence" as the 'standard' used in its

25   _de novo_ review. The Court totally ignored the time served; and

26   his exemplary conduct in all these years. Or the extra time the

27   Board illegally wrote in its Rules and Guidelines under Title 15

28   Division Two Section 2286, that for already served every prior

6(Y)

1    felony conviction (no matter how many years already served on that
2    conviction before); including "two" or "three" strikes law en-
3    hancements, such as five years consecutive for each prior, or
4    doubling the base term on a two strike candidate;); six extra
5    months no one knew even existed, will be assessed by this pseudo
6    court, no matter how exemplary a prisoner's conduct has been
7    over the past twenty years or so. AND, for each subordinate
8    count on the principal case; which may very well have been sen-
9    tenced concurrently, because of P.C. §654 "concerns": well, have
10    no fear, the quasi-judicial B.P.H. Panels will add six more
11    months for each sub-count, consecutively. AND, for each CDC-115
12    RVR, the prisoner forfeits his one third good time for the en-
13    tire year for each year a CDC-115 RVR was suffered. AND, unlike
14    all determinate sentenced prisoners in the CDCR, this time is
15    not recoverable by good behavior in the future no matter how
16    many years of disciplinary-free time follow!!!
17       In short, EVERYTHING that happens in the life of a Lifer,
18    means MORE TIME: not less. The Court's original proceedings, are
19    just a lie. (Please see, Cal. P.C. §§ 654, 666, 667, 667.5, 667(d)
20    667(b-i); 1170 et seq.: especially 1170.12); and 1192.7 et seq.;
21    and P.C § 1168. These sentencing schemes are at odds with each
22    other, they make no sence. And yet there are dozens of others.
23    Defendants are heaped up with time in the Court systems before
24    they arrive in the CDCR. But then, the B.P.H.: which writes its
25    own pseudo Rules & Regulations  and calls THEM THE LAW: heaps
26    a bunch more time on prisoners who appear before them ten-twenty
27    years on down the road; in kangaroo trials that retry, reconvict
28    and resentence the miscreant to another life term; inter alia!

GROUND 2 (Cont.):

3.    Paradoxically, the evidence level of proof on habeas corpus and Civil Rights Law Complaints § 1983, is "preponderance of the evidence" standard. The Boards, however, are allowed a much lower evidence of proof standard; which in the opinion of some judges;is "ANY" evidence. But U.S. Supreme Court Justice Sandra Day O'Connor, wrote for the U.S. Supreme Court, in the case of <u>Hamdi v. Rumsfeld</u>, 124 S. Ct. 2633 @ 2651, that; "Thus, while we do not question that our due process assessment must pay keen atten- tion    to the particular burdens faced by the Executive...¶ Because we con- clude that due process demands some system for a citizen detainee to refute his classification, the proposed 'some evidence' standard is inadequate..." Yet, the courts believe that if the B.P.H. denies under the "some evidence" standard, they have only to find that any evid- ence exists to support that finding by the BPH upheld. By doing that, the "preponderance of the evidence" standard for habeas corpus is abrogated. That creates a "Protected Liberty Interest" in parole for the Petitioner, since his Due Process rights are diluted.

4.    The Board of Parole Hearings, has been very clever in its cre- ation of Title 15 Division Two, over the years. For example; Cal. Penal Code § 5011, mandates that no prisoner is required to confess to, admit to, or even discuss his commitment offense or priors; and if he does not, it may not be held against him by the B.P.H.. And sure enough, that language has been integrated into Title 15, Div. Two § 2236. But ANY Attorney; EVEN the BPH attornies; paid just $280, per Indigenous prisoner they 'take' to the Hearings, immediately advise the prisoner: "If you choose <u>NOT</u> to discuss the commitment offense or priors; you <u>WILL</u> be

6(aa)

DENIED a finding of suitable. Of course, that is hard to prove,
because a Panel is not about to find for suitability in any event.
They do leave clues however, they state: "The prisoner is in den-
ial; or he minimizes; or he lacks insight; or he shows no remorse;
or he will not accept total responsibility..." The Court has
seen every one of those "boilerplate" comments hundreds of times.
The point is, Your Honor[s], that "Confessions or Admissions",
are NOT suitability factors. The only real suitability factor is
TIME! Clean time. The type of clean time this Petitioner has
served on this murder conviction. Petitioner has not committed a
single felony, misdemeanor, disciplinary, since his conviction
by a TRUE Court of Law, in 1992.

    5.   The real issue here is the implied criminality of
the Governors of California and the Commissioners they illegally
install in the B.P.H., only some of whom are finally confirmed by
the State Legislature, and who usually last just so long as they
do not begin doing their rightful Duty, and actually grant suita-
bility to any prisoners who have actually earned parole. The
Governors arrogantly ignore all guidance or directives from the
Courts, (when their Reversals or Denials are themselves reversed
and remanded back for further processing, within the law; as
Judge Condron, said; they just have another hearing and commit
some other flagrant violation, such as in Penal Code § 5075,
where the Governor is directed to intall commissioners within the
professional, geographic, racial, equally spread out selection
of qualified individuals in the State of California, who do NOT
have their own vindictive agendas; (See Exhibit B). The list is
at least 80% ex-law enforcement or victims rights personnel.

6(ab)

1        6.    As to the Psychological Report[s], Dated just prior
2   to the 2007 Subsequent Hearing; Currently, the B.P.H. has embark-
3   ed on a 'new', 'illegal' program, whereby it has initiated the
4   hiring of its own Board paid Psychologists, just as it hires its
5   own Board lawyers to 'watch out'for the due process rights of the
6   poor prisoners before them. If Petitioner had been 'fortunate'
7   enough to have gotten a more favorable Psych Report; the Panel,
8   as they have done in innumerable cases, say  they do not believe
9   the Report, and ordered a 'new', more 'accurate' report. This is
10  **just**     another nail in the coffin of the B.P.H. as it is config-
11  ured contemporaneously, because in the end, corruption is always
12  exposed and the culprits punished. The chief concern for Petition-
13  er and the other thousands of prisoners 'dogged' by these truly
14  sophisticated criminals, and betrayers of the American form of
15  Justice  and Democracy, is to try not to die of old age or insti-
16  tutional deceases while in prison, first.(See Exhibit ' ', attchd.)
17        7.    The Boards' perennial findings of unsuitability is
18  supported only by its political agenda and intransigence.
19                          CONCLUSION
20      WHEREFORE:  Petitioner has proved a <u>Prima Facie</u> case that
21  he is enslaved by the B.P.H. and Warden B. Curry, beyond the legal
22  term handed down by the Court in his case in gross violation of
23  <u>ex post facto</u> and <u>double jeopardy</u> restrictions in the constitu-
24  tions of state & nation. This Hon. Court is requested to review
25  this petition <u>de novo</u> and Reverse & Remand the petition back to
26  the Court and B.P.H. for further 'proper' processing; such as an
27  Evidentiary Hearing. The Writ should issue. Petitioner should  be
28  found suitable for parole, and be collected by the U.S.I.N.S.

1    Consequently, for the foregoing reasons, Petitioner res-

2  pectfully requests this Court grant Review and revisit the rul-

3  ing in the case of In re Powell  288 Cal.Rptr. 431 (Cal. 1988),

4  in which the California Supreme Court improperly adopted the

5  "some evidence" Test Principle, as presented in the case of

6  Superintendant v. Hill  (1985) 472 U.S. 445, 105 S.Ct. 2768, 86

7  L.Ed.2d 356, cited in Powell  p. 437; The Hill, court, considering

8  the standard of review for a prison disciplinary board's revocation of good

9  time credits," (emph. added) ; because "A prison inmate has no vested right in

10  his prospective liberty on a parole release date." (Fain I, supra, 65 Cal.App.

11  3d at p. 390, 135 Cal.Rptr. 543;" inter alia. But now we know that as

12  as far as prison inmates seeking suitability and parole dates,

13  we do now have a protected liberty interest in parole; as shown

14  ante. Continued use of the "some evidence" test principle cons-

15  titutes a violation of clearly established Supreme Court prece-

16  dent setting case law and statutes  and/  or an improper in-

17  terpretation of clearly established case law and statutes. As

18  long as the "some evidence" test is utilized at these hearings,

19  and as long as the Courts use the "some evidence" test principle

20  on de novo review, the quest for parole for life top prisoners

21  will remain an anti-democratic exercise in sub rosa pro forma

22  hearings and habeas corpus filings in their multi-thousands of

23  habeas corpus petitions filed in State and Federal courts. The

24  prison population of life top prisoners iminently qualified can-

25  didates for parole will continue to grow, burgeon and die off

26  in prison: which is the goal of the powers that be: that is also

27  clear: but the unconstitutional practices will in the end des-

28  troy the very systems which created them.

                           6(ad)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 1 & 2 CONCLUSION & PRAYER (Cont.):

1  A.    Specifically, in the case at Bar, the Charade that is

2  the Board of Parole Hearings 75% former police officers Commis-

3  sioners, in combination with Board attorneys who should be aware

4  of the 'game' being run at the expense of the prisoner's life;

5  and probably are;(but as Officers of the Court, cannot advise

6  their charges except under the very test principle that is im-

7  possible to prevail over); in tandem with the courts systematic-

8  ally denying habeas petitions no matter how meritorious, because

9  under the 1% chance of winning provided by the "some evidence"

10  test principle, the Great Writ is watered down in potency until

11  it too is a meaningless exercise in cruelty; Petitioner prays

12  this Court will restore his Due Process rights (which aren't

13  just the right to have a B.P.H. Hearing...), and 'fix" the mess.

14  DATED: ~~May~~ June , 16 2008          Respectfully submitted,

15                                          _Alipio F. Gierr_

16                                                  Petitioner,

17

18

19

20

21

22

23

24

25

26

27

28

                         6(ae)

THE B.P.H. REFUSAL TO FIND PETITIONER ELIG. FOR
PAROLE VIOLATES HIS DUE PROCESS RIGHTS UNDER
THE XIVTH. AMENDMENT, UNITED STATES CONST-
TITUTION, AND THE CALIFORNIA CONSTITUTION,
SECTION 29; ALSO, CASE OF CUNNINGHAM V.CAL-
IFORNIA, 127 S.CT. 856 (2007).

A.     Petitioner Alipio Sierra, hereby petitions this  United

States District Court, Northern District of California, to please

review this collateral attack, de novo, hold an Evidentiary Hear-

ing, if it finds it constructive, and finally issue an Order to

Show Cause, grant the Writ, and Reverse the B.P.H.'s Denial of

Parole Suitability for Petitioner; and also, Reverse and Remand

the California State Courts' denials of this Petition, and compel

these courts to revisit the Holding in the case of In re Powell,

supre, which was improperly derived from the case of Superinten-

dant v. Hill, supra and  thereby violated clearly established

United States Supreme Court case law, by applying the Holding in

that case incorrectly because prisoners in the C.D.C.R, do have

a protected liberty interest on parole, and utilizing this review

test principle on habeas corpus collateral attack, is inadequate.

\.     1.  Petitioner was convicted of one Count of Murder in the

Second Degree, w/knife use allegation, occurring on May 7th. 1991,

and was sentenced to a term of 15 years to Life  yielding an MEPD

of 2002. During the 17 years  of incarceration between the time

of his offense and his  second suitability hearings: 1 Initial and

1 Subsequent, beginning in 2001, petitioner '  .. has been violence

and alcohol-free, conforming  in overwhelming measure to institu-

tional regulations with but several minor infractions entailing

the taking of small amounts of food from culinary, where he has

worked for more than ten (10) years. In both his hearings so far he

1   was found unsuitable based mainly on the purported circumstances

2   of the offense, notwithstanding the crime-free life he led prior

3   to the commitment offense, and the violence-free and felony-free

4   passage of the last sixteen (16) years

5        2.   The conduct of the Board of Parole Hearings with res-

6   pect to Petitioner seeking release on parole is all too familiar

7   to this Court from the records in numerous State and Federal hab-

8   eas corpus actions on this specific issue. The measuring of the

9   "some evidence" standard; In re Rosenkrantz, (2000) 80 Cal. App.

10  4th. 409; and, In re Ramirez, (2001) 94 Cal.App. 4th. 549, 564-

11  571, 114 Cal.Rptr.2d. 81; Brown v. Poole, 337 F.3d. 1160, 1161,

12  (9th.Cir. 2003); &, Biggs v. Terhune, 334 F.3d. 910 (9th.Cir.

13  2003); McQuillon v. Duncan, No. 03-55702, D.C. CV-98-03680-DT,

14  306 F.3d. 895, 903 (9th Cir. 2002); such that Petitioner sought

15  relief in the California & Federal US Courts,   rather than sub-

16  ject himself to a "continuing charade of meaningless hearings",

17  conducted in an "arbitrary and capricious manner," by the B.P.H.;

18  In re Rosenkrantz, supra, @ pp. 392-427; and as a "farce and a

19  sham"; In re Ramirez, supra, @ 381. Therefore, by this verified

20  petition, Petitioner continues as follows:

21        In the case of In re Johnson, BH 001900 (Aug 22, 2002);

22  ordering the release, forthwith, of that Petitioner, because;

23  "While Penal Code § 3041, mandates that parole "shall normally "

24  be granted/Exhibit 9  belies that, In 2002,"[the year after Peti-

25  tioner's Initial Parole Board Suitability Hearing in 2001],"only

26  2.6% of lifers had been granted a parole date; 2001 and 2000 the

27  the percentage was 2.3%, and in 1999, only 1.1%. It thus appears

28  that parole is the exception rather than the norm. Parole is not

1 being determined by the statutes and regulations parole scheme
2 under Cal. P.C. § 3041, and this deprives Petitioner of substan-
3 tive due process of the impartial decision-making required by
4 15 CCR 2250 and the Due Process Clause; <u>People v. Ramirez</u>, 25 C.
5 3 @ p. 268."
6           3.    Now, 'New' Governor, Arnold Schwarzenegger, has sworn
7 to follow the proper laws and statutes, and regulations as to
8 prisoner parole, inapposite to Governors Pete Wilson, & Gray
9 Davis, swore to "never" grant parole to "murderers". The first
10 year of the Schwarzenegger Administration, his record 'rose' to
11 4% of the cases where a Date had been granted by the <u>ultra-con-</u>
12 <u>servative</u> B.P.H.. <u>That</u> so-called 'benevolence' did not last long,
13 however. During the calendar year 2006, and now into 2007; the
14 'Terminator' Governor's record has slid '<u>purposely</u>' back to the
15 previous Governors' 'habits' of bending, changing and trashing
16 the laws, case law, and sentencing statutes of State and Nation,
17 all in panicky subservience to pressure from the CCPOA, Victims
18 Rights Groups; and pressured, cowardly, politicians in the Legis-
19 lature, backed by 'some'"virulently" conservative" members of the
20 very Judiciary which is entrusted with the interpretation and
21 enforcement of the rights of the people charged with crimes and
22 sentenced to indeterminate terms in the CDCR, under the Deter-
23 minate Sentence Law in California; see, <u>Cunningham v. California</u>,
24 127 S.Ct. 856 (2007); where the United States Supreme Court 'HELD';
25 that only a jury can aggravate a crime "beyond a reasonable doubt"
26 standard of proof. Yet, the B.P.H. Commissioners, aggravate and
27 reaggravate prisoners' sentences each time they appear before the
28 Cabal of Commissioners at these <u>pro forma</u> parole Hearings.

6(ah)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.);

1  No matter how deserving the prisoner, a parole date is not a rea-

2  sonable possibility: in 2003, as of October, 2003, there were

3  3100 hearings held. Of these, 121 dates were handed down. That

4  comes to approximately 3% counting the rest of the year. In

5  Petitioner's case, Presiding Commissioner Harris-Ritter, stated:

6          "Mr. Sierra, the panel reviewed all information received
            from the public and relied on the following circumstances
7          in concluding that the prisoner is not suitable for par-
            ole and would pose an unreasonable risk of danger to
8          -society or a threat to public safety if released from
            prison. This is a four-year denial. The offense was
9          carried out in a dispassionate and calculated manner.
            The offense was carried out in a manner which demon-
10         strates a callous disregard for human suffering. The
            motive for the crime was very trivial in relation to
11         the offense. These conclusions are drawn from the State-
            ment of Facts."
12  Then, the Commissioner read from that Statement of Facts:

13         "... In the evening, the inmate and the victim, Alfredo
            Soria, were out drinking. They returned to Soria's resi-
14         dence and continued drinking. Sometime during the night,
            the inmate and the victim argued, and the victim locked
15         the inmate out of the house naked. Neighbors calmed the
            victim down, and the victim then allowed the inmate to
16         get his clothes, and the inmate later. He then later re-
            turned and was seen hanging around the area by several
17         of the victim's friends. He was also seen running from
            the area and hiding the knife."

18

19      4.    Notwithstanding the 'rest' of the hearing; the rea-

20  son for Petitioner's 17 year-long incarceration, and his infi-

21  nite future of more denials, is the commitment offense ALONE.

22  There is nothing Petitioner can do to change this situation,

23  unless the Courts recognize and admit that the Board of Parole

24  Hearings is not in any credible way concerned with finding pris-

25  oners suitable for parole. The opposite is true: they are manda-

26  ted to look for any utterable reason, or no reason except the

27  the aforementioned, commitment offense alone. The  BPH Commis-

28  sioners, are given so much "due deference" by the Courts, that

29  even unlawful, felonious activity is deemed 'appropriate' of them.

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (CONT.):

<u>ARGUMENT</u>

B

3   PETITIONER CONTENDS THAT THE SEPTEMBER 14, 2007
4   DECISION OF THE BOARD OF PAROLE HEARINGS THAT
    PETITIONER WAS UNSUITABLE FOR PAROLE WAS MADE
    IN AN "ARBITRARY AND CAPRICIOUS MANNER". SPECI-
5   FICALLY, PET. ASSERTS, THAT HE HAS A PROTECTED
    LIBERTY INTEREST IN PAROLE, AND THAT BY TWICE
6   DENYING HIM PAROLE, TOTALING NINE MORE YEARS
    IN PRISON OVER HIS M.E.P.D.; ON THE BASIS OF THE
7   COMMITMENT OFFENSE AND HIS FOOD PILFERING 'WRITE-
    UPS', THE BOARD HAS VIOLATED PETITIONER'S DUE PRO-
8   -CESS RIGHTS; <u>INTER ALIA</u>.

9       1.   ."When a decision by the Board denying parole is chal-
10  lenged, 'the court may inquire only whether some evidence in the
11  record before the Board supports the decision to deny parole,
12  based upon the factors specified by statute and regulations.
13  Only a modicum of evidence is required.'"<u>In re DeLuna,</u> (2005) 126
14  Cal. App. 4th 585, 591 (citing <u>In re Rosenkrantz,</u> (2002) 29 Cal.
15  4th. 616).

16      2.   Petitioner asserts that he has a "protected liberty
17  interest in parole". and that the Board's continued findings of
18  unsuitability violate his Due Process rights. Subdivision (a) of
19  Penal Code § 3041 provides that one year prior to an inmate's
20  Mimimum Eligible Parole Release Date (M.E.P.D.), the Board shall
21  meet with the inmate and "normally set a parole release date"
22  set in a manner that conforms to terms for offenses of similar
23  gravity and magnitude with respect to public safety.

24      3.   Petitioner tried to explain to the Panel that he is
25  not capable of mastering the English language, and has there-
26  fore "plateued" academically, inhibiting his ability to learn
27  another vocational trade, apart from the one he has always ex-
28  celled in: Culinary Chef; and despite the fact that he had no

1   negative contact with police in his life prior to the commitment

2   offense, nor has he ever committed  another violent, or drug/al-

3   cohol induced crime, since then. The Panels 'seem' unable to

4   comprehend him. Nothing he says will make a dent or change their

5   minds, because like Pharoah and the Hebrew slaves: their hearts

6   are hardened against him; and they will not let him go free. Pilfer-

7   ing a little food from Culinary is 'normal behavior' by <u>ALL</u> pri-

8   soners in prisons all over the world, since time began. It is

9   common behavior for prisoners to take food out of the dining

10  rooms or mess halls. To not let a man out of prison because of

11  that infraction is cruel and unusual punishment; not to say vin-

12  dictive, despotic; and truly <u>Unamerican</u>!

13       a.  By in effect, retrying, reconvicting & resentencing

14  Petitioner to a Term far harsher than he was sentenced to by a

15  sitting Judge (<u>not a Commissioner</u>), in good standing with the

16  the State Bar and Judicial Council; a member of the Judicial

17  Branch of Government, by an installed Panel-Cabal of rogue com-

18  missioners in the B.P.H. (Respondents), who apply aggravating

19  circumstances <u>already</u> considered at sentencing by the <u>bona fide</u>

20  State Judge, then multiplying the sentence exponentially under

21  Title 15 Division Two 'Guidelines', the BOARD has thrown out the

22  trial Court's Order at Sentencing. This original and <u>Final</u> sen-

23  tencing, is replaced by a macabre version of the B.P.H.'s own

24  choosing and direction. When one considers, it is the B.P.H.,

25  itself which has created these 'new' parameters of time to be

26  served on any given indeterminate sentence which appears in the

27  CDCR, after Petitioner has served seventeen years; five (5) years

28  past his M.E.P.D., without any felonious infractions at all; it

6(ak)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1   is an _ex post facto_ violation under the Vth. and VIIIth. Amend-

2   ments to the United States Constitution, because not only is this

3   interminable Life Without Possibility of Parole sentence being

4   applied by non-judge's, without the knowledge of any Jury, or

5   non Executive Branch oversight group, person or committee, it

6   is done in secret, after the fact, making the term double and

7   later triply harsher than originally intended. This trashing of

8   the law falls under _Double Jeopardy_, and _cruel and unusual_ pun-

9   ishment (VIII th. Amend.). Since the B.P.H., has written these

10  Rules & Guidelines _not_ in conformance with the Protections built

11  into the Bill of Rights and the State & Federal Constitutions:

12  (see, California Constitution, art. 1; §§ 15, 17,& 24.). These

13  allegations are nothing new. The B.P.H. under other names: The

14  Adult Authority & the Board of Prison Terms; has been ignoring

15  judicial sanctions against its actions since at _least_ the early

16  40s: (Please see, _Ex Parte Bertrand, 61 Cal. App. 2d 183, 142_

17  _P. 2d. 351_; where the Court Held that the BOARD is merely a

18  "ministerial Body, which has no authority to impose sentences;

19  and any sentences it imposes are void; (1943)."

20      b.    This Rule of Law is almost as old as the Republic

21  itself. The Nation's first Chief Justice of the United States,

22  the Hon. John Marshall, wrote the Majority Opinion, where the

23  High Court HELD; in the case of _Marbury v. Madison_, (1803) 5 US

24  137; the words that finally gave the Judicial Branch equal

25  power and status to the Legislature and Executive Branches of

26  Government at the Federal _and_ State levels. He wrote, in part:

27  that "Only the Legislative Branch may pass (create) laws, and only the

28  Judicial Branch (_true_ Judges & Justices), may interpret these laws to deter-

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1   "...mine if they are legal and constitutional..." Just so, the B.P.H., is

2   a sub-department in the Executive Branch of Government in Cali-

3   fornia: "merely a Ministerial Body"; the commissioners serve at

4   the pleasure of the Governors; but must be confirmed by the

5   Legislature. But the aforementioned is EXACTLY WHAT THE B.P.H. is

6   guilty of; with the conspiracy of the governors. They have writ-

7   ten Title 15 Division Two, in which the lawful sentences imposed

8   by the trial courts, after consideration by these courts of

9   circumstances in mitigation/aggravation; consideration of level

10  of culpability; in consort with Probation Reports, Rules of Court

11  and myriad other considerations; not the least of which is the

12  Legislative Intent for the crime and the punishment for which

13  the miscreant is condemned; are thrown out the window; then

14  based only on the BOARD's OWN post-trial, post MEPD consider-

15  ations of NEWLY CREATED Aggravating Circumstances; under the

16  Rules allowing them to: they further enhance all the indeterm-

17  inate terms they examine based on their own determinations:

18  their own MATRIX; which they themselves promulgated; such as

19  Title 15 Div. Two, Rule 2286; in which the BOARD gives itself

20  the power to take concurrent terms decreed by a true Judicial

21  Branch Judge; such as a second DSL life term because; for exam-

22  ple; there were two kidnap victims instead of one, in a P.C. §

23  209(b) offense; and then declaring that the prisoner must serve

24  seven more years on that 'concurrent' term; or, ten more years

25  if he has a concurrent P.C. § 187; etc. They have also given

26  themselves the power to further enhance all prior felony convic-

27  tions a prisoner may have on his record, in addition to any en-

28  hancement (consecutive), for which that Prisoner was sentenced

6(am)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1  to at trial; six (6) extra months each, EXTRA, consecutive to
2  everything the trial Court imposed. Additionally, Title 15 Div.
3  Two, Rule 2286, states; that for each subordinate conviction;
4  under the Principal Case for which the Prisoner is serving his
5  DSL term, the BOARD unilaterally decrees the prisoner must serve
6  an additional six (6) months consecutive. ADDITIONALLY, for each
7  CDC-115 RVR suffered during his incarceration, for that year
8  in which he received that '115' , the prisoner gets NO four
9  months of credit for that entire year. This is a non-refundable
10 term, i.e.; there is no way to get one's 'good time' credit back,
11 its gone forever; while all other prisoners can in fact, apply
12 to have their good time credits restored, if they behave for a
13 a period of time. THAT is a violation of the VIIIth. Amendment's
14 Equal Treatment Clause. All this extra time will be computed in
15 once, IF EVER, Petitioner is found suitable for Parole by this
16 Cabal of Commissioners! Petitioner says 'if ever', because in
17 addition to the aforementioned, the BOARD will then go into its
18 own, unilaterally designed, MATRIX Mode, on the sentence imposed
19 and decide how many 'actual' additional years the prisoner must
20 serve on his, until then, 'lawful' sentence. These enhancements In
21 Toto, will easily condemn ANY Prisoner to ten (10), fifteen (15),
22 or even twenty (20) more years stolen, than the JUDGE originally
23 told the prisoner he must serve. (Please see, Title 15, Div. Two
24 §§ 2402-2408.)
25        And if by some miracle, a Prisoner is found suitable
26 for parole by a Panel; and that grant is not rescinded by the
27 BOARD en banc, the Governor WILL reverse! These crimes are in-
28 flicted on parole candidates retroactively, by these BPH 'Boards'.

6 (an)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1   In a case where the man won; Rosenkrantz; which the Superior Court

2   uses in its Order to Deny Petitioner; Also, in the case of

3   Sass v. California Board of Prison Terms; et al; The Court of

4   Appeals For the United States Ninth Circuit; stated unequivocally

5   that Sass; (and all indeterminately sentenced prisoners in

6   California; and in fact, in all the States under the perview

7   of the Ninth Circuit U.S. Court of Appeals); "The California Court

8   did not hold that section 3041(b) does not use mandatory language. Dannenberg

9   argued that 'he was denied federal due process rights arising from his protect-

10  ed interest, and expectation, in a 'uniform' parole release date.' Id. at 1098

11  n. 18. The Court explained that 'he has such a liberty interest and expectation

12  only to the extent that state law provides it,' but did not hold that state

13  law does not provide such a liberty interest. Id. instead, the Court proceeded

14  to the second step of the due process analysis whether the procedures attend-

15  ant upon a deprivation were constitutionally sufficient." Id. (Emph. Added.)

16  ..."The Court would not reach this step if it had held that there was no liberty interest."

17  See, Ky. Dept. of Corr., 490- U.S. at 460. Dannenberg does not explicitly or

18  implicitly hold that there is no constitutionally protected liberty interest."

19  Sass, supra, 2006 DJDAR 11931. In case after case, the State and Federal

20  courts are holding that indeterminate law sentenced prisoners do

21  have a protected liberty interest in parole. In case after case,

22  Respondents are scolded and schooled, and ordered to comply

23  with the laws of State and Nation: But the Cabal of Commissioners

24  have established this little mini-government inside the Executive

25  Branch in California. There, because they have the respect and

26  deference due public servants of long standing; and because

27  heretofore, no one was championing prisoners' causes in this State

28  and throughout the Nation; it was a simple matter 'to set up'

6(ao)

1  this hidden, secretive, state inside the State Government; com-

2  plete with legislative power, to promulgate its own law, notwith-

3  standing the supposed supervision by the Office of Administrative

4  Law (OAL); which more often than not, in past years, was not

5  even consulted before new Title 15 Division Two Rules were con-

6  jured by the lawyers at B.P.H. (See, Exh. B ); Transcripts of

7  the B.P.H. passing a measure whereby they would stipulate amongst

8  themselves that no life term prisoner would ever be transferred

9  to his home country until he was first found suitable for parole.

10 The Chairman stated this pseudo law would not mention that little

11 fact in the new rule/law, because the BOARD is not authorized

12 to take such an action. This Rule/law was certainly put into

13 effect, legal or not; without the knowledge of the Legislature

14 or interpretation by any Judicial Body in this State. The OAL

15 has proved itself part and parcel to the illegalities perpetrated

16 by the B.P.H., because even in the rules they have reviewed, the

17 improprieties and unconstitutional rules are still there! Put into

18 print anyway; condemning thousands of Indeterminate sentenced

19 prisoners to languish ten, fifteen or twenty more years in prison

20 after they honorably served their legal imposed sentence  by

21 a Judicial Court of this Sovereign  State. The activities of

22 these Commissioner/Cops are akin to the heinous actions of such

23 infamous pseudo police' groups such as the GESTAPO. During the

24 1930s in Hitler's Germany, the NAZIs (Nationalsozialistischen

25 Partei), decided the Weimar Courts were way too democratic and

26 liberal. Therefore, all courts in the Weimar Republic were out-

27 lawed. 'New' courts were created and named, "Volksgerichtshof",

28 and "Reichsgerichthofs"; etc. Then, all Weimar Judges, prosecutors

6(ap)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (CONT.):

1  'soft' lawyers, were sent off on a one way trip to the Koncentra-

2  tions Lagers, and 'new' Judges, Prosecutors, and 'proper' Coun-

3  selors were emplaced, insuring 100% conviction rates during

4  the rest of the existence of the Dritte Reich. If by chance

5  a lucky defendant was acquitted, found not guilty, or somehow,

6  walked out of one of these courts a free man; he was promptly

7  met by GESTAPO officers,loaded into one of their Mercedes

8  sedans, and was whisked away to a Vernichttungslager, (Death

9  Camp), anyway. All these 'officials' were SS (Schutz Staffel &
   NAZI Party members.) (Rise and Fall Of The Third Reich-William Shirer.)

10      No. Things have not reached that level of murderous, vin-

11  dictive persecution in America, so far; unless one counts the

12  Due Processless Denizens of the Concentration Camp at Guantanamo

13  Bay, Cuba. But here we have a group of mostly law enforcement

14  career officers taking the law into their own hands. People

15  are dying in California's prisons from old age, and geriactric

16  diseases, who have long been 'rehabilitated', and more import-

17  tantly, have served much more than the time a truly legal

18  Superior Court Judge sentenced them to after a trial by jury,

19  judge, or Plea Agreement: A bona fide Judicial Court of the

20  State of California, who <u>shouldn't</u> take kindly to having

21  their well thought out sentences and interpretations of the

22  laws thrown out of the window with the Laws, Statutes, Penal

23  Codes, Government Codes, and Constitutions, flying out a close

24  second along with the Rules of Court of the State of California.

25  Well, that is exactly what has come to pass in this State.

26  What good is it to talk about suitability, parole plans, self-

27  help programs, age of the prisoner, etc; when we've got a Cabal

28  of Commissioners insuring they get 100% '<u>reconviction</u>' rates?

6.(aq)

1   Of course, like in those NAZI courts of 70 years ago, every

2   once in a while: about 1% of the time, one slips out. A prisoner

3   nicknamed 'Cadillac Bob', out of this institution, was one

4   such lucky soul. Of course, 'Cadillac Bob' suffered from gout,

5   rheumatoid arthritis, sugar diabetes, heart disease, and going

6   blind: had been 'down' since the 80s. Once the Courts all but

7   dragged him out of this place, 'Cadillac Bob', had to immediately

8   check himself into San Bernadino Hospital for treatment of his

9   fatal illnesses. When, former Chairperson of the Board of Parole

10  Hearings, Ms. Susan Fisher, found out he had been rescued, she

11  immediately convened an emergency session of the B.P.H. En

12  Banc, in Sacramento, and ordered him 'picked up' and brought

13  back into custody. ' Cadillac Bob', disappeared from the San

14  Bernadino Hospital without a trace, and has not been heard

15  of since. His real name is Harold Jones, and he has disappeared.

16  The California Newsletter, headed his article "Does Anyone Know

17  The Whereabouts of 'Cadillac Bob'."

18      This writer served 15 years active duty as a Paratroop

19  Unit Commander, in three combat zones, including two tours

20  in Vietnam with the 101st Abn. Div. (Air Mobile) [67-69]; and was

21  honored to do so: After his experiences in the CDCR the past 23

22  years; and led to expect much more time in, at his last BOARD; he

23  wonders, if he would have volunteered for such duty as a commis-

24  sioned officer, knowing what he knows about this country now?

25  This writer is convicted for 211/209(b), where no victim was

26  physically harmed.

27      That is what the Petitioner in this habeas corpus action

28  is fighting: the make-up, and yes, the existence of this Rogue

6 (a)

1   gang of former law enforcement personnel, who have been given a

2   green light to flout the rightful laws of State and Nation and

3   have made a mockery of the California and United States Consti-

4   tutions by their illegal, unethical, arrogant and even felonious

5   actions as Commissioners for the B.P.H., acting under color of

6   State Law, each and every one of them, in their Official Capacity

7   as members of the Executive Branch of Government. They cannot

8   cry out in self defense, that they were "just obeying orders",

9   as those NAZIs did 60 years ago at Nuremberg, Germany, ("Befehl

10  sind Befehl!""Orders are Orders!"), because in this country, uni-

11  formed and plainclothes members of the armed forces and police

12  forces, and officials of the CDCR; as these Commissioners are;

13  are forbidden from carrying out unlawful commands or orders,  on

14  pain of imprisonment, or even death in times of War. All members

15  and former members of law enforcement agencies and or military

16  organizations (as many of these Commissioners also were;) know,

17  beyond any reasonable doubt, that this is true. Yet, the B.P.H.

18  Commissioners conciously smash the Bill of Rights, The Constitu-

19  tions and protections the Amendments have built; in order to

20  complete their mission of realizing as close to a "no parole-

21  policy for Indeterminate Term Prisoners as they can." They

22  have established a mini-police State Government where they can

23  do as they please; sort of like the Commanding General of the

24  'Kingdom of Jones' during the American Civil War, in Alabama.

25  The 'law' started and ended at Gen. Jones's behest until Federal

26  troops arrived there in 1865. Jones, Taxed, punished, executed,

27  rewarded or murdered whom he chose. He did this in obscurity,
                                        authority,
28  ignoring all Confederate or Union. He was a law unto himself.

General Jones got away with this tyrannical behavior during the
War Between the States, because no one was looking.(Ken Burns, 'The
Civil War'.)
          The B.P. H. is not isolated away deep in the middle of war-
time Alabama, but it is 'isolated' deep in the 'Belly of the Beast',
protected and coddled by the Governors and CDCR; tolerated & funded
by the Legislature; until now, because now all the dirty laun-
dry is being put out for public viewing: After all, they were
performing a desired mission: convicts went/go into the prison
system; and if with an Indeterminate Term, "they checked in but
they don't check out... the Roach Motel". Except that now the
prisons are bursting at the seams; the Federal Government is on
the verge of taking over the running of the prison system; and
heads <u>will roll</u>. Forget Democracy, get Justice! Justice is our
President's code word for vengeance. But you can't have it both
ways. That road leads to madness.
-- Specifically, the BOARDS' and Governors' refusals "normally to
grant parole..." [California Penal Code § 3041 (a);] as mandated
by the statutes     and regulations; to those lifers who served
exemplary time in excess of their minimum terms, many of whom
(including this Petitioner); have been imprisoned approaching a1/5
century, exceeding even the maximum terms prescribed by genuine
law, based on the particular facts of their case[s], issues that
were professionally, legally, and <u>finally</u>, Petitioner thought; set-
tled by a qualified Judge, who, by the way, showed Petitioner no
pity or mercy. Little did Petitioner know that he would be 'really
sentenced' a score of years down the road by the GESTAPO (sorry,
Petitioner means the BPH.) Instead, the Governors and their hand-
picked BPH, insure that less than 1% of suitables, parole.

                                6 (at)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1  II.    THE DUE PROCESS VIOLATIONS IN PETITIONER'S CASE

2        Notwithstanding what has been unambiguously stated and at

3  least partially proven in these papers: that the Board of Parole

4  Hearings acts as a 'mini' government inside the larger State

5  government, complete with the three customary branches of govt.

6  found in an American style Democracy; the legislative, judiciary,

7  and an executive; At least the B.P.H. acts as if it is a sovereign

8  independent entity;  existing under cover of the legitimate

9  State government of California; but whom many of its bona-fide

10  governmental officials know about, tolerate and even protect

11  this Cabal of Commissioners:.The Federal Constitution's Bill of

12  Rights, i.e.; the First and Fifth Amendments are codified into

13  the Fourteenth Amendment, were created to afford protection to

14  the individual citizen to enable them the right to redress griev-

15  ances from arbitrary and capricious state actions used to deprive

16  them of due process and equal protection of law...in short, under

17  the Legislature's purpose  of "punishment" for the  crime, the

18  penalty   cannot be indeterminately left in the hands of others

19  forever, (the B.P.H.);or it violates both the due process and

20  equal protection clauses of the Fourteenth Amendment to the

21  United States Constitution. (From, Remson v. Carol A. Daly,

22  B.P.T.; et al, Case No. 03-15871, (D.C. No., CV-02-2587- FCD)

23  (9th. Cir. 2002): Petitioner is emminently suitable for parole!

24        A.   The creators of the Federal Constitution believed

25  that for the  young Democratic Nation to survive, no one person[s]

26  should have the power to accuse, prosecute, convict and impose

27  punishment for felony crime[s]. But as shown in this petition,

28  that is  exactly what the Board of Parole Hearings has by evolu-

6(au)

1  tion been allowed to become: a one man ordered Cabal of Commis-

2  sioners who promulgate illegal rules that cancel out by reinter-

3  pretation, the Governmental and Penal Codes written by the Legis-

4  lature, to codify the system of punishing felons in the State of

5  California; i.e., Title 15, Division Two, Board of Parole Hear-

6  ings Rules. As addressed in this petition, the Governor, through

7  the manipulation of the B.P.H., has defeated the Legislature's

8  duty and power to set equal, proportionate, Just and Legal

9  penalties for felonious, Indeterminate sentenced    defendants,

10  after a Jury trial by a member of the Judiciary and a commission-

11  ed Judge in the State Bar of California; or some other arrange-

12  ment made at Court by qualified lawyers on stipulation, such

13  as Court trials, Plea Bargain Agreements,  <u>Nole Contendere</u>

14  pleadings or guilty pleas on advise given by defense attornies;

15  etc.

16      1.    In accordance with the aforementioned, the <u>Legisla-</u>

17  <u>ture</u> must fix the actual penalty for any given crime to a

18  number of years. This was the purpose of the 'new' Determinate

19  Sentence Law way back in the late '70s, and is based on the

20  Legislature's then intent, declared in Cal. P.C. § 1170(a)(1);

21  (See: Stats 1977C 165 § 15). Based on this  Declaration, that

22  the purpose for imprisonment for crime is "punishment" for the

23  crime itself, the penalty must be the same for each offender

24  committing the offense. Additionally, the declared penalty must

25  be applied equally to each person committing the same offense,

26  or the penalty is uncertain and "void on its face" as violating

27  both State and Federal Constitutions' Equal Protection Clauses.

28  Furthermore, if political appointees usurping the duty of the

1. Judiciary to interpret these laws, because they don't trust who m
2. they are fond of calling "activist judges", operate with impunity
3. as such political employees in the Executive Branch of Government
4. unilaterally determining the 'will' of the Legislature by re-doing
5. the duties relegated to Judge and Juries only, of interpreting
6. the law for the judges, and aggravating a sentence for the jury
7. when and if it finds aggravating circumstances beyond a reasonable
8. doubt during its deliberations; (Please see, the recent decision
9. in <u>Cunningham v. California, 05-6551</u>) applied retroactively to
10. just this type violation as to the actual penalty to be inflicted,
11. ignoring all but the 'Life' part of the sentence handed down by
12. the Courts. As such, there is no legal way to determine the will of the
13. Legislature as to what the penalty should be each offender commit-
14. ting the same type crime, and again the penalty is "void on its
15. face" as being constitutionally uncertain and there is no due
16. process, which must come from a legitimate court of law. The
17. aforementioned is not just some 'Johnny-come-lately' change in
18. the laws of this country; as Justice Thurgood Marshall said;
19. in his Dissenting Opinions in <u>Payne v. Tennessee, supra, &</u>
20. <u>New York v. Harris, supra;</u> "The law has not changed, only the personnel
21. of this Court have changed..." "A virulent conservative" attitude.
22. As far back as 1803, the first Chief Justice of the United States
23. Supreme Court; <u>Marbury v. Madison, supra, In short, under the</u>
24. <u>Legislature's 'new' purpose of "punishment" for the crime,</u>
25. <u>the penalty cannot be indeterminately left in the hands of</u>
26. <u>others besides the jury; i.e., the B.P.H., because it violates</u>
27. <u>both the Due Process, Equal Protection Clauses & the VIth.</u>
28. <u>Amendment United States Constitution; See, Cunningham, supra, 05-6551.</u>

6(aw)

B.    Petitioner has been subjected to a number of
constitutional violations in his latest Sub. Par. Con. Hrg.,
by the unlawful conduct of Presiding Commissioner, Ms.
Belinda Harris-Ritter; and, Mr. Ramon Estrada, the Deputy
Commissioner, just as the other commissioners have in lock-
step done so in his prior hearing.  As a matter of law,
petitioner has a right to compel a governmental authority
from acting in an arbitrary and capricious manner. In addi-
tion to his Federal Due Process, Petitioner's State consti-
tutional Due Process rights are violated when a state sen-
tencing authority intentionally flouts its rules and regula-
tions; See, e.g.; Walker  v. Deeds, (9th. Cir. 1995) 50
F. 3rd. 670. Of course, Petitioner is not implying here
that the B.P.H. is a "state sentencing authority"; he is
saying that the B.P.H. has been encouraged to & does present
itself as a bona-fide sentencing authority; but in fact, it is
just a ministerial body in the Executive Branch of Government,
which has none other than quasi-judicial authority to im-
pose sentences [although it does so anyhow]; inter alia!
Assuming arguendo the B.P.H. were a proper sentencing auth-
ority, they are still rife with corruption, and herein
so charged, by misrepresenting their legal status with
deceptions and lies  See; Ex Parte Bertrand, supra, and
Hicks v. Oklahoma, (1980) 447 U.S. 343, 346, cited by
Campbell v. Blodgett, (1992) 99 F.2d 512, 522, which reiter-
ated that "state laws guaranteeing a defendant procedural
rights at sentencing may create liberty interests protected
against arbitrary definition by the Due Process Clause,

6(ax)

1  of the Fourteenth Amendment," <u>Walker, supra,</u> 50 F.3rd.

2  at 672. How much more egrigious then, is the 'sin', when

3  a governmental, albeit a so-called "ministerial Body",

4  in the Executive Branch of Government passing itself off

5  as a true "State sentencing authority" <u>falsely</u> imposes im-

6  proper Judicial sentencing schemes on all of the prisoners

7  who come before it for suitability findings and base term

8  setting, in order to re-sentence these individuals to

9  LWOP sentences counter to '<u>all</u>' proper, legal & constitution-

10  al laws and statutes?

11       1.   The "arbitrary and capricious" use of the so-

12  called "some evidence standard"; which held up Mr. Rosenkrantz's

13  freedom for so many years, and which is discussed in <u>Rosenkrantz, supra,</u>

14  commits the same type violation for prisoners at parole hearings

15  throughout the State of California, even until the present

16  time, <u>no matter what the Courts say or Hold, or decree, the</u>

17  <u>B.P.H. considers itself a law unto themselves, and EVERY</u>

18  <u>prisoner will have to 'win' his/her case in the courts of</u>

19  <u>State and Union, because the arrogant police officers, senior</u>

20  <u>figures on the Board of Parole Hearings, only hear their Mast-</u>

21  <u>er's Voice; and that Master is the Governor's who gave them</u>

22  <u>their $100,000 a year jobs</u>!! (Please see the Exhibits <b>b-d</b>,

23  attached.)

24       2.   The aforementioned outlines the overall cons-

25  titutional violations which Petitioner and thousands of CDCR

26  prisoners are subjected to perenially by the B.P.H. (See Exh.

27  D, attchd herein.) Specifically, the B.P.H. has violated

28  Petitioner's Due Process rights in the following manner:

6(ay)

1   b. Petitioner's applications for a finding of

2  parole suitability have been rejected by the inheriting Cabal of

3  Commissioners found in the <u>Rosenkrantz</u>, & <u>Ramirez</u>, cases to have

4  repeatedly flouted the laws and regulations governing the B.P.H.

5  's actions. As may be determined by an objective analysis of

6  these factors: Each of the §2402 factors will be discussed in

7  turn; i.e.; Title 15 Div. Two, § 2402 (c):

8   "<u>Circumstances tending to show unsuitability</u>."

9   1.   Commitment of offense. "The prisoner committed

10 The offense in an especially heinous, atrocious or cruel manner."

11   (a)   "<u>Multiple victims were attacked, injured</u>

12 <u>or killed in a same or separate incidents</u>."

13 ----One victim was killed in one incident.

14   (b)   "<u>The offense was carried out in a dispas-</u>

15 <u>sionate abd calculated manner, such as an execution-style murder</u>."

16 ----The offense was a reaction to a humiliation by the victim which left

17 the prisoner embarrassed, mortified and angry. Once re-dressed

18 in his clothes which were retrieved by friends of the victim,

19 who had threatened the prisoner with great bodily injury, with

20 a sharp iron bar, and after throwing him out of the house <u>NAKED</u>,

21 the prisoner climbed back into the house in confusion, was again

22 confronted by the victim with his weapon; the Petitioner ran in-

23 to the kitchen, where he saw and grabbed a kitchen knife, which

24 he in an enibriated state stabbed the victim once in the chest.

25 ----The offense was a reactive homicide, not remotely comparable

26 to an execution-style murder. It was really a voluntary homicide.

27   (c)   "<u>The victim was abused, defiled or mutila-</u>

28 <u>ted during or after the offense</u>."----Apart from the inherent

1   fact of there being a homicide victim, no victims were abused,

2   defiled, or injured in any way.

3          (d)    "The offense was carried out in a manner

4   which demonstrates an exceptionally callous disregard for human

5   suffering."----This factor is more inapplicable here even, than

6   it was found to be in Rosenkrantz. Given that the homicide vic-

7   tim who was the aggressor and the initiator in the tragic inci-

8   which cost the victim his life, the offense was committed in as

9   average a manner as is conceivable under the statutory defini-

10   tions. There is nothing whatsoever exceptional about these facts

11   and nothing indicating an "exceptionally callous disregard for

12   human suffering." See, Rosenkrantz, 80 Cal.4th. at 425.

13        2.    Previous record of violence. "The prisoner on

14   previous occasions inflicted or attempted to inflict serious

15   injury on a victim, particularly if the prisoner demonstrated

16   serious assaultive behavior at an early age."

17          (a)  Petitioner has no record of any crime com-

18   mited on any victim whatsoever; before or since his one event

19   in his life.

20        3.    Unstable social history. "The prisoner has a

21   history of unstable or tumultuous relationships with others."

22          (a)  Since before and after the commitment of the

23   offense Petitioner has always been a passive, friendly person;

24   the opposite of this unsuitability finding. The Psychologists'

25   Reports read at both Hearings, stated: "He will probably continue to

26   have a good record on the outside. He was not a criminal prior to his arrest,

27   and he will undoubtedly not continue a life of crime upon his release. His

28   violence potential should be very low, and he should be able to maintain a

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1  107 U.S. 221, 224 (1883); "Recharacterization of a crime is unconstitutional."

2  See, Green v. United States of America, (1957) 355 U.S. 184, 190,

3  78 S. Ct. 221, 225. Petitioner has shepardized Green; it is still

4  'good law". At any rate, Petitioner has ceased and desisted from

5  such delinquent activity. Also, because he will not be deported to

6  Cuba while the communists are in power; a Federal halfway-house

7  with housing and food provided until petitioner gets a job and an

8  apartment; is in his future. He qualifies for suitability on this

9  factor.

10         4.    Sadistic Sexual offenses. "The Petitioner has pre-

11  viously sexually assaulted another in a manner calculated to

12  inflict unusual pain or fear upon the victim."

13         Totally inapplicable.

14         5.    Psychological factors. "The prisoner has a lengthy

15  history of severe mental problems related to the offense."

16         Petitioner has no history of mental illness related to the

17  offense, although he does acknowledge being inebriated at the rele-

18  vant time. Petitioner's current psychological evaluation refutes

19  the current or past existence of any such severe mental problems.

20         6.    Institutional behavior. "The prisoner has engaged

21  in serious misconduct in prison or jail."

22         Except for the two 115s alleging the pilfering of food from

23  culinary at minimal values; Petitioner has been disciplinary-free

24  for the seventeen years he has been imprisoned. The 128b allega-

25  tions are merely counseling chronos, and are NOT to be used as

26  disciplinary violatios EXCEPT by the Cabal of Commissioners who

27  make it their solemn mission to demonize all the prisoners who

28  appear before them.

                        6(bd)

1          c.  Thus, there are no factors of unsuitability

2    to weigh on the scale. The Petitioner was indeed convicted of a

3    crime, but the nature of the crime and the man, the fact that the

4    crime was committed, over 17 years ago, and his subsequent insti-

5    tutional behavior demonstrates he does not qualify for _any_ of the

6    enumerated unsuitability findings.

7          d.  Regarding the "circumstances to show suita-

8    bility," Petitioner qualifies on all  of these.

9      1.   No juvenile record. "The prisoner does not have a

10   record of assaulting others as a juvenile or commiting crimes

11   with a potential of personal harm to victims;" other than the

12   commitment offense itself.

13     Petitioner has no juvenile record whatsoever, and thus

14   doubly qualifies for a pro-suitability finding. The "some evidence

15   standard" is non-existent here.

16     2.   Stable social history. "The prisoner has experienced

17   reasonably stable relationships with others."

18     This is a mirror image of unsuitability factor 3, and

19   Petitioner submits it on that presentation.

20     3.   Signs of remorse.  "The prisoner performed acts

21   which tend to indicate the presence of remorse, such as attempt-

22   ing to repair the damage, seeking help for or relieving the suf-

23   fering of the victim, or indicating that he understands the nature

24   and magnitude of the offense."

25     Petitioner has repeatedly and sincerely expressed remorse

26   for his actions and the understanding of the magnitude of his

27   crime, even though it was him who was originally accosted by the

28   victim who attacked him with an iron bar and forced him naked,

'6(be)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1    particularly according to the mental health professionals who have
2    examined him and submitted reports to the Board.
3        4.    Motivation for crime. "The prisoner committed his
4    crime as a result of significant stress in his life, especially
5    if the stress has built up over a long period of time."
6        Petitioner was thrown into shock. He met this man in a bar
7    and discovered he was a latino man, who seemed to have a lot in
8    common with Petitioner. Later, after the victim invited Petition-
9    er to his house to listen to Latin music and continue drinking; he
10    suddenly, without warning accosts Petitioner with this heavy, iron
11    exercise bar, and orders him to undress. The D.A. got it totally
12    wrong and inapposite how the incident happened. It was the victim
13    who ordered Petitioner to get naked. The two mwn weren't mutual-
14    ly naked or partially clothed. The so-called victim was fully
15    dressed. He attacked Petitioner with the bar and ordered him to
16    undress. Petitioner did not argue; he ran out of the house after
17    undressing, because it became obvious to him the victim had fur-
18    ther 'plans'. The embarrassment, shock, anger, and mortification
19    were palpable. That, and the effects of the alcohol consumed, was
20    the reason[s] Petitioner went back into that house. No man can
21    honestly say he would not have at least been sorely tempted to
22    react in some way to this outrage. Petitioner, reacted felonious-
23    ly and improperly. He grieves for this LIFE blunder. He is sorry
24    it happened; and sorry a man's life was the price. He has paid for
25    his crime.
26        5.    Battered woman's syndrome. [Not applicable].
27        6.    Lack of criminal history. "The prisoner lacks any
28    significant history of violent crimes." No priors exist at all.

6(b#)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1   (Please see, McQuillon, supra; further defined in the case of

2   Masoner v. State, Case No. CV 03-1261-ER, United States District

3   Court, Central District of California; page -2- "[4] Although

4   the gravity of the commitment offense and other preconviction factors alone

5   may be sufficient to justify the denial of a parole date at a prisoner's

6   initial hearing, subsequent BPT decisions to deny a parole date must be

7   supported by some post-conviction evidence that the release of the inmate

8   is against the interest of public safety.")

9        7.    Age. "The prisoner's present age reduces the

10  probability of recidivism."

11       Petitioner is now all of 57 years of age, and it is

12  well recognized in criminological reality that apart from per-

13  sonal understanding, remorse, and other likelihood of criminality

14  Petitioner is now a middle-aged man who realizes that he might

15  have one last chance for a productive life in American society,

16  which reduces his likelihood of recidivism to zero.

17       8.    Understanding and plans for the future. "The

18  prisoner has made realistic plans for release or has developed

19  marketable skills that could be put to use upon release."

20       Petitioner certainly qualifies under this factor, because

21  he has a very marketable vocation both here in prison, in Cuba,

22  or in the United States upon release on parole as a chef or

23  cook. As stated before, Petitioner has always been gainfully

24  employed wherever he has lived. There is no question that upon

25  release on parole, Petitioner will be more than satisfactorily

26  supervised by Federal Immigration officials and by California

27  State Parole Officers. This man is no threat to public safety.

28       9.    Institutional behavior. "Institutional activities."

6(bg)

1    In both his hearing; the Initial on December 14, 2001,

2    and on his Subsequent, and instant Hearing, on September 14,

3    2006, it has been obvious that Petitioner is a simple and humble

4    man. He is no professor, doctor or Indian Chief. He _is_, however,

5    a man who has always worked and stayed away from conflict with

6    the authorities. In the institution he has attended AA & church

7    since his incarceration began 17 year ago. Of course, his abso-

8    lute inability to learn english does hurt his efforts in these

9    self-help areas. But I do not believe that an American Court

10   of law is prepared to permanently deny a Petitioner the Great

11   Writ simply because he does not speak English! During the

12   American Civil War, from 1860-1865, whole Infantry Divisions

13   of Union troops spoke only German. In fact, when these soldiers

14   were asked about their service; their almost entire vocabulary

15   in the english language was: "Wir fightin' mit Siegel!" (Gen.

16   Siegel, their Commanding General). Yet, the Nation was more than

17   happy to accept the full sacrifice of these soldiers. This

18   writer's Grandfather, a citizen of Puerto Rico, fought for and

19   was wounded in American uniform, in the trenches of WWI France,

20   his service and sacrifice  were "good enough." When his son,

21   the writer's maternal Uncle, Felipe Sanchez, fought at Bataan

22   in the Phillippines, and served three hellish years in a Japanese

23   concentration camp, at Camp       even though he barely spoke

24   a word of English: that service was more than 'acceptable' to

25   America!  That reason for denying parole is bogus _and_ illegal,

26   not to say unconstitutioal!

27        e.    Clearly, there were/are no factors of

28   unsuitability to weigh on the scale. The Petitioner was indeed

1  convicted of the crime. But the fact of his crime-free history and

2  his felony or misdemeanor-free 'post-commitment, institutional time

3  belies the statements of the Commissioners and D.A. Rep., that

4  there is "some evidence" that Petitioner is still an unreasonable

5  risk of danger to the public if released on parole. This awfful,

6  but not confounding crime of killing the victim due to Petitionee"s

7  total humiliation and outrageous treatment at the hands of the victim,

8  happened 17 years ago: almost a score of years. Petitioner has

9  served his maximum time. He was not sentenced by any Court to LWOP.

10      But the revealing and most important 'thing' Petitioner has

11  presented and proved in this habeas corpus petition, is that _more_

12  than suitability or unsuitability factors in this Petitioner's case,

13  the violative, vindictive, felonious activities of the Cabal of

14  Commissioners on the Board of Parole Hearings, are the real reason

15  Petitioner nor the vast majority of his parole eligible peers, and

16  contemporaries presently serving, effectively, Life in Prison With-

17  out the Possibility of Parole interminable sentences are found

18  'suitable' for parole.

19                          CONCLUSION

20      Petitioner satisfies the "some evidence standard" of proof

21  used by the Boards contemporaneously; See, _Superintendant v. Hill_,

22  472 U.S. @ 455; _if_ it is utilized as _interpreted_ by the Judiciary

23  in the case of _Hamdi v. Rumsfeld_, 124 S. Ct. 2633 @ 2651 (2006),

24  where the former Associate Justice of the United States Supreme

25  Court, Hon. Sandra D. O'Connor wrote for the Court: "¶Because we con-

26  clude that due process demands some system for a citizen detainee to refute his

27  classification, the proposed "some evidence" standard is inadequate. A

28

                          6(bi)

21

1   vocationally and educationally.  Now according to your

2   psychiatric report by Dr. Bakeman dated September 19th,

3   2000, the doctor does indicate a diagnosis of Axis I,

4   Alcohol Abuse in Institutional Remission; Axis II, No

5   Contributory Personality Disorder nor Intellectual

6   Disorder; and you have a GAF Score of 80.  In regards to

7   Assessment of Dangerousness, the doctor indicates his

8   violence potential should be very low.  He is a flight

9   [inaudible] and does not try to be aggressive with other

10  inmates and should be able to maintain a peaceful

11  attitude upon his release.  Recommendations or Comments.

12  The doctor indicates alcohol monitoring would, however,

13  be a good idea, since he got in trouble with his use of

14  alcohol and has had a tendency to abuse alcohol in the

15  past.  Alcohol monitoring should be a mandatory

16  condition of his parole.  This inmate does not have a

17  mental disorder which would necessitate treatment either

18  during his incarceration nor during his parole.  Now,

19  Mr. Sierra, have I missed anything?

20          **INMATE SIERRA THROUGH INTERPRETER:**  No.

21          **DEPUTY COMMISSIONER ESTRADA:**  Counsel?

22          **ATTORNEY TARDIFF:**  I had a note of an Inmate

23  Peer Education at some [inaudible], but I don't know if

24  there's a chrono on it.  It was in the preliminary

25  notations of the Board.

26          **DEPUTY COMMISSIONER ESTRADA:**  This reporting

27  period?

22

1       **ATTORNEY TARDIFF:**  3/02 to 2/03.  I just have

2   "successfully completed course in tuberculosis."

3       **DEPUTY COMMISSIONER ESTRADA:**  That's true.  Very

4   good.  I missed that.  There is that one class he did

5   complete, and there is a chrono here.  I just don't have

6   that date.  I don't have the -- I'll get the date on

7   that, okay?  But -- and you're right.  There was

8   indication that he did complete that in regards to TB.

9   Anything else, Counsel?

10      **ATTORNEY TARDIFF:**  No.

11      **DEPUTY COMMISSIONER ESTRADA:**  With that, I'll

12  return to the Chair.

13      **PRESIDING COMMISSIONER HARRIS-RITTER:**

14  Mr. Sierra, we've already talked about the parole plan

15  problem, so at this time I'm going to tell you that we

16  have sent out Penal Code Section 3042 Notices, and those

17  go to the various agencies that have a direct interest

18  in your case.  And in response to those notices, we

19  received a letter from the Los Angeles Police

20  Department.  It's dated June 15th, 2006, on behalf of

21  Chief of Police, William Bratton.  The letter is from

22  Greg R. Hall, H-a-1-1; Captain, Commanding Officer of

23  the Detectives Support Division; and this letter

24  indicates that the Los Angeles Police Department

25  recommends that your parole be denied.  It is the

26  Department's position that they are adamantly opposed to

27  your release back to the community, and they believe you

23

1    should remain segregated from society because they

2    believe this murder was carried out in a manner that

3    exhibited a callous disregard for the life of another.

4    At this time, we have an opportunity for the panel, the

5    Deputy District Attorney, and your attorney to ask you

6    any questions; so I'm going to ask Commissioner Estrada

7    first -- do you have any questions of Mr. Sierra?

8            **DEPUTY COMMISSIONER ESTRADA:**  I have no

9    questions, but the inmate did complete his TB course on

10   June 3rd, 2004.

11           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

12   you.

13           **DEPUTY COMMISSIONER ESTRADA:**  And that's all.

14           **PRESIDING COMMISSIONER HARRIS-RITTER:**  So now

15   we'll go to the Deputy District Attorney to see if he

16   has any questions for you.  Mr. Montagna?

17           **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  Mr. Sierra

18   states that he admits the crime.  I'd like him to

19   explain what happened that night.

20           **INMATE SIERRA THROUGH INTERPRETER:**  For me to

21   explain?

22           **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  Yes.  What

23   happened?

24           **INMATE SIERRA THROUGH INTERPRETER:**  It was a

25   night where I cashed my check.  I had a girlfriend.  I

26   went to her apartment, and I started drinking, and she

27   doesn't smoke cigarettes.  She didn't like the cigarette

24

1    smoke, so we had a small argument.  I went to the bar --
2    to a bar.  I was drinking.  I -- there I met the victim.
3    We were drinking till 2:00 in the morning.  When they
4    closed the bar, he invited me to his house.  We
5    continued drinking.  We kept drinking.  When it was
6    about 6:00 in the morning, I had to go to work; and I
7    told him I had to leave.  He was intoxicated, so he told
8    me that I was not going to leave.  He got a piece of
9    steel.  He threatened that he was going to take off my
10   clothes and could not leave.  When I had my clothes off,
11   some friends of his came; and so they stopped him, they
12   held him, and I put on my clothes.  I believe those
13   friends, they worked together with him.  So everything
14   calmed down.  And so they left and we stood [verbatim]
15   there.  We continued drinking.  I wanted to leave, so he
16   threatened me with a metal object to [inaudible].
17   That's when I got the knife to defend myself.  And so I
18   thrust forward, and I felt that I stabbed him, but I
19   left.  That's all [inaudible].
20        **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  Did you make
21   sexual advances toward the victim?
22        **INMATE SIERRA THROUGH INTERPRETER:**  No.
23        **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  Did he make
24   sexual advances toward you?
25        **INMATE SIERRA THROUGH INTERPRETER:**  No.
26        **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  Well, the
27   evidence at trial indicates that you were naked and

26

1    left were his friends.  I stayed there drinking with

2    him.  When he threatened me the second time, that's when

3    I did not allow that.

4         **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  I have

5    nothing else.

6         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

7    you.  Ms. Tardiff?

8         **ATTORNEY TARDIFF:**  No questions.

9         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

10   you.  Then we'll go to closing statements.  First the

11   District Attorney's Office representative.  Go ahead.

12        **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  From what I

13   understand of the trial record, he was naked.  The man

14   was pulling him.  The victim was poking him, and the

15   neighbors came, and they forced the victim to calm down

16   because the victim was angry at him.  Mr. Sierra got

17   dressed and left, and it was later that he came back and

18   somehow gained entry in the place, took a knife, and

19   killed him.  It would appear that he had been humiliated

20   in some manner by being -- having people see him naked

21   at the door like that.  The conclusion, I think, from

22   all of the evidence in the case was that there was a

23   sexual assault made by Mr. Sierra upon the victim, and

24   he was rebuffed.  The victim threw him out at that

25   point, and that's why he was prodding him with the iron

26   stick.  And there was, you know, a ruckus; and people

27   came and calmed the victim down; and Mr. Sierra was

27

1  allowed to dress and leave; but he came back; and to get

2  his revenge, he came back and killed him.  It's possibly

3  a macho thing and partly because he was humiliated.  It

4  does appear, you know, from everything that there is no

5  evidence that he was a criminal in the usual sense of

6  the word, that this was a situational thing.  I think he

7  places --

8         [Thereupon, tape was turned over to side two.]

9         **DEPUTY COMMISSIONER ESTRADA:**  Okay, go on.

10        **DEPUTY DISTRICT ATTORNEY MONTAGNA:**  Too much --

11  I think Mr. Sierra places -- tries to minimize his

12  involvement and blames a lot of it on the fact that he

13  had been drinking.  There is certainly a conflict

14  between statements he made when he first came into

15  prison and the one in 2000 where -- the 2000 one he

16  admits he killed him because he was humiliated.  But the

17  details vary between the first statement when he came

18  into prison and the later one.  I don't see that there's

19  a great deal of difference between the situation

20  Mr. Sierra is in today and when he last appeared before

21  the Board.  I think his parole plans really are not

22  adequate and that he should spend further time in prison

23  before being given a release date.  Thank you.

24        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

25  you.  Ms. Tardiff?

26        **ATTORNEY TARDIFF:**  Thanks.  In terms of

27  Mr. Sierra's pre-incarceration history, it's favorable.

28

1    He had no prior criminal history that we know of.

2    Apparently he was -- worked steadily.  He served in the

3    Cuban military for three years with an honorable

4    discharge.  In terms of the commitment offense itself,

5    he served the time for the crime at this point,

6    regardless of which set of facts or statements one

7    agrees is the true version.  The issue is whether or not

8    he poses an unreasonable risk of danger should he be

9    released.  He's programmed pretty well considering he's

10   from another country.  He's -- when he was in the

11   literacy programs, he was getting letter grades of A.

12   He's continued to participate in Alcoholics Anonymous

13   for many years.  He has two 115s, no force or violence.

14   Last one was seven years ago.  And 128s -- I know he has

15   five recent ones, but they were actually quite minor.

16   He gets above-average work reports.  His psych reports

17   are supportive.  The first one he received in '95.

18                    "Insight seems to be good.

19             Judgment and impulse control seems to

20             be average.  He shows good self-

21             understanding.  He's psychiatrically

22             improved moderately [inaudible] that he

23             continues improvement out in society.

24             He seemed to be genuinely sorry.

25             Violence potential outside a controlled

26             setting in the past was about average

27             or lower.  At present it is

29

1     decreased" -- so I would conclude it's

2     low.  "In '98, no evidence of a mood or

3     thought disorder.  Demonstrates some

4     insight.  His judgment appeared to be

5     good."

6         Regarding his violence potential, his lack of

7   criminal history, lack of C -- 115s -- I'm assuming they

8   mean violent 115s -- his violence potential is below

9   average to this inmate population.  And then, of course,

10  the most recent one, 2000, indicates that he would pose

11  basically the same amount of threat as anybody -- a

12  citizen -- in the free community.  And that's based on

13  his good record within CDC.

14              "He will probably continue to

15         have a good record on the outside.  He

16         was not a criminal prior to his arrest,

17         and he will undoubtedly not continue a

18         life of crime upon his release.  His

19         violence potential should be very low,

20         and he should be able to maintain a

21         peaceful attitude upon his release."

22         I will submit it on that.  Thank you.

23         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

24  you.  Mr. Sierra, you've already read your statement to

25  us.  Is there anything else you want to say before we

26  deliberate?

27         **INMATE SIERRA THROUGH INTERPRETER:**  No, thank

30

1    you.

2              **PRESIDING COMMISSIONER HARRIS-RITTER:**  Then it

3    is now 10:04 a.m., and we will recess to deliberate.

4                        **R E C E S S**

5                         --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

31

1              **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                      **D E C I S I O N**

3          **DEPUTY COMMISSIONER ESTRADA:**  We're on.

4          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

5     you.  We are back on the record.  All parties previously

6     noted as present are still present, and the time is

7     10:22 a.m.  Mr. -- in the matter of Inmate Alipio

8     Sierra, the panel has reached the following decision.

9     Mr. Sierra, the panel reviewed all information received

10    from the public and relied on the following

11    circumstances in concluding that the prisoner is not

12    suitable for parole and would pose an unreasonable risk

13    of danger to society or a threat to public safety if

14    released from prison.  This is a four-year denial.  The

15    offense was carried out in an especially cruel and

16    callous manner.  The offense was carried out in a

17    dispassionate and calculated manner.  The offense was

18    carried out in a manner which demonstrates a callous

19    disregard for human suffering.  The motive for the crime

20    was very trivial in relation to the offense.  These

21    conclusions are drawn from the Statement of Facts, and I

22    read from the probation officer's report, pages two to

23    three.

24                 "On the morning of May 7th,

25          1991, the inmate stabbed victim,

26          Alfredo Soria, once in the chest,

27    **ALIPIO SIERRA      H-32811      DECISION PAGE 1      9/14/06**

32

1           piercing the heart and killing him.

2           Police officers responded to a call for

3           an ambulance on Chase Avenue in North

4           Hollywood.  On arrival, they found the

5           victim, Alfredo Soria, dead from a stab

6           wound to the heart.  Witnesses

7           identified the inmate as the

8           perpetrator.  One witness observed the

9           inmate hiding the knife on Cantana

10          Street and led officers to it.  The

11          inmate was identified by several people

12          who had observed him at the scene

13          earlier.  In the evening, the inmate

14          and the victim, Alfredo Soria, were out

15          drinking.  They returned to Soria's

16          residence and continued drinking.

17          Sometime during the night, the inmate

18          and the victim argued, and the victim

19          locked the inmate out of the house

20          naked.  Neighbors calmed the victim

21          down, and the victim then allowed the

22          inmate to get his clothes, and the

23          inmate left.  He then later returned

24          and was seen hanging around the area by

25          several of the victim's friends.  He

26          was also seen running from the area and

27   **ALIPIO SIERRA      H-32811     DECISION PAGE 2     9/14/06**

33

1       hiding the knife."

2              As to institutional behavior, the prisoner has

3       programmed in a limited manner while incarcerated, has

4       failed to develop a marketable skill that can be put to

5       use upon release, has failed to upgrade educationally

6       and vocationally as previously recommended by the Board,

7       has not sufficiently participated in beneficial self-

8       help and/or therapy programs, has failed to demonstrate

9       evidence of positive change.  Misconduct while

10      incarcerated includes ten 128(a) counseling chronos,

11      five of which are for stealing food, the last two of

12      which were October 8th, 2004, and November 22nd, 2004.

13      There are also two serious 115 disciplinary reports that

14      are also for stealing food, the last of which was March

15      13th, 1999.  Mr. Sierra, you have to stop stealing food.

16      You keep breaking the same rule over and over.  You have

17      to show the Board that you are capable of following the

18      rules.  Your parole plans are not realistic in that you

19      do not have a documented viable residence, either here

20      or in Cuba; you do not have acceptable employment plans,

21      either here or in Cuba; and you do not have

22      documentation of a marketable skill.  You must have

23      current letters in your file showing where you would

24      live, what employer would hire you, and documentation of

25      work as a cook.  The hearing panel notes that responses

26      to Penal Code Section 3042 Notices indicate opposition

27      **ALIPIO SIERRA      H-32811      DECISION PAGE 3      9/14/06**

34

1    to a finding of parole suitability, specifically from

2    the District Attorney of Los Angeles County and the Los

3    Angeles Police Department which was the law enforcement

4    agency that investigated the case.  Other factors taken

5    into consideration include past mental state; past and

6    present attitude toward the crime; signs of remorse;

7    involvement in other criminal misconduct, which is

8    reliably documented; and other relevant reliable

9    information or circumstances, which taken alone may not

10   firmly establish unsuitability but which, when taken

11   together, contribute to a pattern which results in

12   unsuitability.  Mr. Sierra, the panel believes you have

13   no insight into why this crime happened.  We did not

14   hear remorse for your victim, and it appears to us you

15   have minimized your responsibility for the death of

16   Alfredo Soria.  The panel makes the following findings.

17   The prisoner needs therapy in order to face, discuss,

18   understand, and cope with stress in a non-destructive

19   manner.  Until progress is made, the prisoner continues

20   to be unpredictable and a threat to others.  We think

21   you need insight into why this crime really occurred.

22   Therapy in a controlled setting is needed, but

23   motivation and amenability are questionable.  The

24   prisoner's gains are recent, and he must demonstrate an

25   ability to maintain gains over an extended period of

26   time, which is particularly related to the breaking of

27   **ALIPIO SIERRA      H-32811      DECISION PAGE 4      9/14/06**

35

1  the rules about stealing food.  Nevertheless, the
2  prisoner should be commended for his participation in AA
3  and his Work Supervisor's Reports which are above
4  average for his work on the Lunchbox Crew.  However,
5  these positive aspects of his behavior do not outweigh
6  the factors of unsuitability.  This is a multiple-year
7  denial, and in a separate decision the hearing panel
8  finds that the prisoner has been convicted of murder and
9  it is not reasonable to expect that parole would be
10  granted at a hearing during the next four years.  The
11  prisoner committed the offense in an especially cruel
12  manner, specifically on the evening before May 7th,
13  1991, he and the victim, Alfredo Soria, were out
14  drinking.  They returned to Soria's residence and
15  continued drinking, and sometime during the night they
16  had an argument, and Mr. Soria locked the inmate out of
17  the house naked.  Neighbors calmed the victim down, and
18  he allowed the inmate to get his clothes, and then he
19  left.  The inmate later returned and was seen hanging
20  around the area by several of the victim's friends.  He
21  was also seen running from the area and hiding the
22  knife.  One of the witnesses did show the police where
23  the knife was and positively identified Mr. Sierra.  The
24  offense was carried out in a dispassionate and
25  calculated manner, the offense was carried out in a
26  manner which demonstrates an exceptionally callous
27  **ALIPIO SIERRA      H-32811      DECISION PAGE 5     9/14/06**

36

1   disregard for human suffering, and the motive for the

2   crime was very trivial in relation to the offense.  The

3   prisoner has not completed necessary programming, which

4   is essential to his adjustment, and needs additional

5   time to gain such programming.  He has failed to upgrade

6   vocationally or educationally as requested by a prior

7   Board.  Therefore, a longer period of observation and/or

8   evaluation of the prisoner is required before the Board

9   should find that the prisoner is suitable for parole.

10  These are our recommendations to you, Mr. Sierra.  The

11  panel recommends that you become and remain disciplinary

12  free.  Do not steal any more food.  If available,

13  upgrade vocationally and educationally.  If available,

14  participate in self-help and therapy programming.  We

15  think you've done a good job participating in AA, and we

16  urge you to continue that.  And we also want you to

17  cooperate with clinicians in the completion of a new

18  clinical evaluation.  We are requesting a complete

19  clinical evaluation based upon the panel's belief that

20  your current mental health is an important issue.  In

21  the new full evaluation, the panel requests that the

22  clinician specifically address the following:  the

23  prisoner's violence potential in the free community, the

24  significance of alcohol or drugs as it relates to the

25  commitment, and an estimate of the prisoner's ability to

26  refrain from the use or abuse of same when released, the

27  **ALIPIO SIERRA      H-32811      DECISION PAGE 6      9/14/06**

37

1  prisoner's psychosexual problems, the extent to which

2  the prisoner has explored the commitment offense and

3  comes to terms with the underlying causes, the need for

4  further therapy programs while incarcerated, and whether

5  or not the inmate is minimizing his role in the crime,

6  and whether there was a sexual aspect to the crime that

7  he needs to address before he can gain insight.   That

8  concludes the reading of the Decision.   Commissioner

9  Estrada, do you have any comments?

10             **DEPUTY COMMISSIONER ESTRADA:**   No comments.

11             **PRESIDING COMMISSIONER HARRIS-RITTER:**   Then that

12  concludes the hearing, and the time is 10:31 a.m.   Thank

13  you and good luck, Mr. Sierra.

14                   **A D J O U R N M E N T**

15                       --oOo--

16

17

18

19

20

21

22

23  **PAROLE DENIED FOUR YEARS.**

24  **THIS DECISION WILL BE FINAL ON:**___JAN 1 2 2007___

25  **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **ALIPIO SIERRA     H-32811     DECISION PAGE 7     9/14/06**

38

**CERTIFICATE AND**

**DECLARATION OF TRANSCRIBER**

I, C. M. LOPEZ, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 37, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ALIPIO SIERRA, CDC No. H-32811, on SEPTEMBER 14, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 3, 2006, at Sacramento County, California.


C. M. Lopez, Transcriber
**NORTHERN CALIFORNIA COURT REPORTERS**

EXHIBIT B

EXHIBIT B

ORIGINAL

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

CHAIRMAN JAMES W. NIELSEN, PRESIDING

SPECIAL BOARD OF PRISON TERMS MEETING

Monday, October 5, 1998

Board of Prison Term
428 J Street, 6th Floor
Sacramento, California 95814

CAPITOL REPORTERS
DEPOSITION & GENERAL COURT REPORTERS
2340 HARVARD STREET, SACRAMENTO, CA 95815

EXHIBIT A

1

## PROCEEDINGS

-oOo-

CHAIRMAN NIELSEN: Opened the teleconferenced Board of

Prison Terms emergency meeting at 3:00 p.m.

CHAIRMAN NIELSEN: Agency Secretary Quintin

Villanueva is in attendance at our emergency meeting. First

item on the agenda is the roll call:

CHAIRMAN NIELSEN: Commissioner Giaquinto.

CHAIRMAN NIELSEN: Commissioner Giaquinto on vacation.

CHAIRMAN NIELSEN: Commissioner Guaderrama.

COMMISSIONER GUADERRAMA: Here.

CHAIRMAN NIELSEN: Here.

CHAIRMAN NIELSEN: Commissioner Gillis.

COMMISSIONER GILLIS: Here.

CHAIRMAN NIELSEN: Ms. Bentley.

VICE CHAIRMAN BENTLEY: Here.

CHAIRMAN NIELSEN: Commissioner Van Court.

CHAIRMAN NIELSEN: Van Court. Not present.

CHAIRMAN NIELSEN: Commissioner Ortega.

COMMISSIONER ORTEGA: Here.

CHAIRMAN NIELSEN: Commissioner Shelton.

2

1          CHAIRMAN NIELSEN:  Commissioner Shelton not present.

2          CHAIRMAN NIELSEN:  Commissioner Williams.

3          COMMISSIONER WILLIAMS:  Here.

4          CHAIRMAN NIELSEN:  We do have a quorum here present.  We

5  do not have minutes of our previous meeting; this is a special meeting to address only

6  the emergency regulation.

7

8          The first item on the agenda would be to have a declaration of the

9  emergency.

10          EXECUTIVE OFFICER:  Jenny Willis will read the regulation.

11          CHAIRMAN NIELSEN:  After reading of the text we can entertain

12

13  a motion on the emergency.

14          MS. WILLIS:  Good afternoon, Commissioners.  I'm proposing

15  that the Board adopt emergency regulations to implement the Board's policy regarding

16  foreign prisoner transfers.  This regulation is Administrative Directive 98-11.

17          The first step requires that the Board declares that an emergency

18

19  exists regarding the adoption of the regulation and that it is necessary to preserve the

20  public peace and general welfare of the citizens of the State of California.

21          The emergency adoption of the regulation is necessary to

22  implement the authority given to the Chairman of the Board of Prison Terms through

23  Government Code Section 12012.1 in the convention on the transfer of sentenced

24  persons.

25

3

1    At this point, I am requesting that a Commissioner make a motion

2    to declare that an emergency exists based on my prior comments.

3        COMMISSIONER GUADERRAMA:  Commissioner Guaderrama

4    so moves.

5

6        CHAIRMAN NIELSEN:  Any second?

7        COMMISSIONER ORTEGA:  Ortega seconds.

8        CHAIRMAN NIELSEN:  Is there any discussion on the motion,

9    Commissioners?  The declaration of the emergency is the purpose of this motion.

10       COMMISSIONER GUADERRAMA:  I do have a question.

11

12       CHAIRMAN NIELSEN:  Yes?

13       COMMISSIONER GUADERRAMA:  In the past, before we

14   transferred a prisoner to another country, he had to have a parole date.  I don't see

15   where that's addressed anywhere on this write up.

16

17       CHAIRMAN NIELSEN:  That has, indeed, been our policy in the

18   past.  Let's see if we've got it addressed in here in any way.

19       MS. WILLIS:  Actually, the convention and the Government Code

20   doesn't give the Board of Prison Terms the authority to set that policy.  We've

21   interpreted the convention and we've added the language of the convention into the

22   regulation.

23

24       CHAIRMAN NIELSEN:  Manny, your point is well taken.  I can't

25   recall an occasion where we have ever transferred without having found suitability.

4

1   But your point is, Jenny, we need to be silent on that in the regulations.

2        MS. WILLIS:  Exactly.  And what you'll see is that the factors

3   considered for deciding whether or not to transfer the prisoner are very similar to the

4   factors we consider when we decide whether or not a prisoner is suitable for a parole.

5        CHAIRMAN NIELSEN:  We want to have an indication of the

6   receiving nation's intentions regarding incarceration.  This has always been a sensitive

7   issue and an important issue.  That's why we are quicker to approve a transfer with the

8   European Convention countries because they are more willing to give us those

9   assurances than Mexico has been and, hence, it's a much easier decision to make

10  because of a higher degree of assurance on how much time they're going to serve.  So

11  we wanted that indication in here, but I think you're right.  You're reminding me when

12  we discussed it how we would word the emergency regulation.  We couldn't put that

13  in.

14       COMMISSIONER ORTEGA:  Then this will not affect our right to

15  not transfer somebody if we decide that they need a parole date.

16       CHAIRMAN NIELSEN:  That's correct, we can make that

17  determination.

18       CHIEF COUNSEL:  The emphasis in this regulation is on an

19  individual consideration of each case and you retain all your discretion with regard to

20  any particular decision.

21       CHAIRMAN NIELSEN:  In this regulation there's an actual

CAPITOL REPORTERS

5

1  additional burden that we're imposing and that is an acknowledgment of the host

2  country, meaning that the inmate has got to get them to write us -- the burden is on the

3  inmate. So, we've actually toughened up our own policy a little bit by virtue of this

4  emergency regulation.

5

6          COMMISSIONER ORTEGA:  Thank you very much.

7          CHAIRMAN NIELSEN:  Any other discussion?

8          COMMISSIONER GILLIS:  I'm not sure what the problem is that

9  we're trying to correct.

10          CHAIRMAN NIELSEN:  The problem is the Office of

11

12  Administrative Law (OAL) got into a fair amount of trouble earlier this year for the

13  amount of regulations they had not examined or looked at and that there might be

14  agencies with what they've called underground regulations. And, in fact, over the

15  years we have never put forth a regulation relating to the Foreign Prisoner Transfer

16  Program since the Governor delegated his authority to the Chairman of the Board of

17

18  Prison Terms to deal with this Foreign Prisoner Transfer Program. What the OAL will

19  find is that we do need to have a regulation.

20          COMMISSIONER GILLIS:  Thank you. I just recall in the past

21  that this was not something on which the Board had discretion . It was strictly

22  between you and the Governor and the Board had no say so in that. I thought that was

23  why we never had any regulation.

24

25          MR. CHARTRAND:  Whenever we have a rule of general

6

1    applicability to everyone in a certain class, we're going to have to have a regulation

2    that's adopted and approved through the Office of Administrative Law. OAL has

3    determined we've been operating a program and making decisions of general

4    applicability, but not having any regulations to support it; this is why we have to do

5    this regulation.

6           COMMISSIONER GILLIS: It was my understanding that it was

7    not something that the Board had any discretion with or that we made any decision on.

8    Communication was strictly between the Chairman and the Governor.

9           MR. CHARTRAND: Yes, but the two of them have been operating

10   a program in the state in regards to a specific class of people. And so even though it's

11   only the Governor and the Chairman of the Board of Prison Terms, because they apply

12   this program to everybody in this class, we need to have a regulation.

13          CHAIRMAN NIELSEN: Any further discussion on the motion for

14   Declaration of Emergency?

15         Roll Call:

16          COMMISSIONER GUADERRAMA: In favor.

17          CHAIRMAN NIELSEN: Nielsen, in favor.

18          COMMISSIONER GILLIS: Aye.

19          VICE CHAIRMAN BENTLEY: Aye.

20          COMMISSIONER ORTEGA: Aye.

21          COMMISSIONER WILLIAMS: Aye.

7

1          CHAIRMAN NIELSEN: We now have declared the emergency.

2    The next motion would be to adopt the regulation as an emergency.

3          MS. WILLIS: I'm requesting that a Commissioner make a motion

4    to adopt AD 98-11 that contains the specific text of the emergency regulation and

5    other findings required by the Office of Administrative Law.

6

7          COMMISSIONER GUADERRAMA: Guaderrama so moves.

8          CHAIRMAN NIELSEN: Moved by Guaderrama. Is there a

9    second?

10

11         VICE CHAIRMAN BENTLEY: Second.

12         CHAIRMAN NIELSEN: Bentley seconded it. Any discussion on

13   the motion? No further discussion

14         CHAIRMAN NIELSEN: We will do the roll call.

15         COMMISSIONER GUADERRAMA: Aye.

16         CHAIRMAN NIELSEN: Nielsen, aye.

17

18         COMMISSIONER GILLIS: Aye.

19         VICE CHAIRMAN BENTLEY: Aye.

20         COMMISSIONER ORTEGA: Aye.

21         COMMISSIONER WILLIAMS: Aye.

22         CHAIRMAN NIELSEN: Motion unanimously passed. Is there

23   any further business to come before us? None. Then we will stand in adjournment.

24

25         Gentlemen, I thank you for affecting this special call. We do have

8

1   some additional news on Mr. Siripongs. I'll let Mr. Ching report on this death row

2   inmate's status.

3           MR. CHING:  The Attorney General has informed us that

4   Siripongs' last appeal in the United States Supreme Court was denied today.

5   Consequently, the District Attorney in Orange County will go forward and obtain a

6   death warrant from the Superior Court by the middle of the month.  The Governor's

7   Office is planning to ask the Defense Attorney to submit a clemency petition if, at all,

8   by a date nearer the first week of November.

9           CHAIRMAN NIELSEN:  We do not have any clemency request

10  properly before us, but remember we talked about the rolling notice date to keep

11  ourselves current if we have to call a Board meeting on a moment's notice.  We'll keep

12  you apprised of it, but that's all the update for now.

13          Quintin, would you mind saying something to the Commissioners?

14          MR. VILLANEUVA:  I was a little disappointed that you're all not

15  here; you're all out working and doing the good Governor's work, but I'll try to make

16  one of your future meetings.

17          I had the pleasure of being with the Governor, as did John Gillis,

18  the other night and we talked about the work you're all doing under the leadership of

19  Jim Nielsen and our concern that it carries on at the end of this administration.  The

20  Governor, as it was expressed to me, thinks all of you are doing a hell of a job — have

21  done a hell of a job for the past eight years and hopes that it continues on.

1   The other reason I am here today is that I have a particular inte

2   in this issue that you've dealt with today on foreign nationals and, hopefully, we

3   going to get something rolling and when the new administration comes in, they c

4   pick up the ball and carry it a little further. I had a meeting with, I think it was fi

5   consul generals -- it might have been four -- and a deputy last week on this very i

7   and they seem inclined to work it out and try to cut through the red tape and see i

8   can't get things moving again to get the foreign nationals out of our prisons and i

9   theirs.

10      CHAIRMAN NIELSEN: Carol and Gentlemen, thank you ver;

11  much for piping in this way. Have a good week out there. We'll talk to you later

12  through the week.

14                          -o0o-

15      [Whereupon the proceedings in the above matter were concludec



_James W. Nielsen_

JAMES W. NIELSEN, CHAIRMAN

EXHIBIT C

EXHIBIT C

State of California                                                                    Board of Prison Terms

# Memorandum

Date    :    January 26, 2006

To      :    Commissioners
             Deputy Commissioners

Subject:    **Psychological Reports**

Psychological reports have traditionally been considered by hearing panels in evaluating suitability for parole during the lifer hearing process. The result of this is that these reports have been used for purposes for which they were not intended. This is especially true for those inmates who are not part of the Mental Health Services Delivery System (MHSDS). Effective immediately psychological reports, using a new format, will be provided during the lifer hearing process only for those inmates who are assigned to MHSDS. Inmates who are not a part of the MHSDS will have initial psychological reports generated upon entry into the Department of Corrections and Rehabilitation. Psychological Reports for subsequent lifer hearings for non-MHSDS inmates will not be generated thereafter. This policy is in effect notwithstanding Department of Corrections and Rehabilitation Department Operations Manual section 62090.13.

For inmates not assigned to the MHSDS, the following procedures are to be used:

- In cases where a psychological report has been ordered by a previous panel but not provided by the institution, the current panel shall not postpone a current hearing. The panel shall proceed with the hearing in the absence of the report.

- In cases where the latest psychological report contains a risk assessment, the hearing panel shall articulate to the inmate and his counsel that the panel has read and considered the section of the report regarding risk assessment, and is not assigning any weight to it in the panel's decision.

- As to aspects of the psychological report other than a risk assessment, in determining what weight to give to any opinion expressed by the clinician, you should consider the facts and materials upon which each opinion is based, and the reasons for the opinion. An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved, or has been disproved, or is inconsistent with other information you have read and considered in preparation for or during the course of the parole suitability hearing, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons on which it is based.

- You are not bound by the clinicians opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable.

- Psychological reports shall not be ordered for the purposes of evaluating parole suitability of non-MHSDS inmates. The one exception to this directive is that if a previous psychological report was cited by the Governor as grounds for a reversal of a grant of parole, then a follow-up report shall be ordered.

- The panel may request a follow-up psychological report using the new format for MHSDS inmates only.



**DENNIS KENNEALLY**
Executive Director
Board of Parole Hearings

STATE OF CALIFORNIA
COUNTY OF SAN LUIS OBISPO

DECLARATION OF ALBERT M. LEDDY

I, ALBERT M. LEDDY, hereby declare:

1)   I was an attorney at law, currently retired. After
     graduating from Boalt Hall, University of California at
     Berkeley, I practiced law until 1983 including serving as
     Deputy District Attorney and then District Attorney of
     Kern County, California, from 1952 to 1965 and again from
     1970 to 1983.

2)   Between 1983 to 1992 I served as a Commissioner and then
     as Chairman of the Board of Prison Terms (BPT) pursuant
     to my appointment and re-appointments to those positions
     by Governor George Deukmejian.

3)   During approximately 9 years of service as BPT Chairman
     and Commissioner, parole hearings were conducted as now
     for "life" prisoners (with a maximum prison term of life
     and a minimum of between 7 and 25 years, reduced for work
     and good behavior), by 3-member BPT panels at intervals
     prescribed by the California Penal Code statutes and the
     parole regulations in the Code of Regulations, Title 15,
     Division 2, Board of Prison Terms, §§ 2000 et seq.

4)   From 1983 to 1990 BPT panels became more reluctant to
     grant paroles in accordance with Penal Code § 3041(a)
     (which requires that at the initial hearing a parole date
     "shall normally" be set), resulting in a substantial,
     steady decline in the percentage of parole dates granted
     at hearings. This decline was caused by increasing
     political pressure and new BPT Commissioner appointees
     who disfavored paroling life prisoners.

5)   After  Governor  Wilson's  election  in  1990, he
     substantially intervened to reduce parole grants; in
     actual effect his policy practically eliminated paroles.
     He accomplished this, first, by appointing and
     re-appointing BPT Commissioners known to disfavor parole
     or to favor a "no-parole" policy. These appointees were
     all crime victims, former law enforcement personnel or
     Republican legislators who had been defeated in elections
     and needed a job.

6)   Governor  Wilson  made his "no-parole" policy known in
     several ways including, I believe, through statements
     quoted by the media and possibly through the Youth and
     Adult Correctional Agency Secretary, although I can't say
     I know this to be fact. I am aware that he wanted
     previously set parole dates rescinded.

103

(247)



Leddy
EXHIBIT NO. A
7-7-01

7)  The new BPT appointments by Governor Wilson violated Penal Code § 5075 which required that "[t]he selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross-section of the racial, sexual, economic, and geographical features of the population of the state." Governor Wilson's appointments have been mostly from his home area of San Diego. Most are not qualified by training or experience for the position of BPT Commissioner, and they do not fulfill the statutory cross-section requirements of racial, sexual, economic or geographical proportion.

8)  My knowledge of these facts is based on publication and by awareness of said appointments. my daily dealings with them as panel members at BPT hearings at which paroles were denied contrary to the laws and regulations, and Mr. Wilson's public statements disavowing parole policy as set forth in the statutes and regulations, and proclaiming during his campaigns that he would not have "another Willie Horton episode." On one occasion Joe Sandoval, former Secretary of YACA (a cabinet level appointment) personally warned the Commissioners to be careful about granting paroles. Chairman John Gillis told two Commissioners, "stop giving these dates."

9)  Governor Wilson also accomplished his "no-parole" policy by having the BPT use a previously unused law to void practically all grants of parole by BPT's panels, while not using it to overturn any decision denying parole. This law was Penal Code § 3041.2.

10)  Governor Wilson also had the BPT use a seldom-used regulation, 15 CCR § 2451(c), to rescind nearly all of its previous grants of parole to prisoners awaiting their release. This regulation, known as the "improvident grant" clause, became routinely used to rescind those previously set dates. On one occasion, after I refused to recommend rescission on a panel, I was told by Ted Rich, BPT's Executive Officer, to recommend rescission when it is the Governor's desire. It was obvious to myself and other Commissioners that we would not be re-appointed if we did not comply.

11)  At one point I became concerned enough about the "no-parole" policy that I wrote a 9-page brief about how we were not complying with the laws. I gave a copy to each Board member, pointing out that we could be sued. I asked that this brief be a topic on the Board's agenda. Ted Rich, as Executive Officer, said, "That's not going to be on the agenda. You can't have it on the agenda."



104

AUG-25-2008  12:57      EPT/LEGAL                                916 322 3475   P.04/26

Declaration of   bert M. Leddy

Inasmuch as I expressed my dissatisfaction verbally and in my brief, I'm sure that my objections helped me not to get re-appointed.

12) ~~Accordingly, the effect that~~ Governor Wilson has exerted upon BPT personally, through his politically-based policy, by his EPT appointments, and by his intervention to rescind and reverse parole grants, has been to remove any reasonable possibility of parole for practically all of the thousands of California prisoners serving terms of life with the possibility of parole.

13) Such a "no-parole" policy is contrary to Penal Code § 3041 which requires that BPT "shall normally" set a parole date in most cases, i.e., unless the prisoner is shown to pose a threat to public safety, and that BPT panels shall declare prisoners "suitable" for a future release date and set that release date unless a preponderance of the evidence presented at the hearing demonstrates that the prisoner "will pose an unreasonable risk of danger to society if released from prison."

14) Although the reluctance to grant parole began in the early 80's, under Governor Wilson's regime BPT panels denied parole in over 99% of cases by employing procedures that violate the parole statutes and regulations. Primarily used are offense factors. EPT panels find prisoners "unsuitable" for parole based mainly or entirely on the facts and circumstances of their offense instead of their level of dangerousness, as reflected by performance, rehabilitation and expert evaluation in their prison records. Because the facts and circumstances of crimes do not change, the procedure effectively increases all such sentences from life with possibility of parole to life without any possibility of parole. Despite contrary regulations and statutes, BPT's chief counsel and Executive Officer urged me and the other Commissioners to deny paroles based on the prisoners' offenses.

15) The procedure also eliminates EPT's duty to set parole dates because parole can't be granted for those found "unsuitable." This renders illusory EPT's term-setting obligation and lifers' opportunity to parole. Even the most deserving prisoners shown overwhelmingly not to pose an unreasonable risk (or any) risk of danger to the public if released have not, cannot and will never receive parole under such a policy.

16) After 1992, when my final term as BPT Commissioner expired, I re-entered the private practice of law. I represented an inmate at his BPT hearing. Although the inmate had a statutory right to call witnesses, who could have refuted the allegations the panel used to deny



parole, the BPT denied the witness. Additionally, the BPT substituted Commissioner Carol Bentley, a former Assemblyperson who was appointed after she was not re-elected. I had never known Ms. Bentley to grant parole to any lifer. She was the panel chairperson. She was rude, her hostility was obvious and it was evident she was pre-determined to oppose parole.

17) Prior to the commencement of his parole hearing, I personally heard Ron Koenig, a Commissioner on the hearing panel and former BPT Chairman, inform Rick Ervood, the Riverside County District Attorney attending the hearing, 'don't worry' because "we won't parole this guy," in those approximate words. This is consistent with my experience described above in which BPT's hearing panels often made decisions to deny parole prior to the hearings.

18) It has been clear to me that there is a general conspiracy to prevent life prisoners from paroling, especially those whose offenses include murder. Obviously, such a "no-parole" policy means that no murder offender can get a fair hearing as the law requires. If you can deny a prisoner "suitability" solely on the basis of the crime, you can deny him forever. The crime won't change. The parole law is based on the idea that prisoners do change, and become no danger to public safety. Statistically the murder offender—rarely repeats at crime once released.

19) As a taxpayer, I believe it is a waste of perhaps millions of dollars each year to incarcerate those life prisoners whose prison records adequately demonstrate they are no longer a threat to public safety. The correctional system spends millions on programs to teach them trades and marketable skills, to give them a general education, and until its discontinuation, psychological therapy to help them change their lives. I believe the law must be followed, that the Governor cannot create his own set of punishments in defiance of the clear legislative intent. Every man is entitled to a fair hearing where the burden of proof is set and adhered to, and the results are not just what is politically expedient for one person, the sitting governor.

20) I am informed that Governor Gray Davis has expressed his policy that no murder offender will be paroled on his watch. As a former Commissioner and as a lawyer, such a policy is clearly contrary to the statutes and



regulations governing the parole process. Such a policy will exacerbate an already unacceptable situation which is backlogging hundreds, perhaps more, of life prisoners who are already beyond the term they would normally have served but for the "no-parole" policy.

I declare, under penalty of perjury, that the facts I have stated are true and correct. My expressions of belief as to each specified facts are based on the reasons I have given as to each such fact. I would be willing to testify to same in a court of law. I so swear, this ___ day of ___ March ___ 1999, at Los Osos, California.

Albert M. Leddy
Declarant

## DECLARATION OF MONICA KNOX

I, MONICA KNOX, declare as follows:

1. I am a Deputy Federal Public Defender and, together with Deputy Federal Public Defender Guy Iversen, I represent petitioner in this matter.

2. The factual disputes underlying petitioner's claims center on whether there is a policy and/or practice of the Board of Prison Terms to deny findings of suitability and parole dates to prisoners serving life terms: petitioner claims there is such a policy and/or practice and that is the reason he has been denied parole; respondent claims there is no such policy and/or practice.

3. Earlier discovery orders by this court gave us access to, among other things, the transcripts of parole suitability hearings held between 1995 and 2000 as well as the "lifer packets," i.e., the accompanying material the Board relies on to determine suitability. We have read, by random selection, over 300 of those transcripts and reviewed the accompanying lifer packets. We have tabulated the results of 284 of those cases (the others not being tabulated because they were stipulated findings of unsuitability, usually in exchange for a shorter denial period). The tabulated results appear as Exhibit A.

4. The tabulated results, we believe, are strong evidence that there is in fact a policy and/or practice by the Board of finding all lifers unsuitable for parole. Some of the significant findings in the 284 cases are as follows:

A. 283 were found unsuitable for parole

B. All 283 were found unsuitable based, first and primarily, on the offense

C. 277 were found unsuitable because their offenses were considered cruel and/or callous or for no reason at all as specified in the regulations

D. Although the Board found each and every offense to be cause to find the lifer unsuitable, the offenses ranged from planned, premeditated murders and torture or execution murders to accidental killings or kidnaps without any injury at all.

E. Although the Board almost always gave secondary reasons for the findings of unsuitability, those reasons were often not supported by the facts or were so questionable given the facts that they suggested the Board was simply reaching for anything less than positive about

6

1  the lifer. For example, the Board would cite the lifer's disciplinary history in prison as a reason
2  for finding him unsuitable despite the fact that the lifer may not have had any disciplinary action
3  in many years or may have had disciplinary actions for only trivial matters (such as using a bed
4  sheet for a clothesline or being late to work). The Board would cite the lifer's "escalating pattern
5  of criminal history" as a reason for finding him unsuitable despite the fact that the lifer may have
6  no prior convictions or only minor (non-violent misdemeanor) convictions. The Board would
7  cite an unfavorable psychological report as a concern regarding suitability despite the fact that
8  the lifer's psych report would assess him as an average or below average risk of danger.

9        F. Of the 283 lifers found unsuitable

10       12 had no prior record at all, no disciplinaries of any kind in prison, psych
11 reports of average or low risk of danger, programming (self-help programs and work) in prison
12 and release plans

13       4 had no prior record at all, no disciplinary actions in the last 10 years, a
14 psych report of average or low risk, programming (self-help programs and work) in prison and
15 release plans

16       18 had only minor prior record (just arrests or just non-violent juvenile
17 actions), no disciplinary actions in the last 10 years, a psych report of average or low risk,
18 programming (self-help programs and work) in prison and release plans

19       11 had more serious prior records (felony convictions) but had been
20 disciplinary free for at least 10 years, had a psych report of low risk of danger, had programmed
21 (self-help and work) and had release plans

22     5. Although we are continuing to review transcripts, we believe, based on the data we
23 already have, that information held by current and former commissioners, current and former
24 deputy commissioners and current and former executive directors is critical. In particular, we
25 need to explore with these person how they understood their jobs relative to suitability hearings
26 for lifers. We have reason to believe that many, if not all, of them have understood their jobs
27 in the last ten years to be to find all lifers unsuitable for parole.

28

7

6. Former Commissioner Albert Leddy recently was deposed in consolidated cases pending in San Diego Superior Court. In re Fortin, Sheets, Zych, Barrientos, Jackson and Slaman, HSC 10279, 10270, 10329, 10336, 10373, 10325. Those cases raise issues similar to those pending in this matter, and we have worked closely with the attorney in the San Diego cases, Deputy Public Defender Matthew Braner. A copy of Mr. Leddy's deposition is attached as Exhibit B.

7. Mr. Leddy was a BPT Commissioner from August, 1983, until May, 1992. He noticed a significant change in how hearings were conducted after Pete Wilson became governor in January, 1991. Specifically, he noticed that the findings of suitability dropped significantly, the number of recissions increased dramatically, and yet the lifers and their factors (background, offense, and prison programming) had not changed.

8. Mr. Leddy testified that Governor Wilson' Secretary of Youth and Adult Corrections, Joe Sandoval, met with the BPT commissioners, told them to "be more careful" about finding lifers suitable for parole, and explained that Governor Wilson did not want a "Willie Horton." (Exhibit B at 34-35.) He provided specific examples of how things changed and of suitability hearings and recision decisions that were conducted pursuant to political agendas and not the regulations. (See, e.g., Exhibit B at 50, 59-60, 65, 89.)

9. Mr. Leddy testified that the governor's public statements regarding lifers not being paroled had a direct effect on the commissioners, explaining that they were political appointees and understood the need to please the governor in order the keep their jobs. (Exhibit B at 61, 70.)

10. Mr. Leddy testified to conversations he had with other commissioners and deputy commissioners about the changes in the process. He indicated, for example, that former Commissioner O'Connell told him that certain commissioners would be "hand picked" for recision hearings because they were known to always rescind the finding of suitability and the grant of parole. (Exhibit B at 68.) He noted that former Commissioners O'Connell and Aceto told him that former Commissioner and Chairman Gillis had told them not to give parole dates to lifers. (Exhibit B at 71, 73-75.)

8

1     11. Mr. Leddy explained that he was chastised by former executive officer Patterson for

2  giving "too many" parole dates to lifers. (Exhibit B at 71-72.)

3     12. Based on the foregoing, we have reason to believe that the current and former

4  commissioners have relevant and critical information regarding the practices and unwritten

5  policies of the Board in making parole determinations for lifers. However, it appears that they

6  are unwilling to voluntarily provide the information.

7     13. When I spoke with Mr. Leddy last year, he indicated that he believed a few of the

8  former or current commissioners and deputy commissioners would be willing to talk with me.

9  He later advised me, however, that he had checked with them and they had told him they would

10  be willing to talk and answer questions only if subpoenaed and required to do so.

11     14. Respondent's counsel herein, Deputy Attorney General Barbara Spiegel, has advised

12  us that she will "not agree to allow" the deposition of the former or current commissioners,

13  deputy commissioners or others we want to speak with.

14     15. There is a proceeding pending in the Eastern District of California, a habeas petition

15  filed by a lifer, raising the same claims as raised in this proceeding regarding the Board's

16  practice and/or policy of refusing to find suitable for parole any lifer. Melvin Coleman v.

17  California Board of Prison Terms, CV-S-96-783 LKK PAN P. A request to depose some

18  current and former commissioners and deputy commissioners is pending in that action. At a

19  hearing on February 28, 2001, counsel for the Board in that case indicated that the Board

20  Chairman had sent a letter to current and former commissioners and deputy commissioners

21  advising them to contact the Board and/or the Attorney General's office if they were contacted

22  by any defense attorney seeking to speak with them about lifer hearings. The Attorney General's

23  office, in the Eastern District case, in the San Diego Superior Court case and apparently in this

24  case, has instructed current and former commissioners and deputy commissioners not to speak

25  with defense counsel (although recently, after a ruling by the magistrate in the Eastern District

26  case, that deputy attorney general agreed that she would no longer instruct former

27  commissioners and deputy commissioners not to speak).

28

16. Based on the foregoing, we will need an order for this Court allowing us to subpoena to deposition the current and former commissioners and deputy commissioners and others we need to interview in order to get the relevant information we have reason to believe they hold.

17. We have not filed a Joint Stipulation re: Discovery relative to depositions at this point because we believed that we should first seek permission under Rule 6 for leave to conduct depositions. As soon as we receive that leave, we will serve on respondent's counsel our portion of a Joint Stipulation, obtain her portion and file it with the Court (assuming there are any disagreements about depositions).

I declare the foregoing is true and correct.

Executed under penalty of perjury this 24th day of April, 2001, at Los Angeles, California.

MONICA KNOX
Deputy Federal Public Defender

10

# EXHIBIT – D

**From:**   Santos N Yvonne Chavez [saintsgirl97@hotmail.com]
**Sent:**   Tuesday, December 11, 2007 4:14 PM
**To:**   jonnan@gv.net; tina.blach@aon.at; dewlin@att.net; jennew212@aol.com; daddysangel4life@hotmail.com; sassyten2@yahoo.com; desireef1966@sbcglobal.net; kcussinsdoyle@sbcglobal.net; shortcake672004@yahoo.com; lyndwyer@earthlink.net; krugerjeanne@yahoo.com; hochinmoon@hotmail.com; kittygutierrez@comcast.net; jojo4richie01@att.net
**Subject:**   <POD> Lifers seek court allies in fight with state for parole

I apologize if there are any duplicates, I sometimes lose track as I look through each groups e-mails.

## Have a wonderful day...Love, Yvonne

### A Few Words of Wisdom:

**DON'T LET SOMEONE BECOME A PRIORITY IN YOUR LIFE WHEN YOU ARE JUST AN OPTION IN THEIR LIFE...**

**NEVER EXPLAIN YOURSELF TO ANYONE, BECAUSE THE PERSON THAT LIKES YOU DOESN'T NEED IT, AND THE PERSON THAT DISLIKES YOU WON'T BELIEVE IT...**

---

To: prisonersofdavis@yahoogroups.com; politicalinjustice@yahoogroups.com
From: christinam222@sbcglobal.net
Date: Mon, 10 Dec 2007 13:49:25 -0800
Subject: <POD> Lifers seek court allies in fight with state for parole

### Lifers seek court allies in fight with state for parole

### Judges have overruled governor

### By Andy Furillo - afurillo@sacbee.com

### Monday, December 10, 2007

Frustrated by Gov. Arnold Schwarzenegger and his parole board, more California life-term prisoners are turning to the courts for another shot at freedom – and winning enough cases to put the state on edge.

In the past two years, at least seven convicts sentenced to life imprisonment have been freed on court-issued writs of habeas corpus, after the governor or his appointees on the Board of Parole Hearings had denied them release dates. About two dozen more have persuaded judges to order the governor or the board to review their decisions.

Those numbers pale compared with the thousands of lifers eligible for release dates whose parole applications have been rejected – 99.5 percent of them last year. But the state believes some judges are overstepping their authority, and the state attorney general's office has appealed three cases, which the state Supreme Court agreed to hear.

Senior Assistant Attorney General Julie Garland contends that in the past two years some lower courts have infringed on the

Recent Activity

4
New Members

Visit Your Group
Green Y! Groups
Environment Groups
Find them here
connect with others.
Cat Fanatics
on Yahoo! Groups
Find people who are
crazy about cats.
Yahoo! Groups
Wellness Spot
A resource for Curves
and weight loss.

12/16/2007

executive authority of the governor and the board to decide which lifers get out and when, with the judges deciding on their own whether life-term inmates no longer are a danger to society and can be released.

"Some of these recent cases have opened the door, and attorneys might feel that by going to court, they might have another bite at the apple," Garland said.

At issue in the cases under appeal is the "standard of review" the state Supreme Court established in 2002 in the so-called Rosenkrantz case for lifers seeking parole. The dispute doesn't apply to the 3,500-plus prisoners sentenced to life without possibility of parole.

State law says the parole board "shall normally set" a release date for lifers who have a possibility of parole – more than 29,000 of whom are now behind bars – unless the "timing" or "gravity" of the current or past convictions "is such that consideration of the public safety requires a more lengthy period of incarceration."

The court's decision in the Rosenkrantz case set a precedent for lifers to seek judicial review of their parole decisions but restricted it to questioning whether there was "some evidence" to support the board or the governor's findings. It also established that the facts of the original crime were sufficient for a judge to make the call.

But in the case of convicted murderer Sandra Davis Lawrence, the 2nd District Court of Appeal in Los Angeles ruled earlier this year that the "ultimate test" of the law is whether the evidence could determine if the offender posed an unreasonable safety risk. The appellate panel ruled the evidence fell short and ordered Lawrence released. Her case is one of the three being appealed.

Garland characterized the courts' rulings on inmates' "suitability" for release as "a pretty big shift" from their established role of reviewing only the evidence on which the governor and the board based their decisions.

But law professor Michael Brennan, of the University of Southern California's Post-Conviction Justice Project and also one of Lawrence's lawyers, said the inmates filing writs have usually served more than 20 years, have compiled exemplary disciplinary records and are entitled by law to parole.

"They have done everything possible inside the institution to rehabilitate themselves," Brennan said. "They have secure parole plans. They have a place to go and live. They have plans on how they are going to support themselves."

Before Lawrence turned to the courts, she had served 25 years in prison on a first-degree murder conviction for shooting and stabbing her lover's wife to death. Now 60, she earned a master's degree in business administration while in prison. Court papers filed on her behalf described her as a model prisoner.

The parole board granted Lawrence a release date, but Schwarzenegger reversed the decision last year, saying the callousness of her crime suggested she still posed an unreasonable risk. The appellate court disagreed with the governor and ordered her released in May.

Louis Mauro, the governor's chief deputy legal affairs secretary, said Schwarzenegger has "broad discretion" to reverse parole grants. The courts, Mauro said, "should not be usurping the executive's discretionary determination on whether an inmate poses a risk of danger to society when released."

"That's a separation-of-powers problem," Mauro said.

In his first year in office, the Republican governor, ironically, laid down a record on lifer paroles that sharply contrasted with the more restrictive stance of his Democratic predecessor, Gray Davis. From his November 2003 inauguration through December 2004, Schwarzenegger allowed 79 lifers to go free, compared with the six releases that Davis approved in nearly five years in office. Schwarzenegger signaled when he approved two releases during his first two weeks in office that he would view lifer paroles differently than Davis did. Schwarzenegger's office distributed a prepared statement that it would let the parole board "do its job" unless he believed it made a "clear error" in releasing a prisoner. Davis operated on a virtual no-parole policy for lifers. "If you take someone else's life, forget it," he said in his first months in office in 1999. "I see no reason to parole people who have committed an act of murder."

Victims' rights groups harshly criticized Schwarzenegger over his releases, even airing television advertisements – funded by the governor's political antagonists in the California Correctional Peace Officers Association – criticizing his parole policies.

Shortly after the ads began to run in mid-2005, the governor, then embroiled in a special election campaign, changed course and approved only 35 lifer releases for the year. Last year, he signed off on 23 paroles, or 0.5 percent of the 4,657 lifers who had hearings. So far this year, he has allowed 35 lifer paroles; the number of hearings was unavailable.

Christine Ward, director of the Doris Tate Crime Victims Bureau, thinks Schwarzenegger is still allowing too many lifer releases. But she called the recent judicial decisions "a little scary" and hopes the state Supreme Court reaffirms the previous standard of review. "I may not be happy with the decisions the governor is making, but the bottom line is that he's supposed to be the last word," Ward said.

Advocates for lifers who had been heartened by Schwarzenegger's earlier expressions of leniency are equally discouraged by the governor's turnaround. They're saying if the state doesn't want to let any lifers out, it ought to pass a law to that effect.

"Let's debate it honestly and openly and see if it passes constitutional muster," said Michael Beckman, a Santa Monica attorney who represents lifers at their parole board hearings. "The way we're doing it now, it's intellectually dishonest to everybody."

As of the end of November, there were 29,607 life-term inmates doing time with a possibility of parole, according to the California Department of Corrections and Rehabilitation.

One was James Stockman, 49, a Washington man who has been in prison for 24 years on a 25-to-life, first-degree murder conviction for stabbing a man to death during a fight in Humboldt County. In January, the parole board approved Stockman for a release date. In June, the governor took it away.

"I was obviously very disappointed," said Stockman, in an interview at California State Prison, Solano. "I've worked very hard for this." Stockman said he has earned a bachelor's degree in computer science and has never been disciplined in prison. He also said he is married and, if released, has an opportunity to get a computer-related job in Vacaville. He also claimed close ties to a Vacaville church.

12/16/2007

George Rounds, 44, who has done 26 years on a 15-to-life
conviction for the second-degree murder of his step-uncle, said the
courts represent the last and best hope for lifers.

"So they're filing writs and petitions and starting to participate in the
rule-making," he said.

Garland, the senior assistant attorney general, said lifers have
been filing writs "for years," but it's only been in the past two years
that they've enjoyed success.

If the state doesn't move to stop it now, she said, "more inmates
would seek release in habeas corpus and would continue to be
more successful."

___.__.__.____

Messages in this topic (1) Reply (via web post) | Start a new topic
Messages | Files | Photos | Links | Database | Polls | Calendar
MARKETPLACE

Earn your degree in as few as 2 years - Advance your career with an AS, BS, MS
degree - College-Finder.net.
YAHOO! GROUPS

Change settings via the Web (Yahoo! ID required)
Change settings via email: Switch delivery to Daily Digest | Switch format to
Traditional
Visit Your Group | Yahoo! Groups Terms of Use | Unsubscribe

___.__.__.____

Share life as it happens with the new Windows Live. Share now!

12/16/2007

California Home                                                          Thursday



CDCR Home
Victims
Visitors
Offenders
Rehabilitation
News
About CDCR
Divisions & Boards
  Adult Operations
  Adult Programs
  Board Of Parole Hearings
  Juvenile Justice
  Prison Industry
  Authority
  Corrections Standards
  Authority
  Office of Legal Affairs
Career Opportunities
Reports & Research
Budget & Regulations
Community Resource
Directory
Contact Us

## Commissioners

**Sandra Bryson**

Sandra Bryson, 60, of Markleeville, most recently served as a support services and reserve deputy for the Alpine County Sheriff's Department. Since 1986, Bryson has served as director of Bryson and Associates, a law enforcement and canine consulting company that includes among its clients the Office of Emergency Services and the Federal Emergency Management Agency. She is also an instructor for California Peace Officer Standards and Training. Bryson is a member of the California Narcotics Officers Association and the National Association of Search and Rescue. This position requires Senate confirmation and the compensation is $99,693. Bryson is a Democrat. She will hear adult matters.

BOPH Links

• Home
• Chairman
• Commissio
• Deputy Co
• Divisions &
• En Banc De
• Regulatory
• Legislative
• Parole Hea
• Attorney/In
  Services

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

California Home                                                          Thursday



CDCR Home
Victims
Visitors
Offenders
Rehabilitation
News
About CDCR
Divisions & Boards
    Adult Operations
    Adult Programs
    Board Of Parole Hearings
    Juvenile Justice
    Prison Industry
    Authority
    Corrections Standards
    Authority
    Office of Legal Affairs
Career Opportunities
Reports & Research
Budget & Regulations
Community Resource
Directory
Contact Us

**Commissioners**

**Philip S. Inglee**



Philip S. Inglee, 68, of Orange County, has
served on the Board of Prison Terms since
2005. Prior to that, he served as a commissioner
on the Orange County Parole Board from 2001
to 2005. Inglee worked as a banking executive
for 33 years, serving as president and chief
executive officer of Liberty National Bank from
1982 to 1998. In addition, he has served as
chair of the Huntington Beach Planning
Commission and as foreman of the Orange
County Grand Jury from 1999 to 2000. He
served as an officer in the United States Marine
Corps from 1959 to 1962 on active duty and as
a member of the reserves from 1962 until his
retirement as a colonel in 1989. Inglee is a
Republican. He will hear adult matters.

BOPH Links

• Home
• Chairman
• Commissic
• Deputy Co
• Divisions &
• En Banc De
• Regulatory
• Legislative
• Parole Hea
• Attorney/In
  Services

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy



**California Home**                                                                 Thursday

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**



### Commissioners

**Darcel Woods**

Darcel Woods, 47, of La Verne, has served as a professor in the correctional science department at Chaffey College since 1995 and currently serves as department co-chair. From 1994 to 2003, Woods served as a project specialist for the Baldy View Regional Occupational Program, where she coordinated The Success Project, a correctional reintegration program. Prior to that, she was a parole agent for the California Youth Authority, now the Division of Juvenile Justice, from 1989 to 1994. Woods began her career as a deputy sheriff with the Los Angeles County Sheriff's Department in 1982. This position requires Senate confirmation and the compensation is $108,167. Woods is a Democrat. She will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissio**
- **Deputy Cor**
- **Divisions &**
- **En Banc De**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

6/7/2007



**California Home**                                                      Thursday

CDCR Home
Victims
Visitors
Offenders
Rehabilitation
News
About CDCR
Divisions & Boards
  Adult Operations
  Adult Programs
  Board Of Parole Hearings
  Juvenile Justice
  Prison Industry
  Authority
  Corrections Standards
  Authority
  Office of Legal Affairs
Career Opportunities
Reports & Research
Budget & Regulations
Community Resource
Directory
Contact Us





My CA

Schw

## Commissioners

**Michael Prizmich**

Michael Prizmich, 61, of Plymouth, retired from the Amador County Sheriff's Department in 2006, where he served since 1976, starting as a deputy before moving through the ranks and eventually reaching the position of sheriff in 1995. Prizmich also served as the director of personnel and risk management for Amador County from 1984 to 1990. He began his career in law enforcement with the Oakland Police Department in 1971. Prizmich has been a member of the Board of Corrections and the Off-Highway Vehicle Commission. This position requires Senate confirmation and the compensation is $108,167. Prizmich is a Republican. He will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

**California Home**                                                            Thursday



Commissioners

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**
  **Adult Programs**
  Board Of Parole Hearings
  **Juvenile Justice**
  **Prison Industry Authority**
  **Corrections Standards Authority**
  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**

◯ My CA

Schw

## Commissioners

### Linda Shelton

Linda Shelton, 55, of Redding, has served as chief probation officer for Glenn County since 1999. Shelton was a division director responsible for the Shasta County Juvenile Hall from 1990 to 1999. She joined the Shasta County Probation Department as a deputy probation officer in 1980. Shelton is past president of the Chief Probation Officers of California and was a faculty member for the Shasta College Administration of Justice Department from 1992 to 1998. The compensation is $99,693. Shelton is a Democrat. She will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissio**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California.  Conditions of Use  Privacy Policy

http://www.cdcr.ca.gov/DivisionsBoards/BOPH/lshelton.html                    6/7/2007



**California Home**                                                                                          Thursday

CDCR Home
Victims
Visitors
Offenders
Rehabilitation
News
About CDCR
Divisions & Boards
  Adult Operations
  Adult Programs
  Board Of Parole Hearings
  Juvenile Justice
  Prison Industry
  Authority
  Corrections Standards
  Authority
  Office of Legal Affairs
Career Opportunities
Reports & Research
Budget & Regulations
Community Resource
Directory
Contact Us



My CA

Schw

### Commissioners

**Edward Martinez**

Edward Martinez, 48, of Modesto, has been self-employed as a private investigator with EM Investigations since 2005. Martinez previously was a field investigator with the workers' compensation firm Freese & Gianelli from 2000 to 2005, deputy sheriff and detective for the Stanislaus County Sheriff's Department from 1992 to 2000 and deputy sheriff for the Orange County Sheriff's Department from 1982 to 1992. This position requires Senate confirmation and the compensation is $99,693. Martinez is a Republican. He will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California.  Conditions of Use  Privacy Policy

California Home                                                                                    Thursday



CDCR Home
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**
  **Adult Operations**

  **Adult Programs**

  Board Of Parole Hearings

  **Juvenile Justice**

  **Prison Industry Authority**

  **Corrections Standards Authority**

  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource Directory**
**Contact Us**



## Commissioners

### A. Stanley Kubochi

A. Stanley Kubochi, 59, of Sacramento, has served as principal district attorney for the Sacramento County District Attorney's Office since 2004. Kubochi has served as a deputy district attorney for the Sacramento County District Attorney's Office since 1985, where he has held assignments in the prison crimes unit, public assistance fraud unit, misdemeanor unit and felony trails. Previously, he served as an assistant public defender for the Sacramento County Public Defender's Office from 1973 to 1985. This position requires Senate confirmation and the compensation is $108,167. Kubochi is a Republican. Kubochi will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissic**
- **Deputy Co**
- **Divisions &**
- **En Banc De**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

http://www.cdcr.ca.gov/DivisionsBoards/BOPH/Kubochi.html                    6/7/2007



**California Home**                                                   Thursday

CDCR Home

**CDCR Home**
**Victims**
**Visitors**
**Offenders**
**Rehabilitation**
**News**
**About CDCR**
**Divisions & Boards**

  **Adult Operations**

  **Adult Programs**

  Board Of Parole Hearings

  **Juvenile Justice**

  **Prison Industry
  Authority**

  **Corrections Standards
  Authority**

  **Office of Legal Affairs**
**Career Opportunities**
**Reports & Research**
**Budget & Regulations**
**Community Resource
Directory**
**Contact Us**







○ My CA

Schw

**BOPH Links**

- **Home**
- **Chairman**
- **Commissio**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In
  Services**

### Commissioners

**Jack Garner**

Jack Garner, 61, of Gold River, has been appointed to the Board of Parole Hearings to hear Adult matters. He is currently the bureau chief for the Commission on Peace Officer Standards and Training. Garner has served with the Commission since 1990, beginning his tenure as senior law enforcement consultant. He was previously the city manager and chief of police for the City of Martinez. Garner is a member of the FBI National Academy of Graduates Association, the California Police Chiefs Association and the California Peace Officers Association. This position requires Senate confirmation and the compensation is $99,693. Garner is a Republican.

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy



**California Home**                                                      Thursday

CDCR Home
Victims
Visitors
Offenders
Rehabilitation
News
About CDCR
Divisions & Boards
  Adult Operations
  Adult Programs
  Board Of Parole Hearings
  Juvenile Justice
  Prison Industry
  Authority
  Corrections Standards
  Authority
  Office of Legal Affairs
Career Opportunities
Reports & Research
Budget & Regulations
Community Resource
Directory
Contact Us



○ My CA

Schw

## Commissioners

### Janice Eng

Janice Eng has served as director of operations for the marketing and
advertisement firm Trade Management Group since 2003. Prior to that, Eng
was managing partner of HealthStar from 2001 to 2002, executive director of
Intriguard, a division of California Medical Review from 1998 to 2001, principal
of the consulting firm Eng Enterprises from 1995 to 1998 and director of quality
and customer satisfaction for the Baxtor Healthcare Corporation from 1989 to
1995. This position requires Senate confirmation and the compensation is
$99,693. Eng is a Democrat. She will hear adult matters.

**BOPH Links**

- **Home**
- **Chairman**
- **Commissio**
- **Deputy Co**
- **Divisions &**
- **En Banc D**
- **Regulatory**
- **Legislative**
- **Parole Hea**
- **Attorney/In**
  **Services**

Updated: 04/12/2007
Back to Top of Page

© 2005 State of California. Conditions of Use  Privacy Policy

# Commentary

THE MONTEREY COUNTY HERALD, SUNDAY, OCTOBER 14, 2007

www.montereyherald.com

## Judge weighs in on Herald series

POLICIES
CONTRIBUTE TO
PAROLEE SPACE

By JEFFREY ARONS

Down
for Life

### Inside

**On the Opinion page:**

Today's college
students are Quiet
Americans. —
Thomas Friedman

**E**

EXHIBIT `E´

EXHIBIT `E´

S157805

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re ALIPIO SIERRA on Habeas Corpus

---

The petition for writ of habeas corpus is denied.

George, C. J., was absent and did not participate.

SUPREME COURT
**FILED**

APR 2 3 2008

Frederick K. Ohlrich Clerk

---

Deputy

---

WERDEGAR

Acting Chief Justice

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| ─ALIPIO SIERRA,<br>H-32811, C-230L<br>P.O. BOX 689, CTF II(C)<br>SOLEDAD, CA 93960-0689 | |
| TELEPHONE NO.:              FAX NO.: | |
| ATTORNEY FOR *(Name):*  IN PRO PER, IN FORMA PAUPERIS | |

| COURT  UNITED STATES DISTRICT COURT |
|---|
| STREET ADDRESS:  NORTHERN DISTRICT OF CALIFORNIA |
| MAILING ADDRESS:  ATTN: CLERK OF THE COURT |
| CITY AND ZIP CODE:  U.S. COURTHOUSE, 450 GOLDEN GATE,AVE. |
| BRANCH NAME:  SAN FRANCISCO, CA 94102-3483 |

| PETITIONER/PLAINTIFF:<br>  SIERRA, ALIPIO, |
|---|
| RESPONDENT/DEFENDANT:<br>  B. CURRY Warden, B.P.H. COMMISSIONERS, ET AL. |

| **PROOF OF SERVICE BY MAIL** | CASE NUMBER: |
|---|---|

1. I am at least 18 years of age, not a party to this action, and I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:

3. I served a copy of the following documents *(specify):*
   [X] Petition for Writ of Habeas Corpus          [ ] _____

by enclosing them in an envelope AND
   a. [  ] **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
   b. [X] **placing** the envelope for collection and mailing on the date and at the place shown in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4. The envelope was addressed and mailed as follows:
   a. Name of person served: U.S. DIST. CT. NOR. DIST.     HON. EDMUND G. BROWN, JR.
   b. Address:  CA., ATTN: CLERK OF THE COURT              [X] STATE ATTORNEY GENERAL
      U.S. COURTHOUSE, 450 GOLDEN GATE, AVE.               ATTN: HABEAS CORPUS DESK (B.P.H
   c. Date mailed: SAN FRAN. CA 94102-3483; 5/ /08         POST OFFICE BOX 83266
   d. Place of mailing *(city and state):* P.O. BOX 689, CTFII(C)    SAN DIEGO, CA 92186-5266
      SOLEDAD, CA 93960-0689    (VERIFICATION)

5. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
   Date: As to All other issues presented herein, on Information and Belief the data & Exhibits are also true & correct.

   ALIPIO SIERRA  7/15/08                    ▶ Alipio F. Sierr
   (TYPE OR PRINT NAME)                       (SIGNATURE OF PERSON COMPLETING THIS FORM)

**PROOF OF SERVICE BY MAIL**

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1 " process in which the Executive's factual assertions go wholly unchallenged or

2 are simply presumed correct without any opportunity for the alleged [here, pris-

3 soner] "to demonstrate otherwise falls constitutionally short. As the Government

4 itself has recognized, we have utilized the 'some evidence' standard of review,

5 not as a standard of proof, "and not in an "arbitrary and capricious"

6 manner. Of the eight applicability factors, all weigh strongly in

7 favor of a finding of suitability. The offense itself is 17 years

8 old, and paid in full. Second degree murder is not a LWOP offense.

9 As wrong as Petitioner's actions were, they were motivated by the

10 criminally assaultive behavior of a man whom Petitioner thought

11 could be a great friend in the future. Seventeen years is enough.

12 There is just not "some evidence" in this record that supports a

13 finding that either the circumstances of the offense or Petition-

14 er's current attitude weigh against a finding of suitability. Given

15 that there are no factors qualifying finding, an overwhelming

16 majority of factors favoring suitability; it is arbitrary, capri-

17 cious, irrational ans illegal, for a Court to deny Habeas Corpus

18 on the "some evidence" standard, when the standard of proof on

19 habeas corpus is the "preponderance of evidence" standard. He is

20 denied parole because of a political agenda in the California

21 Executive Branch of government.

22    WHEREFORE: because Petitioner's second degree murder was not

23 "especially heinous", and the "some evidence" standard, illegal

24 though it is, isn't satisfied in his case; he respectfully requests

25 this Court issue an Order To Show Cause to Respondents as to whe-

26 ther Petitioner is illegally denied a Parole Suitability, by the

27 B.P.H. Commissioners and Mr. B. Curry, Warden at CTF II (C), who

28                          6(bJ)

PETITION FOR WRIT OF HABEAS CORPUS
GROUND 3 (Cont.):

1 | have violated his substantive due process rights and have creat-

2 | ed a protected liberty interest on parole for Petitioner; creat-

3 | ing "an unforeseeable judicial-like enlargement of the criminal

4 | statutes, applied retroactively.

5 | The Court must use the "preponderance of evidence" standard

6 | of evidentiary proof, in its determination that the B.P.H.'s

7 | denials, using the "some evidence" standard for administrative

8 | hearings, is fair in the case instant.

9 | Petitioner's case should be remanded back to the B.P.H.

10 | for a fair and Just Hearing; where he can hope for a parole suit-

11 | ability finding, and a Parole Date.

12 | DATED: June 16, 2007          Respectfully submitted,

13 | Joseph P. Gutierrez          Alipio F. Sierra

14 | JOSEPH P. GUTIERREZ,          ALIPIO SIERRA, Petitioner,
   | Layman Assistant, Pro Bono    In Propria Persona,
   | D-02765, Z-138L               In Forma Pauperis

15 | P.O. Box 689, CTF II (C)
   | Soledad, C. 93960-0689

16

17

18

19

20

21

22

23

24

25

26

27

28

6(bk)

EXHIBIT   A

EXHIBIT   A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

| | |
|---|---|
| In the matter of the Life ) | |
| Term Parole Consideration ) | CDC Number H-32811 |
| Hearing of: ) | |
| ) | |
| ALIPIO SIERRA ) | |
| _____ ) | |

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTMBER 14, 2006

9:20 A.M.

PANEL PRESENT:

Bilenda Harris-Ritter, Presiding Commissioner
Ramon Estrada, Deputy Commissioner

OTHERS PRESENT:

Alipio Sierra, Inmate
Maryann Tardiff, Attorney for Inmate
Mr. Montagna, Deputy District Attorney, Los Angeles
   County
Interpreter, Unidentified
Correctional Officer, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

| | | |
|---|---|---|
| _____ | No | See Review of Hearing |
| _____ | Yes | Transcript Memorandum |

**C. M. Lopez, Northern California Court Reporters**

<u>INDEX</u>

<u>Page</u>

Proceedings ............................................... 1

Case Factors .............................................. 7

Pre-Commitment Factors ................................... 11

Post-Commitment Factors .................................. 15

Parole Plans ............................................. 13

Closing Statements ....................................... 26

Recess ................................................... 30

Decision ................................................. 31

Adjournment .............................................. 37

Transcriber Certification ................................ 38

--oOo--

1

1          P R O C E E D I N G S

2          **DEPUTY COMMISSIONER ESTRADA:**  Okay.

3    We're on.

4          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

5    you.  Good morning.  We are on the record.  This is a

6    subsequent parole consideration hearing for Alipio

7    Sierra, CDC Number H-32811.  Today's date is

8    September 14th, 2006.  We are located at CTF, Soledad.

9    The inmate was received on April 20th, 1992, from Los

10   Angeles County.  The life term began on April 20th,

11   1992; and the minimum eligible parole date is January

12   5th, 2002.  The controlling offense for which the inmate

13   has been committed is murder in the second degree, Case

14   Number PA-006487, count one, Penal Code Section 187 and

15   Penal Code Section 12022(b), as in boy, use of a weapon,

16   a knife.  This hearing is being tape recorded; and for

17   the purpose of voice identification, we will go around

18   the room, we will say our names, we will spell our last

19   names; and, Mr. Sierra, when we get to you, if you could

20   please also give us your CDC number, we would appreciate

21   that.  Okay?  Good.  And at this time, I would like to

22   swear in the interpreter.  Do you -- do you swear or

23   affirm that you will truthfully and accurately translate

24   from Spanish to -- from English to Spanish and Spanish

25   to English to the best of your ability?

26          **INTERPRETER:**  I do.

27          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

2

1    you.  Mr. Sierra, I have in your file that you have

2    completed the BPT Form 1073 on 8/9/2005 indicating that

3    the only assistance you need for your hearing is the

4    interpreter and that you have no disabilities under the

5    Americans with Disabilities Act.

6         INMATE SIERRA THROUGH INTERPRETER:  No, I do not

7    have any disabilities.

8         PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  I

9    do note that you are wearing glasses.  Are those

10   sufficient for purposes of reading documents?

11        INMATE SIERRA THROUGH INTERPRETER:  Yes.

12        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

13   Thank you.  And did you have any difficulty walking up

14   or down the stairs to get here today?

15        INMATE SIERRA THROUGH INTERPRETER:  No.

16        PRESIDING COMMISSIONER HARRIS-RITTER:  All

17   right.  And do you have any hearing impairments?

18        INMATE SIERRA THROUGH INTERPRETER:  A little on

19   my right ear.

20        INMATE SIERRA THROUGH INTERPRETER:  Are you able

21   to hear sufficiently to proceed with the hearing today?

22        INMATE SIERRA THROUGH INTERPRETER:  Yes.

23        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

24        INMATE SIERRA THROUGH INTERPRETER:  Although, if

25   you could speak a little higher.

26        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.  Is

27   this better?

3

1          **INMATE SIERRA THROUGH INTERPRETER:**  Yes.

2          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

3    I'll do my best.  Thank you.  And have you ever been

4    included in the Triple CMS program?

5          **INMATE SIERRA THROUGH INTERPRETER:**  Alcoholics

6    Anonymous?

7          **PRESIDING COMMISSIONER HARRIS-RITTER:**  No, the

8    Triple CMS program.

9          **INMATE SIERRA THROUGH INTERPRETER:**  What is

10   that?

11         **PRESIDING COMMISSIONER HARRIS-RITTER:**  That has

12   to do with getting psychotropic medication for help with

13   any mental health issues.

14         **INMATE SIERRA THROUGH INTERPRETER:**  No.  No, I

15   didn't have any.

16         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

17   And so you were never in the Enhanced Out-patient

18   Program either; is that correct?

19         **INMATE SIERRA THROUGH INTERPRETER:**  What's that

20   for?

21         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Same

22   thing.

23         **INMATE SIERRA THROUGH INTERPRETER:**  No.

24         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Do

25   you have any disability that would prevent you from

26   participating in today's hearing?

27         **INMATE SIERRA THROUGH INTERPRETER:**  No.

4

1          **PRESIDING COMMISSIONER HARRIS-RITTER:**    Thank

2    you.   Counselor, are there any issues under ADA you

3    believe need further discussion?

4          **ATTORNEY TARDIFF:**    No.   I'd like to add that

5    that he's been able to respond to the questions, so I

6    believe he can adequately hear, particularly since he

7    has the interpreter right next to his ear.   Perhaps,

8    though, next time he needs to tell somebody if he wants

9    further --

10          **PRESIDING COMMISSIONER HARRIS-RITTER:**

11    Assistance with hearing?

12          **ATTORNEY TARDIFF:**    -- assistance, but at this

13    point I do believe he can hear to be able to respond to

14    the questions and know what's going on.

15          **PRESIDING COMMISSIONER HARRIS-RITTER:**    Okay.

16    Thank you very much.   Mr. Sierra, we will reach a

17    decision today and inform you whether or not we find you

18    suitable for parole, and we will tell you the reasons

19    for our decision.   If you are found suitable, the length

20    of your confinement will be explained to you.   Before we

21    recess to deliberate, the District Attorney's

22    representative, your attorney, and you will be able to

23    make a final statement regarding your suitability.   Your

24    statement will be why you are suitable for parole.   You

25    have certain rights, and those rights include the right

26    to a timely notice of the hearing, and the right to

27    review your Central File, and the right to present

5

1  relevant documents.  Counselor, have your client's

2  rights been met?

3          **ATTORNEY TARDIFF:**  Yes.

4          **PRESIDING COMMISSIONER HARRIS-RITTER:**  You also

5  have a right to an impartial panel.  Mr. Sierra, do you

6  have any objection to the panel?

7          **INMATE SIERRA THROUGH INTERPRETER:**  No, it's

8  fine.

9          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

10  you.  Counselor, do you have any objection?

11          **ATTORNEY TARDIFF:**  No.

12          **PRESIDING COMMISSIONER HARRIS-RITTER:**

13  Mr. Sierra, you will receive a copy of our written

14  tentative Decision today.  That decision becomes final

15  in 120 days, and a copy of the Decision and a copy of

16  the transcript will be sent to you.  In 2004, the

17  regulations regarding the appeals process were changed;

18  so if you have questions regarding an appeal, you should

19  talk to your attorney or visit the prison Law Library.

20  You are not required to admit or discuss your commitment

21  offense; however, the panel does accept as true the

22  findings of the court.  Do you understand?

23          **INMATE SIERRA THROUGH INTERPRETER:**  Yes.

24          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay,

25  thank you.  Commissioner Estrada, is there any

26  confidential material in the file, and will it be used

27  in this hearing?

6

1          **DEPUTY COMMISSIONER ESTRADA:**  There is no

2     confidential information in the inmate's Central File.

3          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

4     you.  I have previously passed the hearing checklist to

5     both the representative from the District Attorney's

6     Office and Ms. Tardiff representing the inmate, and both

7     of you have indicated that you have all of these

8     documents; is that correct?

9          **ATTORNEY TARDIFF:**  Correct.

10          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

11     you.  Then we will take that into evidence at this time.

12     Are there any preliminary objections?

13          **ATTORNEY TARDIFF:**  No.

14          **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

15     right.  And are there any additional documents?

16          **ATTORNEY TARDIFF:**  No.

17          **PRESIDING COMMISSIONER HARRIS-RITTER:**  And will

18     Mr. Sierra be speaking with the panel?

19          **ATTORNEY TARDIFF:**  Yes.

20          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay,

21     thank you.  Mr. Sierra, would you please raise your

22     right hand and I will swear you in.  Do you solemnly

23     swear or affirm that the testimony you give at this

24     hearing will be the truth, the whole truth, and nothing

25     but the truth?

26          **INMATE SIERRA THROUGH INTERPRETER:**  I swear.

27          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay,

7

1   thank you.  I'm going to refer to the probation
2   officer's report, pages two to three; and I quote for
3   the record,
4                    "On the morning of May 7th,
5            1991, the inmate is alleged to have
6            stabbed victim, Alfredo Soria
7            [phonetic], once in the chest piercing
8            the heart and thereby killing him.
9            Police officers responded to a call for
10           an ambulance at a Chase Avenue address
11           in North Hollywood.  On arrival they
12           found the victim, Alfredo Soria, dead
13           from a stab wound to the heart.
14           Witnesses identified the inmate as the
15           perpetrator.  One witness observed the
16           inmate hiding the knife on Cantana
17           [phonetic] Street and led officers to
18           it.  The inmate was identified by
19           several people who had observed him at
20           the scene earlier.  Apparently, in the
21           evening, inmate and victim were out
22           drinking.  They returned to Soria's
23           residence and continued drinking.
24           Sometime during the night, the inmate
25           and the victim argued, and the victim
26           locked the inmate out of the house
27           naked.  Neighbors calmed the victim

8

1              down, and he allowed the inmate to get

2              his clothes, and the inmate left.  He

3              later returned and was seen hanging

4              around the area by several of the

5              victim's friends.  He was also seen

6              running from the area and hiding the

7              knife."

8          Mr. Sierra, does that accurately describe what

9      happened?

10          INMATE SIERRA THROUGH INTERPRETER:  Can you

11      explain that a little further?

12          PRESIDING COMMISSIONER HARRIS-RITTER:  I just

13      read you from the probation officer's report the facts

14      regarding the crime, and I just wondered if you agreed

15      with the way they were described as what -- as to what

16      happened.

17          INMATE SIERRA THROUGH INTERPRETER:  Yes, I did

18      commit the crime.

19          PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

20      And how do you feel about the fact that you'd committed

21      the crime?

22          INMATE SIERRA THROUGH INTERPRETER:  I feel real

23      bad.

24          PRESIDING COMMISSIONER HARRIS-RITTER:  And what

25      is it about committing the crime that makes you feel

26      bad?

27          INMATE SIERRA THROUGH INTERPRETER:  Aside the

9

1    fact that I was very intoxicated that day.  If you like,

2    I can read my declaration.

3              PRESIDING COMMISSIONER HARRIS-RITTER:  Did you

4    want to read that during your closing statement, or do

5    you want to read it now?

6              INMATE SIERRA THROUGH INTERPRETER:  I want to

7    read it now if that's fine.

8              PRESIDING COMMISSIONER HARRIS-RITTER:  That's

9    fine.  Go ahead.  And before you do that, I just want to

10   clarify I don't believe that I indicated what time we

11   started the hearing this morning, and I believe it was

12   approximately 9:20 a.m.  Go ahead and read your

13   statement.

14             INMATE SIERRA THROUGH INTERPRETER:  My

15   responsibility was my life.  If I had not defended

16   myself, who knows what might have happened.  Maybe the

17   deceased would have been myself.  I wish to say once

18   more that day that I took the life of that person I

19   wasn't completely in use of my faculties.  I was

20   intoxicated; I was drunk.  With that I do not want to

21   justify what I did even though the outcome that resulted

22   I feel very bad.  I feel remorseful, and I feel very sad

23   for the life that I took.  I ask for forgiveness of the

24   family members of the victim.  Daily I ask God for

25   forgiveness for what I did.  Me, Alipio Sierra, I am

26   given -- I am 57 years old.  When I came to the United

27   States, I was 31 years old; and school for me was not an

1    option.  I never learned English formally.  Like always,

2    I speak a little English which helps me to communicate

3    at work.  Fortunately, in this country, there is a large

4    Hispanic community which many of them have lived all

5    their lives in this country without speaking English.

6    In this -- with this statement I do not want to give the

7    impression that I do not have any interest in learning

8    English.  On the contrary.  I've always tried to learn

9    to improve myself as much as possible.  I have been a

10   Foreman of cooks for more than 30 years.  That is my

11   vocation.  Aside from all these previous explanations,

12   with all due respects, I want to let you know that I

13   have an immigration hold which means that I'm going to

14   be deported to my country of origin, Cuba.  There I do

15   not need English to survive.  Nevertheless, English can

16   help me, because my country is a country which is

17   visited by many tourists.  Once I am eligible for

18   parole, I prefer to be deported.  The immigration will

19   deport me to my country of origin.  I would -- and on

20   the other hand, I would serve my parole time in

21   California somewhere.  My plans are very simple.  I have

22   all these years in prison.  I am going to try to be

23   clean of alcohol, drugs, and all these places that can

24   make -- put -- keep me in trouble [verbatim].  It's

25   clear that I want to have another opportunity to serve

26   and help in society from one I was included.  I can

27   easily find a job as a cook in any restaurant.  I

12

1          **INMATE SIERRA THROUGH INTERPRETER:**  Two

2     children.

3          **PRESIDING COMMISSIONER HARRIS-RITTER:**  And a

4     wife?

5          **INMATE SIERRA THROUGH INTERPRETER:**  Yes.

6          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were you

7     married?

8          **INMATE SIERRA THROUGH INTERPRETER:**  I was not

9     married; I was just living with her.

10          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Do

11     you have any contact with your -- with that woman or

12     your children?

13          **INMATE SIERRA THROUGH INTERPRETER:**  No, not with

14     the woman.

15          **PRESIDING COMMISSIONER HARRIS-RITTER:**  What

16     about your children?

17          **INMATE SIERRA THROUGH INTERPRETER:**  Yes.

18          **PRESIDING COMMISSIONER HARRIS-RITTER:**  And where

19     are your children now?

20          **INMATE SIERRA THROUGH INTERPRETER:**  In Cuba.

21          **PRESIDING COMMISSIONER HARRIS-RITTER:**  And how

22     often do you hear from them?

23          **INMATE SIERRA THROUGH INTERPRETER:**  In letters.

24          **PRESIDING COMMISSIONER HARRIS-RITTER:**  How

25     often?

26          **INMATE SIERRA THROUGH INTERPRETER:**  Every year.

27          **PRESIDING COMMISSIONER HARRIS-RITTER:**  So a

13

1    letter each year?

2        INMATE SIERRA THROUGH INTERPRETER:  More or

3    less.

4        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

5    Have they said anything in their letters about helping

6    you with a place to live or a job if you were deported

7    to Cuba?

8        INMATE SIERRA THROUGH INTERPRETER:  Oh, yes.  I

9    have practically all my family there.

10        PRESIDING COMMISSIONER HARRIS-RITTER:  Do you

11    have any letters from your family documenting offers of

12    residence or employment?

13        INMATE SIERRA THROUGH INTERPRETER:  No, but if

14    it's necessary, I can obtain them.

15        PRESIDING COMMISSIONER HARRIS-RITTER:  Well, in

16    looking at parole plans, it is necessary to have

17    documentation -- where you would be living and where you

18    would be working -- for us to consider whether they are

19    appropriate parole plans, so you do need to get that.

20        INMATE SIERRA THROUGH INTERPRETER:  I can do it.

21        PRESIDING COMMISSIONER HARRIS-RITTER:  Okay.

22    And so you have no specific parole plans at this time;

23    is that correct?  You have no documentation today?

24        INMATE SIERRA THROUGH INTERPRETER:  No, I do not

25    for here.

26        PRESIDING COMMISSIONER HARRIS-RITTER:  And you

27    have no documentation of where you would live or work in

14

1    Cuba; is that correct?

2              **INMATE SIERRA THROUGH INTERPRETER:**  I have my

3    house there.

4              **PRESIDING COMMISSIONER HARRIS-RITTER:**  Do you

5    have letters from anyone confirming that?

6              **INMATE SIERRA THROUGH INTERPRETER:**  I do not

7    have any letters.

8              **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

9    You will need to have letters confirming where you --

10   the address and what work you would be doing.  That's

11   imperative.

12             **INMATE SIERRA THROUGH INTERPRETER:**  Yes,

13   correct.

14             **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

15   You do understand that now?

16             **INMATE SIERRA THROUGH INTERPRETER:**  Yes, I

17   understand.

18             **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

19   right. As far as your personal history, when you lived

20   with the mother of your children, did you fight?

21             **INMATE SIERRA THROUGH INTERPRETER:**  No.

22             **PRESIDING COMMISSIONER HARRIS-RITTER:**  No

23   arguments?

24             **INMATE SIERRA THROUGH INTERPRETER:**  No.  Like

25   any married person, we had some arguments.

26             **PRESIDING COMMISSIONER HARRIS-RITTER:**  Did you

27   tell her you were leaving her and going to the United

15

1    States?

2            **INMATE SIERRA THROUGH INTERPRETER:**  We were

3    separated.

4            **PRESIDING COMMISSIONER HARRIS-RITTER:**  And

5    before you left, did you tell her you were going?

6            **INMATE SIERRA THROUGH INTERPRETER:**  Yes, of

7    course.

8            **PRESIDING COMMISSIONER HARRIS-RITTER:**  At this

9    time, Mr. Sierra, I'm going to turn the hearing over to

10   the Deputy Commissioner, Mr. Estrada, to talk to you

11   about your post-conviction factors.

12           **DEPUTY COMMISSIONER ESTRADA:**  Thank you.  Good

13   morning, Mr. Sierra.

14           **INMATE SIERRA:**  Good morning.

15           **DEPUTY COMMISSIONER ESTRADA:**  Documents reviewed

16   for post-conviction information includes your Central

17   File, the Life Prisoner's Evaluation Report prepared for

18   the December 2005 calendar by Correctional Counselor I

19   Brown; post-conviction progress report covering the

20   period of August 1st, 2001; and report prepared by

21   Correctional Counselor I Brown and T. Berdesto,

22   B-e-r-d-e-s-t-o; and the psychological evaluation

23   prepared for the December 2000 calendar by Dr. Bakeman,

24   spelled B-a-k-e-m-a-n.  At the time of Mr. Sierra's last

25   parole consideration hearing on December 4th, 2001, he

26   was housed at CTF Soledad.  The Board took action to

27   deny parole for four years and recommended that the

16

1    inmate become and remain disciplinary free, upgrade

2    vocationally and educationally. Your Classification

3    Score at your last hearing was zero, and your current

4    Classification Score is 19, and that's because of the

5    revision of the Classification Score; is that correct?

6            INMATE SIERRA THROUGH INTERPRETER:  Yes.

7            DEPUTY COMMISSIONER ESTRADA:  And your prior

8    custody level at your last hearing was Medium A, and it

9    continues to be Medium A, correct?

10           INMATE SIERRA THROUGH INTERPRETER:  Yes.

11           DEPUTY COMMISSIONER ESTRADA:  You do have a

12   USINS hold under Number A, as in alpha, 23223608,

13   correct?

14           INMATE SIERRA THROUGH INTERPRETER:  Yes.

15           DEPUTY COMMISSIONER ESTRADA:  Okay.  Now at the

16   last hearing it was recommended that you upgrade

17   vocationally, and I don't see anything in the Central

18   File indicating that you've participated in any

19   vocational program; is that correct?

20           INMATE SIERRA THROUGH INTERPRETER:  Yes.

21           DEPUTY COMMISSIONER ESTRADA:  Why not?

22           INMATE SIERRA THROUGH INTERPRETER:  Because of

23   my age, my eyesight -- basically my eyesight.  And also

24   you must be aware that I am practically alone here in

25   the United States, and all -- I've worked all my life.

26           DEPUTY COMMISSIONER ESTRADA:  Yes, but it was

27   recommended that you upgrade vocationally to get another

17

1    trade.

2           INMATE SIERRA THROUGH INTERPRETER:  I tried for

3    many years to learn English.  It's not that I do not

4    want to, it's that I cannot.  I'm speaking to you

5    sincerely.

6           DEPUTY COMMISSIONER ESTRADA:  Okay.  Okay, well,

7    also -- let's see.  You do have a TABE Score which

8    indicates a grade point level of 2.2.  You were tested

9    on April 24th, 2002.  And I see that you've been

10   participating in the Culinary Literacy Program since

11   March 2nd, 2001; is that correct?

12          INMATE SIERRA THROUGH INTERPRETER:  Yes.

13          DEPUTY COMMISSIONER ESTRADA:  Okay, what do you

14   do there?

15          INMATE SIERRA THROUGH INTERPRETER:  I've been

16   studying at school.

17          ATTORNEY TARDIFF:  Are you still in that?

18          INMATE SIERRA THROUGH INTERPRETER:  No --

19          ATTORNEY TARDIFF:  No --

20          INMATE SIERRA THROUGH INTERPRETER:  -- they

21   eliminated that program.

22          DEPUTY COMMISSIONER ESTRADA:  When?

23          INMATE SIERRA THROUGH INTERPRETER:  I believe it

24   was in 2004.  I'm not sure.

25          DEPUTY COMMISSIONER ESTRADA:  Okay.  And there

26   is --

27          INMATE SIERRA THROUGH INTERPRETER:  I work and

18

1    study.

2              **DEPUTY COMMISSIONER ESTRADA:**  Okay, and there

3    were one, two, three, four chronos indicating your

4    participation.  Now are you working right now?

5              **INMATE SIERRA THROUGH INTERPRETER:**  Yes.

6              **DEPUTY COMMISSIONER ESTRADA:**  What are you

7    working in?

8              **INMATE SIERRA THROUGH INTERPRETER:**  I work in

9    the Kitchen.

10              **DEPUTY COMMISSIONER ESTRADA:**  Okay.  According

11    to your Central File, it looks like you're working in

12    the Lunchbox Crew --

13              **INMATE SIERRA THROUGH INTERPRETER:**  Yeah, I work

14    in the Kitchen, yes.

15              **DEPUTY COMMISSIONER ESTRADA:**  Okay.  And the

16    last chrono -- or Work Supervisor's Report -- dated June

17    30th, 2005, indicate that you have above-average Work

18    Supervisor's Reports.  And you're still there, correct?

19              **INMATE SIERRA THROUGH INTERPRETER:**  Yes.

20              **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Now during

21    this reporting period, you have not had any psychiatric

22    treatment; is that correct?

23              **INMATE SIERRA THROUGH INTERPRETER:**  No.

24              **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Now you've

25    been going to AA and NA; is that correct?

26              **INMATE SIERRA THROUGH INTERPRETER:**  I go -- I go

27    to two, Spanish and English.

19

1        **DEPUTY COMMISSIONER ESTRADA:**  Okay.  How often

2   do you go?

3        **INMATE SIERRA THROUGH INTERPRETER:**  Once a

4   month.

5        **DEPUTY COMMISSIONER ESTRADA:**  Okay.  And when

6   did you begin?

7        **INMATE SIERRA THROUGH INTERPRETER:**  Many years.

8   I do not recall it.

9        **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Many years.

10  Okay.  And there are, I count, 18 chronos indicating

11  your participation in both AA -- mostly AA; is that

12  correct?

13       **INMATE SIERRA THROUGH INTERPRETER:**  Yes.

14       **DEPUTY COMMISSIONER ESTRADA:**  Okay.  Very good.

15  Do you know your steps, Mr. Sierra?

16       **INMATE SIERRA THROUGH INTERPRETER:**  I do not

17  know them.  My memory -- I know the meeting.  I know

18  what it is.  I do not know them by memory, but I know

19  what they consist of.

20       **DEPUTY COMMISSIONER ESTRADA:**  Now there are some

21  laudatory chronos -- well, one -- dated December 23rd,

22  2001, indicating your unselfish contribution to the

23  Culinary Inmate Meal for Christmas night, 2001.  Okay.

24  Now since you arrived in prison, you have had a total of

25  two 115s:  October 13th, 1998, attempting to steal food

26  from the Culinary; then on 3/13/1999, stealing food, 30

27  days' loss of credit.  I see that you've also had ten

20

1    counseling chronos; and I see one, two, three, four,

2    five are related to stealing State food.  What's the

3    problem?

4              **INMATE SIERRA THROUGH INTERPRETER:**  I'm going to

5    explain.  I work in the Kitchen.  I want to eat well.

6    Not that I want to take it to -- I want to survive and

7    eat the best I can.

8              **DEPUTY COMMISSIONER ESTRADA:**  Okay.  So -- but

9    it's a violation of the prison rules.

10             **INMATE SIERRA THROUGH INTERPRETER:**   I

11   understand.

12             **DEPUTY COMMISSIONER ESTRADA:**  Now -- so your

13   last 115, technically speaking, was on March 13th, 1999,

14   for stealing State food; so you haven't had a 115 for

15   seven years, six months -- seven and a half years.  But

16   during that time, since 1999, you have picked up one,

17   two, three, four, five, six, seven counseling chronos;

18   and three of them are related to stealing food.  The

19   last two counseling chronos, on 10/8/04 and 11/22/04,

20   were for stealing food, so there's a pattern here.  Your

21   last counseling chrono was on 11/22/04, so that would be

22   about one year, ten months -- approximately ten

23   months -- that you haven't had any counseling chronos.

24   Now your Correctional Counselor I report by Brown

25   indicates that prior to release the prisoner could

26   benefit from becoming disciplinary free by participating

27   in self-help and therapy programs and upgrading

c/o P. Lyons  7·16·08

CONFIDENTIAL  LEGAL MAIL!

ALIPIO SIERRA
H-32811, C-230L
P.O. BOX 689, CTFII (C)
SOLEDAD, CA 93960-0689

RECEIVED
JUL 1 8 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

U.S. MARSHALS SERVICE
JUL 18 2008
INSPECTED BY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
ATTN: CLERK OF THE COURT
UNITED STATES COURTHOUSE
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102-3483

CONFIDENTIAL LEGAL MAIL!